UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

FILED
JAN 2 0 2023
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY
UNITED STATES DISTRICT COURT

---

THE RED RIGHT HAND RIFLE SYNDICATE LLC;
& MEMBERS THE WORKERS ASSEMBLY of above:
KEENAN FISHER, THERESA KRENZER
Plaintiffs.

Civil Action No. 22 CV 6440
AMENDED COMPLAINT

-against-

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; ATF §
KYLE WILKINS (IOI) in their individual capacity, §
SEAN P. BURKE (IOI) in their individual capacity, §
JOHN CURTIS (DOI) in their individual capacity, §
SPECIAL AGENT JOHN DEVITO in their individual capacity,
SPECIAL AGENT ANDREW O'CONNELL in their individual capacity, §
ATF AGENT JOHN DOE #1, #2, #3, #4 in their individual capacities, §
DIRECTOR STEVEN DETTELBACH, in their official capacity; §
ATTORNEY GENERAL MERRICK GARLAND, in their official capacity; §
NEW YORK GOVERNOR KATHLEEN HOCHUL, in their official capacity; §
NEW YORK STATE JOINT TERRORISM TASK FORCE; JTTF §
NEW YORK STATE POLICE § NYSP SPECIAL INVESTIGATIONS UNIT; SIU §
ACTING SUPERINTENDENT STEVEN A NIGRELLI in their official capacity §
COL. RICHARD S ALLEN, NYSP FIELD COMMANDER in their official capacity§
DEP. SUPERINTENDENT DOMINICK CHIUMENTO, in their official capacity§
DEP. SUPERINTENDENT COL. GEORGE NOHAI (JTTF), in their official capacity §
DIVISION COUNCIL MICHAEL DEYO, in their individual capacity §
INVESTIGATOR CHRISTOPHER D BONHAM in their individual capacity §
RYAN BENTLY in their individual capacity §
BRUCE DRAKE in their individual capacity §
SA LANDER in their individual capacity §
M PIETRZYKOWSKI in their individual capacity §
STEVEN MOWERS in their individual capacity §
JUSTIN PRUSAK in their individual capacity §
RICHARD CANINO in their individual capacity §
BRYAN BLUM in their individual capacity §
DAVID CERRETTO in their individual capacity §
JORDAN BONAFEDE in their individual capacity  §
MICHAEL MANLEY in their individual capacity §
JESSICA A KUZUDAL in their individual capacity §
MICHAEL S TURTON in their individual capacity §
COLEY S ELLISON in their individual capacity §
JASON D FIFIELD in their individual capacity §
BRIAN J RATAJCZAK in their individual capacity §

WILLIAM PEARSALL in their individual capacity §
8/18/22 NYSP JOHN DOE #1-8
COUNTY OF ONTARIO in *respondeat superior*
to ONTARIO COUNTY SHERIFF'S OFFICE §
Frmr SHERIFF KEVIN HENDERSON in their individual capacity §
SHERIFF DAVID CIRENCIONE in their individual capacity §
C.O. BRYAN HOUSEL in their individual capacity §
ONTARIO COUNTY DISTRICT ATTORNEY'S OFFICE §
DISTRICT ATTORNEY JAMES RITTS, in their official capacity  §
ASST. DISTRICT ATTORNEY JEFFERY FRIESEN, in their individual capacity  §
ASST. DISTRICT ATTORNEY PETER VAN DELLON, in their individual capacity  §
MONROE CRIME ANALYSIS CENTER INVESTIGATOR KUPKA in their
individual capacity §
THE FINGER LAKES RAILWAY CORP §
UNITED STATES DEPARTMENT OF JUSTICE §
UNITED STATES OF AMERICA §
 Defendants.

---

## COMPLAINT

Plaintiffs, Red Right Hand Rifle Syndicate LLC and members of its Workers Assembly,

Keenan Fisher and Theresa Krenzer, seek relief from this Court against Defendants the

Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF"), ATF Industry

Operations Investigator Kyle Wilkins in his individual capacity, Industry Operations

Investigator Sean P. Burke in his individual capacity, ATF Director of Industry

Operations John Curtis in his individual capacity, ATF Special Agent John Devito in his

individual capacity, ATF Special Agent Andrew O'Connell in his individual capacity,

ATF Director Steven Dettelbach in his official capacity; Attorney General Merrick

Garland in his official capacity, NY Governor Kathy Hochul in their official capacity;

the New York State Police, acting NYSP Superintendent Nigrelli in his official capacity,

Field Commander Richard Allen in his official capacity, Deputy Superintendent Col.

Dominick Chiumento in his official capacity, Deputy Superintendent Col. George Nohai

(JTTF) in his official capacity, NY Joint Terrorism Task Force (the "JTTF") and NYSP

Special Investigations Unit (the "SIU"), Investigator Christopher D Bonham in his individual capacity, Jordan Bonafede in their individual capacity, Bryan Blum in his individual capacity, Investigator David Cerretto in his individual capacity, Bruce Drake in his official capacity, Ryan Bentley in his individual capacity, SA Lander in his individual capacity, M Pietrzykowski in their individual capacity, Justin Prusak in their individual capacity, TFO William Pearsall in his individual capacity, Trooper Jessica A Kuzudal (shield 1898) their individual capacity, Steven Mowers in their individual capacity, Investigator Michael S Turton in their individual capacity, Investigator Richard Canino in his individual capacity, Investigator Coley S Ellison (shield 2428) in their individual capacity, Senior Investigator Jason D Fifield (shield 1829) in their individual capacity, Troop Commander Brian J. Ratajczak in their individual capacity, Michael Manley (shield 2375) in their  individual capacity; the Ontario County District Attorney's Office, Assistant District Attorney Friesen in his individual capacity, Assistant District Attorney Peter Van Dellon in his individual capacity, District Attorney James Ritts in his official capacity; the Ontario County Sheriff's Office[1], former Sheriff Kevin Henderson in his individual capacity, Sheriff David Cirencione in his individual capacity, Communications Officer Bryan Housel in his individual capacity; Monroe Crime Analysis Center Investigator Kupka in their individual capacity; the Finger Lakes Railway Corporation in its individual capacity, Finger Lakes Railway Corp President Mike Smith in his official capacity; the United States Department of Justice; and the United States of America, a federal corporation. The Plaintiff files this action seeking relief under 18 U.S. Code § 1962 (d) alleging that a criminal enterprise of federal and

---

[1] As a threshold matter, as the Ontario Sheriff's Office is an "administrative arm" of the municipal entity, the County of Ontario, and thus lacks the capacity to be sued as a separate entity, this complaint is lodged against the County of Ontario in *respondeat superior*

state agents, acting outside the bounds of their duty under color of law, conspired to violate the Plaintiffs' federal constitutional rights under the First, Second, Fourth, Fifth, Sixth, Thirteenth and Fourteenth Amendments to the Constitution and commit substantial damages against the Plaintiff's interstate and international commerce, in collusion with the Finger Lakes Railway Corp, violating a number of federal statutes, namely 1951, 1959, 1201, 241, 242, 1623, 1512, 1590, 1592, 1001, plus 27 CFR § 478.33a, as well as NY PEN § 160.15, 155.40, 353, 155.30(8) and 155.30(7).

In *Sedima*, the Court found *any person* to be an unambiguous reference (*473 U.S. at 495*). As such, no one is *per se* excluded from RICO's coverage. There is no justification for excluding police officers or other officials, and in fact, liability for the types of violent crime (for example, armed kidnapping, armed robbery, armed witness intimidation, theft of firearms) engaged in by the defendants in this case under color of law are more consistent with RICO's original design than many of its established applications[2]. While police departments are legitimate incorporated enterprises, the form of racketeering that took place through the Defendant entities appears to much more closely resemble the conduct of the archetypal mobster. From in or about August 2021, the Defendants, together with others known and unknown, being persons employed by and associated with the ATF, NYS Police, SIU, FGLK, NY JTTF *et all*, enterprises engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and unlawfully conspired, conducted and participated, directly and indirectly, in the conduct of the criminal enterprises' affairs through a pattern of racketeering activity under color of law. The defendant's enterprise displayed a conspiracy and pattern of racketeering activity consisted of the following acts:

---

[2] See Organized Crime Control Act of 1970, Pub. L. No. 91-452, §1, 84 Stat. 922.

**interference with interstate commerce** through **armed robbery, kidnapping, extortion, witness intimidation,** and **theft of firearms.**

*Salinas v. United States*, 522 U.S. 52, 63-64 (1997) provides "If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators." A conspirator must simply intend to further an endeavor which, if completed, would satisfy all elements of a civil RICO claim. Id. at 65; see also *CGC Holding Co., LLC v. Broad and Cassel*, 773 F.3d 1076, 1088 (10th Cir. 2014) (one conspires to violate RICO by adopting the goal of furthering the enterprise, "even if the conspirator does not commit a predicate act")[3]. Furthermore, just as an attorney may operate and manage an enterprise in violation of section 1962(c), attorneys may be held liable as conspirators where they "cross the line" and become part of the criminal organization itself, as "its consigliere and fixer."[4]

In *Bolye*, the Supreme Court clarified the characteristics of an actionable association-in-fact enterprise. The Supreme Court stated that an association-in-fact enterprise possesses three characteristics: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. The Supreme Court further explained:

> Such a group need not have a hierarchical structure or a chain of command; decisions may be made on an ad hoc basis and by any number of methods-by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing

---

[3] *United States v. Godwin*, 765 F.3d 1306, 1324 (11th Cir. 2014)

[4] *United States v. Farrell*, 921 F.3d 116, 139 (4th Cir.), cert. denied , 140 S. Ct. 269 (2019).

but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach.

*United States v. Kamahele*, 748 F.3d 984, 1003-1005 (10th Cir. 2014) provided that a gang was an association-in-fact enterprise where the members' common purpose was to enhance the gang's reputation by instilling fear through criminal activity and profiting from that activity, the members were related because, among other things, "shared hostility toward anyone wearing red in the neighborhood." The pattern of behaviors of the Enterprise detailed below follow a similar modus operandi.

"Pattern of racketeering activity" requires at least two acts of racketeering activity committed within ten years of each other. 18 U.S.C.A. § 1961(5) (West 1984). Congress intended a fairly flexible concept of a pattern in mind[5]. It must be shown that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity. Id. Racketeering predicates are related if they have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events. Id. at 240, 109 S. Ct. at 2901; *Ticor Title Ins. Co. v. Florida*, 937 F. 2d 447, 450 (9th Cir. 1991). Furthermore, the degree in which these factors establish a pattern may depend on the degree of proximity, or any similarities in goals or methodology, or the number of repetitions.[6] A RICO action is easily constructed is when a single criminal episode constitutes a pattern of racketeering activity.[7] For instance, in United States v. Moeller,[8] the defendant was criminally charged with burning a factory and kidnapping three employees. These acts were all committed within the course of one afternoon. The

---

[5] *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 2900, 106 L. Ed. 2d 195 (1989)

[6] *United States v. Indelicato*, 865 F. 2d 1370, 1382 (2d Cir.), cert. denied, 493 U.S. 811, 110 S. Ct. 56, 107 L. Ed. 2d 24 (1989).

[7] *See 18 U.S.C. § 1961(5)*.

[8] 402 F. Supp. 49 (D. Conn. 1975) (relying on *United States v. Parness*, 503 F.2d 430, 441-42 (2d Cir. 1974)).

question arose whether these acts strung together in a short time frame could be interpreted as a pattern of racketeering activity. The court held that they could, and did not dismiss the RICO indictment.[9] The pattern of activity established by the conspiratorial enterprise in this case will be shown to extend over a year in time (so far).

To satisfy the Conspiracy element of RICO charges, the court need not prove that a defendant agreed with every other conspirator, knew all of the other conspirators, or had full knowledge of all the details of the conspiracy. *Delano, 825 F. Supp. at 542*. All that must be shown is: (1) that the defendant agreed to commit the substantive racketeering offense through agreeing to participate in two racketeering acts; (2) that he knew the general status of the conspiracy; and (3) that he knew the conspiracy extended beyond his individual role.[10] The Supreme Court reasoned that when the "enterprise" in § 1962 is the vehicle for the commission of the racketeering activity, "it need not have a property interest that can be acquired nor an economic motive for engaging in illegal activity; it need only be an association in fact that engages in a pattern of racketeering activity."[11]

In *Sedima, S.P.R.L. v. Imrex Co.*, the Supreme Court suggested, in dictum, that the criminal standard of proof does not apply to RICO's civil provisions. Although the Court noted that "in a number of settings, conduct that can be punished as criminal only upon proof beyond a reasonable doubt will support civil sanctions under a preponderance standard," the Court expressly declined to decide the applicable standard

---

[9] *Moeller*, 402 F. Supp. at 57-58; see *United States v. Licavoli*, 725 F.2d 1040 (6th Cir. 1984) (conspiracy to commit murder and conspiracy to murder may constitute separate predicate acts for a RICO conviction); see also *Beth Israel Medical Center v. Smith*, 576 F. Supp. 1061, 1066 (S.D.N.Y. 1983) (mail and wire fraud where confidential information was sold to attorney for use in soliciting client); *United States v. Chovanec*, 467 F. Supp. 41 (S.D.N.Y. 1979) (six incidents of wire fraud in defrauding the victim over a few weeks period); *United States v. Salvitti*, 451 F. Supp. 195, 200 (E.D. Pa. 1978) (each mailing, although it may be related to a single scheme, is a separate act for purposes of meeting the "pattern" requirement), affd, 588 F.2d 822 (3d Cir. 1977).

[10] *United States v. Rastelli*, 870 F. 2d 822, 828 (2d Cir.), cert. denied, 493 U.S. 982, 110 S. Ct. 515, 107 L. Ed. 2d 516 (1989).

[11] *Nat'l Org. for Women, Inc. v. Scheidler*, at 258-59.

of proof. Since *Sedima*, every court of appeals that has addressed the issue has held that the preponderance standard applies in civil RICO actions.[12] Despite the need for only a preponderance standard, the following complaint will set forth, with substantial evidence, the clear and distinct unlawful 1962(c) and 1962(d) conspiracy against the plaintiff to affect a series of rights violations, kidnapping, robbery, witness intimidation and interference in interstate commerce by a criminal Enterprise of collective Defendants.

### Qualified Immunity

"New York courts recognize the defense of qualified immunity to shield the government official from liability unless that action is taken in bad faith or without a reasonable basis." *Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 364 (2d Cir. 2004). The Plaintiff will raise factual issues regarding the retaliatory and conspiratorial intent of law enforcement defendants, rendering qualified immunity under New York law not appropriate at this time. *Cf. Russell v. Westchester Cmty. Coll.*, No. 16-cv-1712, 2017 WL 4326545, at *14, 2017 *U.S. Dist. LEXIS* 159540, at *35 (*S.D.N.Y.* Sept. 27, 2017) ("Plaintiff [will] sufficiently allege[] that this decision was taken with discriminatory intent and in bad faith."); see also *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 587-88 (S.D.N.Y. 2011). The actions of defendants named in their individual capacities in this case, without reserve, were made in bad faith and without reasonable basis, considering that the plaintiff was by law afforded the same exemption from NY penal prosecution for possession of assault weapons afforded to law enforcement themselves. Qualified Immunity in this case is a get out of jail free card for vicious criminal thugs.

---

[12] *Chappaqua v. Marine Midland Bank, N.A.*, 30 F.3d 339, 347 (2d Cir. 1994), *United States v. Local 560, Int'l Bhd. of Teamsters, Armco Indus. Credit Corp. v. SLT Warehouse Co, Am. Auto. Accessories, Inc. v. Fishman*, 175 F.3d 534, 542 (7th Cir. 1999)

## I.    INTRODUCTION

This lawsuit expressly challenges a federal agency's unlawful enforcement of the Gun Control Act of 1968 (the "Act"), codified in 18 U.S.C. § 921 *et seq*, and challenges unconstitutional NY enforcement policy under Secure Ammunition and Firearms Enforcement Act ("SAFE Act") and Red Flag Policy, and exposes and challenges civil rights and RICO violations against the Plaintiff by a conspiratorial Enterprise of the federal, state and corporate Defendants, as codified in 18 U.S.C. § 1962(c) and § 1962(d) *et seq*. As will be provided, the presented challenges are inexorably linked within this case, and display a broad pattern of rights abuses against American citizens and law abiding businesses under color of law.

The ATF administers and regulates federal firearms licenses ("FFLs"), which grant the holder the right to sell firearms. For decades, the relationship between the ATF and licensees was generally collaborative. The ATF would inspect licensees for compliance with the Act and educate licensees who made inadvertent mistakes with the goal of improving compliance. This helped licensees assist law enforcement efforts, prevent the diversion of firearms from lawful commerce, ensure successful tracing of firearms, and protect the public. Revocation of an FFL was an exceedingly rare action by the ATF and reserved only for the worst actors. For example, in 2013, the ATF only sought revocation of FFLs in 81 out of over 10,500 inspections.[13] This made sense, as the Act allows license revocations for "willful[]" violations. 18 U.S.C. § 923(e). But everything changed in the summer of 2021, when the Biden Administration announced a new

---

[13] Bureau of Alcohol, Tobacco, Firearms and Explosives, Fact Sheet: Federal Firearms License Revocation Process (May 2014), attached as Exhibit A.

policy to enforce the Act against licensees who inadvertently fail to comply.[14] As part of this effort, the Acting Assistant Director of the ATF George Lauder issued a memorandum instructing ATF Special Agents in Charge and Directors of Industry Operations to revoke FFLs for a single violation in many circumstances.[15] Since then, revocations have increased over 500%, as the ATF has effectively written the word "willful" out of the statute by instituting a policy of revoking FFLs for inadvertent paperwork errors. This new definition of "willful" violates the plain language of the governing statute and puts all law-abiding licensees at risk of revocation for minor and inconsequential paperwork errors that do not pose a threat to public safety, nor result in prohibited possessors obtaining firearms. The Plaintiff, operating as a gun store in New York that services clients across the United States and Canada, seeks a de novo judicial review overturning the ATF's unconstitutional revocation of its FFL08; a return of all stolen inventory and effect held by the Defendants; compensation for economic damages caused for the Defendants' role in damages against the plaintiff (including kidnapping its workforce and robbing its inventory); a declaration that the ATF's new enforcement policy violates the Gun Control Act; a permanent injunction preventing Defendants from ignoring the Gun Control Act's requirement that violations be willful; a declaration that SAFE violates the 2nd, 4th and 14th Amendments to the Constitution; a permanent injunction preventing Defendants from enforcing unconstitutional SAFE policy; a permanent injunction preventing Defendants from discrimination, profiling and malicious prosecution of both FFLs and citizen firearms owners on the grounds of

---

[14] The White House, Fact Sheet: Biden-Harris Administration Announces Comprehensive Strategy to Prevent Gun Violence and Ensure Public Safety, available at:
https://www.whitehouse.gov/briefing-room/statements-releases/2021/06/23/fact-sheet-bidenharris-administration-announces-comprehensive-strategy-to-prevent-and-respond-to-gun-crimeand-ensure-public-safety/ (June 23, 2021).
[15] See George Lauder, Implementation of the Administration's Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety (July 14, 2021), attached as Exhibit B.

race, sexuality, religion, perceived politics or the use of their first amendment right to free expression, nor deny to any person within a state's jurisdiction the equal protection of the laws; and a permanent injunction preventing Defendants from retaliation for an FFL's refusal of service to police, who are not a protected class, in violation of that FFL's 1st, 2nd, 4th and 14th amendments, to not be deprived of life, liberty, or property, nor be stripped of their right to bear arms, without due process of law.

## II.   JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964 (though jurisdiction may also be conferred based on diversity or supplemental jurisdiction).

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because this action arises under the United States Constitution; 28 U.S.C. § 1346(a)(2), because this suit constitutes a civil action against an executive department of the United States; and 5 U.S.C. § 702 and 706 (providing for judicial review of agency action).

3. This Court has the authority to grant declaratory relief under 28 U.S.C § 2201 and preliminary and permanent injunctive relief under 28 U.S.C. § 2202.

4. Venue is proper within this judicial district pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions asserted by Plaintiffs arose within this judicial district. Venue is proper within the Western NY Division pursuant to 28 U.S.C. § 124(d).  § 1965(b) of RICO provides that process may be served in "any judicial district of the United States" when required by the "ends of justice." Courts have held that such "nationwide service of process" provisions also

confer personal jurisdiction over a defendant in any judicial district as long as the defendant has minimum contacts with the United States.

5. The Plaintiff was directed to request a De Novo judicial review from this court specifically by the ATF[16].

### III.   PARTIES

6. Plaintiffs Keenan Fisher[17] and Theresa Krenzer are members of the Workers Assembly, and own and operate Stea Rosie Rifle Syndicate[18], dba The Red Right Hand Rifle Syndicate, originally opened in Victor, New York. Each owns ⅓ of the business and is a law abiding citizen. All worker-owners of the LLC have struggled with homelessness in the past 3 years, and depend on the LLC for secure futures.

7. Plaintiff Red Right Hand Rifle Syndicate LLC is a New York limited liability company owned by the members of the Workers Assembly and acquired a Federal Firearms License and Arms Export Controls Act registration. Plaintiffs assert the claims herein on behalf of both themselves and their customers as explained below.

8. Defendant United States of America is a federal corporation as codified by 28 USC § 3002(15)(a).

9. Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives is an agency of the United States corporation as codified in 28 USC § 3002(15)(b) and responsible for administrating and enforcing the Gun Control Act.

10. Defendant Steven Dettelbach is the Director of the ATF and is sued in his official capacity.

---

[16] Attached as **Exhibit C**
[17] See Character Reference of Pastor Corey Keyes, West Bloomfield Congregational Church, attached as **Exhibit D**
[18] See Federal Firearms License and AECA registration, attached as **Exhibits E and F**

11. Defendant Kyle Wilkins is an Industry Operations Investigator assigned to the
Plaintiff, whom in a campaign to interfere with legal interstate commerce, made a litany
of false accusations against the Plaintiff to both the ATF and NYS Police[19] that
constitute actual malice and malicious prosecution, whom conspired with the DA and
NYSP to lie to a Grand Jury to secure an indictment[20], attempted to intimidate the
plaintiffs on 8/18/22[21] and subsequently attempted to use false statements to secure an
Order of Protection[22], and is sued in his individual capacity. Wilkins has directly
participated in the Enterprise's conspiracy under 18 U.S. Code § 1962(d) through
violations of 18 U.S. Code § 241 (Conspiracy against rights), 18 U.S. Code § 242
(Deprivation of rights under color of law), NY Penal § 135.25 Kidnapping in the first
degree/18 U.S. Code § 1201 (Kidnapping), 18 U.S. Code § 1951 (Interference with
commerce by threats or violence), §1959, § 1623 (False declarations before grand jury
or court), 18 U.S. Code § 1512 (Tampering with a witness or victim) and § 1001 (False
statements).

12. Defendant Sean Burke, IOI, directly participated in the Enterprise's  § 1962(d)
conspiracy against the plaintiff via violations of 18 U.S.C. § 1951 and § 242.

13. Defendant John Curtis, Industry Operations Director, revoked the Plaintiff's FFL
after just six months of operation citing Wilkin's maliciously untrue statements[23] and
following the unconstitutional guidance of the ATF "Zero Tolerance" policy, then
denied the LLC a stay of revocation to even sell its inventory to another FFL in a
further attempt to interfere with interstate commerce, and is sued in his individual

---

[19] See Wilkin's blatantly false statements in his ATF Referral to NYS Police (Jan 25, 2022), attached as **Exhibit G**
[20] See Wilkin's blatantly false statements in Grand Jury testimony, attached as **Exhibit H**
[21] See 8/18 "Warning Against Unlawful Activity" from the desk of John Devito, attached as **Exhibit I**
[22] See Wilkin's denied request for an Order of Protection in State of NY vs Keenan Fisher, claiming the Plaintiffs are dangerous and
citing untrue statements about our political views (we are not aligned with the Sovereign Citizens ideology) as reasoning
[23] See revocation letter signed by John Curtis, attached as **Exhibit J**

capacity,[24] having directly participated in the Enterprise's conspiracy under 18 U.S. Code § 1962 through violations of 18 U.S. Code § 241, 18 U.S. Code § 242, and 18 U.S. Code § 1951.

14. Defendant John Devito, ATF Special Agent, was the lead agent in command of the unlawful witness intimidation attempt on 8/18/22 in which 2 ATF agents and a squad of NY State Troopers, as evidenced by his name on the intimidating document[25] given to the Plaintiffs and identified vocally by agents in bodycam footage from the incident[26], and is sued in his individual capacity, having directly participated in the Enterprise's conspiracy under 18 U.S. Code § 1962 through violations of 18 U.S. Code § 1951, §1959, § 241, § 242, and 18 U.S. Code § 1512 (Tampering with a witness or victim). Each of the John Doe ATF agents and John Doe state troopers involved on 8/18 share his guilt.

15. Defendants Andrew O'Connell (ATF Special Agent) and William Pearsall (NYSP TFO) intimidated a client of the plaintiff and her immigrant husband, stole a legally purchased firearm from her home, and are sued in their individual capacities, having directly participated in the Enterprise's conspiracy under 18 U.S. Code § 1962 through violating 18 U.S. Code § 1951 and New York Penal Law Section 155.30(7) Grand Larceny in the fourth degree by stealing property that consists of one pump shotgun and magazines from the home of plaintiff's clients in violation of their 2nd, 4th and 14th Amendment rights in violation of 18 USC § 242.

---

[24] See email from John Curtis denying the Plaintiff's timely and valid request for a stay of revocation to sell its inventory, which will benefit the police as civil asset forfeiture, attached as **Exhibit K**

[25] See "Letter of Warning Against Unlawful Activity" from the desk of Special Agent John Devito, "served" to the plaintiffs and signed under duress during an witness intimidation attempt at their home (August 18th, 2022), attached as **exhibit L**

[26] Plaintiff has requested this damning bodycam footage via FOIL, but agencies have failed to comply with requests and DA is actively suppressing release of the video as "irrelevant" to the plaintiffs' criminal defense, despite it being a clear display of interagency RICO conspiracy and malice.

16. ATF Agent John Doe #1 and #2 are sued in their individual capacities, having directly participated in the Enterprise's conspiracy under 18 U.S. Code § 1962 through violating 18 U.S. Code § 1951 and 27 CFR § 478.33a.

16. Defendant Special Investigations Unit (SIU) is a municipal incorporation and police division of the State of New York;

17. Defendant Christopher D Bonham (SIU), an officer of the New York State Police, and the main directing partner engaged in conspiracy with Agent Wilkins to forge a search warrant and affect the kidnapping and robbery of the plaintiffs on and around 1/27/22, is sued in his individual capacity, having directly participated in the Enterprise's conspiracy under 18 U.S. Code § 1962 through violations of 18 U.S. Code § 241, § 242, § 1201 (Kidnapping), § 1951 (Interference with commerce), §1959, § 1623 and § 1001; and NY PENAL § 155.40, 353, 155.30(8) and 155.30(9) and NY Penal § 135.25 Kidnapping in the first degree.

18. Defendants the New York State Police, including Acting Superintendent Steven A Nigrelli, in his official capacity, Col. Richard S Allen in his official capacity, Deputy Superintendent Col Dominick Chiumento in his official capacity, Deputy Superintendent Col. George Nohai (JTTF) in his official capacity.

19. Division Council Michael Deyo in his individual capacity for having directly participated in the Enterprise's conspiracy under 18 U.S. Code § 1962 through violations of 18 U.S. Code § 241, 18 U.S. Code § 1201, 18 U.S. Code § 1951.

20. Defendants within New York State Police Troop E, SIU and associates including Troopers Jordan Bonafede, Steven Mowers, Richard Canino, Bryan Blum, Investigator David Cerretto, Trooper Jessica A Kuzudal, Investigator Michael S Turton, Investigator

Coley S Ellison, Senior Investigator Jason D Fifield, Troop Commander Brian J.
Ratajczak, Justin Prusak, Trooper Michael Manley, Ryan Bently, Bruce Drake, SA
Lander and M Pietrzykowski, Division Council Deyo, all who acted under color of law
in the kidnapping and armed robbery of the plaintiffs, each in their individual
capacities, each having directly participated in the Enterprise's conspiracy under 18
U.S. Code § 1962 through violations of 18 U.S. Code § 241, 18 U.S. Code § 242, 18
U.S. Code § 1201 (Kidnapping)/NY Penal § 135.25 Kidnapping in the first degree, 18
U.S. Code § 1951 (Interference with commerce by threats or violence), §1959, and §
924(c)(a;ii) (using or possessing a firearm in the course of a violent crime), 27 CFR §
478.33a - Theft of firearms, and violation of NY PEN § 160.15 and 155.40, specifically
"property obtained by extortion committed by instilling in the victim a fear that the
actor or another person will (a) cause physical injury to some person in the future, or
(b) cause damage to property, or (c) use or abuse his position as a public servant by
engaging in conduct within or related to his official duties, or by failing or refusing to
perform an official duty, in such manner as to affect some person adversely", a Class C
Felony.

21. ATF John Doe #3 and #4, as well as 8 John Doe members of the NYSP on the
8/18/2022 bodycam footage, are sued in their individual capacities, having directly
participated in the Enterprise's conspiracy under 18 U.S. Code § 1962 through
violations of §1951, §1512, 241 and 242.

22. The County of Ontario is sued in *respondeat superior* to Defendant Ontario County
Sheriff's Office, a municipal incorporation in the state of New York, with former Sheriff
Kevin Henderson, Sheriff Cirencione, and Communications Officer Bryan Housel each

sued in their individual capacity, with their efforts furthering the Enterprise's conspiracy through violations of 18 U.S. Code § 1951, 241, 242 and NYP § 155.40, specifically "property obtained by extortion committed by (c) use or abuse his position as a public servant by engaging in conduct within or related to their official duties, or by failing or refusing to perform their official duty, in such manner as to affect some person adversely", a Class C Felony;

23. Finger Lakes Railway Corporation is a Class III railroad enterprise (a foreign business corporation of the state of Delaware) that owns and operates 167 miles of track from its Geneva headquarters; Finger Lakes Railway (FGLK) has track in 6 counties in the Finger Lakes region including Ontario, Seneca, Cayuga, Onondaga, Yates, and Schuyler and connects with CSX, Norfolk Southern, Canadian Pacific, and New York Susquehanna & Western Railroads, and is sued in its individual capacity as accomplice, having directly participated in the Enterprise's conspiracy under 18 U.S. Code § 1962, through violations of NY Penal § 135.25 Kidnapping in the first degree/18 U.S. Code § 1201 (Kidnapping), 18 U.S. Code § 1951 (Interference with commerce by threats or violence), § 1959, §924(c)(a;ii) (possessing a firearm in the course of a violent crime), 27 CFR § 478.33a - Theft of firearms, and NY PENAL § 155.40. FGLK President Mike Smith is sued in his official capacity.

24. The County of Ontario is sued in *respondeat superior* to the Ontario County District Attorney's Office, a municipal incorporation of the state of new york; Defendant DA James Ritts is sued in his official capacity.

25. Defendant ADA Jeffery Friesen is sued in his individual capacity, having directly participated in the Enterprise's conspiracy under 18 U.S. Code § 1962 through violations of 18 USC § 241 and 242.

26. Defendant ADA Peter Van Dellon is sued in his individual capacity for having directly participated in the Enterprise's conspiracy under 18 U.S. Code § 1962 through violations of 18 U.S. Code § 1623, § 241, § 242, § 1590, §1592 and 18 U.S.C. § 1001 (Concealment of Bodycam from co-conspirators' 8/18 violation of 18 U.S.C. § 1512.

27. Defendant Investigator Kupka of Monroe Crime Analysis Center is sued in their individual capacity for having directly participated in the Enterprise's conspiracy under 18 U.S. Code § 1962 through violations of 18 U.S. Codes § 1951 and 241.

28. Defendant NY Joint Terrorism Task Force is a multi-agency Enterprise in the state of New York "[pooling] talents, skills, and knowledge from across the law enforcement and intelligence communities into a single team that responds together," and flourished with funding after 9/11. Documents obtained by various American Civil Liberties Union (ACLU) affiliates in 2004, 2005, and 2006 in response to Freedom of Information Act requests showed that JTTF investigations have focused on "peaceful advocacy organizations such as the School of the Americas Watch, Greenpeace, Catholic Workers Group, the Rocky Mountain Peace and Justice Center in Colorado, and the Thomas Merton Center for Peace and Justice in Pennsylvania, among others."[27] The ACLU has criticized these investigations as an inappropriate targeting of "peaceful political activity having nothing to do with terrorism." After joining in 2002, San Francisco, California withdrew its police officers from the JTTF in 2017. It was later

---

[27] "New documents confirm that FBI's Joint Terrorism Task Force wastes resources and threatens First Amendment rights by targeting peaceful protest activity as "domestic terrorism"". American Civil Liberties Union. N.d. More About Joint Terrorism Task Forces | American Civil Liberties Union (aclu.org)

revealed in 2019 from an FBI white paper that San Francisco police officers and the FBI were not truthful about the JTTF's violations of local law and policy, and that the police involved with JTTF thought civil rights and free speech in San Francisco were a problem.[28] The Department of Justice Office of the Inspector General faulted the JTTF for providing the OIG "with speculative, after-the-fact rationalizations for their prior decisions to open investigations that [OIG] did not find persuasive."[29] FBI data showing that more than half of the violent crimes, including over a third of the murders in the U.S. go unsolved each year, calls for a broader analysis of the proper distribution of law enforcement resources.

29. Defendant Governor Kathleen Hochul, an Architect of Disarmament abusing New Yorkers' civil rights for the sole benefit the prison-industrial complex under the guise of promoting public safety, is sued in her official capacity;

30. Defendant Attorney General Merrick Garland is the head of the Department of Justice and is sued in his official capacity.

31. Defendant United States Department of Justice is an agency of the United States as codified in 28 USC § 3002(15)(b) and is also responsible for administrating and enforcing the Gun Control Act.

## IV.   FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

**A. The Gun Control Act's regulatory scheme.**

32. Congress passed the Act in 1968. 18 U.S.C. § 921 et seq.

33. The Act sets up a comprehensive scheme for regulating FFLs.

---

[28] Ryan Devereaux, The Intercept, "FBI and San Francisco Police Have Been Lying about Scope of Counterterrorism Investigations, Document Suggests", 01 November 2019, https://theintercept.com/2019/11/01/fbi-joint-terrorism-san-francisco-civil-rights/
[29]   Marian Wang, Watchdog Faults FBI for 'Factually Weak' Basis for Investigating Activists, ProPublica (September 20, 2010) https://www.propublica.org/article/watchdog-faults-fbi-for-factually-weak-basis-for-investigating-activists

34. The Attorney General has delegated authority to enforce the Act to the ATF. 28 C.F.R. § 0.130.

35. If an applicant fulfills the statutory requirements for a license, it "shall be approved." 18 U.S.C. § 923(d).

36. The Act also gives the Attorney General the statutory authority to revoke licenses. 18 U.S.C. § 923(e).

37. The Act "imposes significant record-keeping obligations upon firearms dealers." *Fairmont Cash Mgmt., LLC v. James*, 858 F.3d 356, 362 (5th Cir. 2017).

38. The Act requires licensees to keep records of their sales through a firearms transaction record, commonly called a Form 4473. 18 U.S.C. § 923(g); 27 C.F.R. § 478.124. The Form 4473 requires almost 100 data inputs.

39. Licensees must also contact the national instant criminal background check system ("NICS") before completing a transfer. 18 U.S.C. § 922(t).

40. The ATF inspects licensees for compliance with the Act.

41. Generally, the ATF conducts these inspections less than once per year. See 18 U.S.C. § 923(g)(1)(B). The Plaintiff received 4 faux-inspections in its first 6 months.

42. The Act only allows revocation when a licensee "willfully" violates a provision of the Act, or a rule prescribed by the Attorney General or fails to have secure gun storage or safety devices. 18 U.S.C. § 923(e). 22. The Act does not define "willfully," but the Fifth Circuit has held it requires that a licensee know of "his legal obligation and purposefully disregarded or was plainly indifferent to the record-keeping requirements." *Fairmont Cash Mgmt., LLC v. James,* 858 F.3d 356, 362 (5th Cir. 2017).

**B. The DOJ and ATF's decades-long revocation policy focused on compliance, not punishment.**

43. Prior to 2021, the ATF had an enforcement policy that generally focused on compliance and education. See, e.g., Exhibit A ("ATF industry operations investigators (IOI) conduct inspections of [licensees] to ensure compliance with the law and regulations and to educate licensees on the specific requirements of those laws and regulations.").

44. Specifically, the ATF would "assist with business practices designed to improve compliance with the [Act]." Exhibit A.

45. It would only revoke on "rare occasions" when it "encounters a licensee who fails to comply with the laws and regulations and demonstrates a lack of commitment to improving his or her business practices." Exhibit A.

46. Further, "revocation actions are seldom initiated until after a licensee has been educated on the requirements" of the Act, and revocations were only for the most serious violations such as failing to account for firearms, failure to verify and document purchaser eligibility, failure to maintain records requisite for successful firearms tracing, and failure to report multiple sales of handguns. Exhibit A.

47. In other words, the ATF did not seek revocation for a handful of accidental paperwork errors that may occur among the thousands of transactions a licensee processes.

48. Such an enforcement policy makes intuitive sense, and, more importantly, is in line with the statutory requirement that violations be "willful[]."

49. The ATF's own prior enforcement orders reflected this willfulness requirement:

"The term willfulness means a purposeful disregard of, a plain indifference to, or

reckless disregard of a known legal obligation." ATF O 5370.1D (10/02/2019).

50. ATF statistics also reflect this collaborative approach. In 2020, for example, ATF

only successfully sought revocation 40 times out of 5,823 inspections. ATF, Firearms

Compliance Inspections, available at:

https://www.atf.gov/firearms/compliance-inspections.

51. This is, despite the fact that, in 2020, only 56% percent of inspections resulted in

"no violation" reports. The rest (2,546) contained some sort of violation. Id. 32. The far

more common response to violations of the Act were a "Report of violations" (1,289

instances), a "Warning letter" (804), or a "Warning conference" (306). Id. 33. In 2021,

licensees did even better, as the ATF sought revocation in only 27 out 6,639

inspections. ATF, Fact Sheet: Facts and Figures for Fiscal Year 2021, available at:

https://www.atf.gov/resource-center/fact-sheet/fact-sheet-facts-andfigures-fiscal-year-2

021.

**C. Defendants change their enforcement policy to a de facto strict liability regime.**

52. After the Biden Administration announced its comprehensive strategy to overhaul

gun laws in June 2021,[30] the ATF issued a memorandum to all Special Agents in Charge

and Directors of Industry Operations that alerted them that single violations should now

result in revocation proceedings. Exhibit B.

53. The Department of Justice was explicit in announcing it would be changing its

enforcement regime: "But for those dealers who willfully break the law and put public

---

[30] The White House, Fact Sheet: Biden-Harris Administration Announces Comprehensive Strategy to Prevent Gun Violence and Ensure Public Safety, available at: https://www.whitehouse.gov/briefing-room/statements-releases/2021/06/23/fact-sheet-biden-har ris-administration-announces-comprehensive-strategy-to-prevent-and-respond-to-gun-crime-andensure-public-safety/ (June 23, 2021).

safety at risk by violating certain ATF requirements, ATF will seek to revoke their licenses pursuant to its zero-tolerance approach, absent exceptional circumstances."[31]

54. Further, the memorandum alerted Special Agents in Charge and Directors of Industry Operations that there will be a new enforcement order—a new ATF O 5370.1D—that will "set forth revised procedures for processing FFL inspections that result in findings of violations listed above[32] or other violations that merit revocations." Exhibit B.

55. If any of the listed violations are found during the inspection, the ATF will seek revocation "absent extraordinary circumstances." Exhibit B.

56. This new Enforcement Policy has resulted in a staggering increase in revocation recommendations.

57. Since announcing this new policy, the ATF has initiated at least 273 revocation proceedings, and likely many more.

58. Upon information and belief, the new Enforcement Policy is to revoke FFLs for inadvertent paperwork errors that do not result in prohibited possessors obtaining firearms.

59. The effect of this new policy is to remove "willfully" from the statute. This results in a strict liability regime, where accidental typos and other minor paperwork errors could cost and are costing business owners their livelihoods.

**D. Long Term Inter-Agency Misconduct Provides Extended Pattern of Racketeering Behavior Under Color of Law Common to Defendants**

---

[31] Department of Justice, Justice Department: Violent Crime Reduction Efforts, available at: https://www.justice.gov/file/1468221/download, attached as Exhibit C.
[32] The five violations listed are: (1) the transfer of a firearm to a prohibited person; (2) failing to conduct a required background check; (3) falsification of records, such as a firearms transaction form; (4) failing to respond to an ATF tracing request; and (5) refusing to permit ATF to conduct an inspection in violation of the law.

60. The Church Committee's exposure of the FBI's COINTELPRO abuses led to a series of reforms, including laws designed to regulate government surveillance and internal guidelines (Attorney General's Guidelines) which limited the FBI's investigative authority and spelled out the rules that govern law enforcement operations. These reasonable limits have been either abandoned or ignored since 9/11, however, through legislation like the USA Patriot Act, through amendments to the AG Guidelines, and through an expansion of powerful Joint Terrorism Task Forces (JTTF) that operate with virtually no public accountability.

61. Plaintiff Fisher was first investigated by the FBI and CIA as a Sophomore while dating the granddaughter of Reagan's Chief of Staff concerning their "dissident politics", beginning at Langley High School.

62. In 2008, Attorney General Michael Mukasey broadened the FBI's power to investigate people absent any evidence that they were involved in a crime, something that would have been illegal prior to 9/11. The new guidelines also specifically allowed the FBI and  JTTF to consider religious affiliation and ethnicity when selecting targets, although those couldn't be the sole criteria to justify threat assessments. Michael German, a former FBI special agent and currently a fellow with the Brennan Center for Justice who worked undercover in the 1990s infiltrating white nationalist organizations and eventually resigned after filing whistleblower complaints, argues the change has been detrimental to the FBI's mission "targeting [] based on what people say and think and who they associate with rather than evidence of criminality… alters the focus of the investigation away from the individuals who are involved in criminal activity."

German says the loosening of its rules and the FBI's embrace of its radicalization theory (seen in cases like the Whitmer Kidnapping Plot where FBI agents led the boogaloo militiamen) moved the bureau away from investigating actual crimes, particularly regarding white nationalists and neo-Nazis.

"We see these types of complex sting operations, and yet the FBI…can't tell you how many people white supremacists killed last year, because they don't even track these crimes," he says. Investigations proceed based on statements and associations, often of a fringe political nature, rather than evidence of crimes.

63. As a senior attending Freedom HS in 2008, the FBI arrived to question the plaintiff's mother about why there was a plane ticket purchased in their name that they never boarded, suspecting them of some vaguely explained terrorist activity.

The answer? She had canceled the flight because she'd decided the whole family was going to take a trip to NY by car. The plaintiff was a 17 year old.

64. In high school, the plaintiff worked at and frequented a paintball field, where their semipro team alternatively acted as a training squad for visiting proteams or a "local asset" squad for the Marines in wargames vs Army/Airforce. The Plaintiff became interested in tactics, and was assigned to the leadership position of their squad. The Marines encouraged them to go ROTC or to follow their passions as a combat photographer if not. The family's contacts in the DOD quietly dissuaded the plaintiff from joining the military because of the FBI's "dissident" files on them. They went to college for photography instead.

65. In fall of 2011, establishing for the Court the long term foundations of NY police malice existing in this case against the plaintiff, and within 10 years of RICO predicate

acts that occurred in 2021 as shown below, Plaintiff Fisher and their family were the target of Police Misconduct and off-duty death threats with a firearm by a Canandaigua cop.

66. The plaintiff was followed from a friend's home in Canandaigua and pulled over by an officer Demchuk, who removed the sober plaintiff from the vehicle and asked if they were carrying any weapons. The completely cooperative and sober plaintiff replied "This whole thing is a weapon, baby" jokingly referring to their 130 pound body, which was half the size of the officers, trying to lighten the mood. The officer called in two cars of backup and cited the plaintiff with 9 tickets before making them drive back to the house the officer had followed them from and stay the night.

67. The plaintiff represented themself in Canandaigua Town Court, questioning the officer and embarrassing on the stand; all maliciously prosecuted charges were dropped by the Court in favor of the plaintiff.

68. Shortly after the case was dismissed, the officer acquired the plaintiff's personal information from police systems and paid an armed, armored, off duty visit to what he believed to be the plaintiff's address with his AR15, arriving at the plaintiff's grandparent's farm (and the plaintiff's personal mailing address and range) at 3AM.

69. The officer pulled into the private driveway, exited his vehicle, and brandished his assault rifle while screaming "Keenan get out here, I'm gonna to teach you a lesson!"[33] and was met at the door by the plaintiff's sleepy grandmother holding the youngest grandchild, a toddler at the time. The plaintiff's grandfather pulled his grandmother out of harm's way and met the trespassing, belligerent, violent criminal with his trusty sweet 16ga shotgun to affect the criminal trespasser's vacation from the property.

---

[33] Testimony of eyewitnesses to police misconduct is prepared to be delivered to this Court.

70. The plaintiff's grandparents, concerned for their and the plaintiff's safety, complained about the incident, a clear violation of NY Penal Law § 120.14: Menacing in the second degree against the family.

71. In 2017, NY Times exposes revealed[34] between 2006 and 2013, ATF agent Thomas Lesnak and informants Jason Carpenter and Christopher Small engineered a RICO scheme to steal approximately $24 million from USTC's farmers to the benefit of the entire ATF. They did so by leveraging their employment with ATF to (1) sell USTC an ATF-front operation as though it was a standard commercial tobacco business and (2) deprive USTC of millions of dollars through self-dealing sales of contraband received from ATF. This ATF slush fund mixed public and private money with zero oversight or statutory authority.[35] ATF spending was not limited to investigative expenses[36]. Two informants made $6 million each. One agent steered hundreds of thousands of dollars in real estate, electronics and money to his church and his children's sports teams, records show. The ATF now acknowledges it can point to no legal justification for the scheme. But far from reigning in the spending, records show that supervisors at headquarters encouraged it by steering agents from around the country to Bristol to avoid the red tape of Washington to procure funding, equipment and personal benefits[37]. This pattern of Racketeering Behavior and Corruption is the long term, unpunished norm at the ATF.

---

[34] Matt Apuzzo, 'I Smell Cash': How the A.T.F. Spent Millions Unchecked, N.Y. Times (Sept. 8, 2017), https://nyti.ms/2xhriuM
[35] Matt Apuzzo, A.T.F. Memo Indicates Agents' Off-the-Books Account Was Against the Rules, N.Y. Times (June 23, 2017), https://nyti.ms/2t18Mnv
[36] Matt Apuzzo, Secret A.T.F. Account Paid for $21,000 Nascar Case 5:18-cv-00473-D Document 1 Filed 10/01/18 Page 3 of 384 Suite and Las Vegas Trip, N.Y. Times (Apr. 11, 2017), https://nyti.ms/2p0hn8k
[37] BSD vs ATF RICO Complaint, Case 5:18-cv-00473-D https://www.usleaf.com/wp-content/uploads/2018/10/ATF_Complaint.pdf

72. By July 2014, two federal judges in California ruled[38] that ATF agents violated the Constitution by setting people up for "fictitious crime"[39], described as a staple of the ATF playbook since the mid-1990s. "There's something very wrong going on here," said University of Chicago law professor Alison Siegler, "The government is creating these crimes and then choosing who it's going to target." The newspaper identified a sample of 635 defendants arrested in ATF stings between 2004 and 2014, and found 579, or 91%, were minorities. The ATF's actions were labeled as Outrageous Government Conduct.

73. In March 2018 in Chicago, U.S. District Chief Judge Ruben Castillo said from the bench, "These ... cases have served to undermine legitimate law enforcement efforts in this country." "Even during the low point of the great violence caused by the alcohol wars of Prohibition, the ATF did not seek to use 'false alcohol warehouse' tactics against any ethnic organized crime groups to promote public safety," Castillo wrote. Corruption is a creeping disease, and in the long years since Prohibition, the agency has become the organized criminals that they once aided in stopping.

74. February 2019, Portland withdrew from the JTTF for the second time, citing "JTTF is a controversial agreement between the FBI, ICE, and local law enforcement agencies that was lacking transparency, leading to excess surveillance, and targeting immigrants, political activists, and racial & religious minorities."[40] Portland had previously left the JTTF under former Police Chief and Mayor Tom Potter in 2005 over similar concerns.

---

[38] Brad HeathUSA TODAY (07/20/2014)
https://www.usatoday.com/story/news/nation/2014/07/20/atf-stash-house-stings-racial-profiling/12800195/
[39] U.S. District Court Judge Manuel Real declared that federal agents had "created the fictitious crime from whole cloth" and that their conduct was unconstitutional.
[40] Commissioner Hardesty Year 1 Recap (2019 - 2020) | Portland.gov

75. In July 2020, the Oregon AG would bring charges against the agencies comprising the JTTF in Oregon U.S. District Court under violations of the civil rights of Oregon residents using unlawful tactics, abducting, injuring and threatening peaceful protesters without probable cause or a warrant utilizing unmarked vans.

76. These activities on the west coast are highlighted as evidence of the reach of the unconstitutional, criminal enterprises engaged in targeting civilians since 9/11.

77. By knowledge, belief and evidence, the plaintiffs are but a few of countless citizens targeted by these enterprises with a definite purpose: to strip them of their rights, steal their property, and bind them as slaves under the 13th amendment on false charges.

78. The enterprise outlined in this complaint is but one of many, each tailor-made to target a specific citizen or organization, comprising the unconstitutional hydra that is the JTTF and its inter-agency investigation policy of ethnic, religious and political persecution as a fostered principle. This collection of intertwined enterprises, agencies and their agents each believe themself to be above the law, not servants of it.

**E. Plaintiffs reasonably fear that Defendants have revoked their FFL under the new ATF policy, using its Zero Tolerance wording, after Defendants enacted a conspiracy to kidnap, rob, and directly interfere in Plaintiff's interstate commerce.**

79. Plaintiff is FFL and AECA licensee that operates as a firearms import/export business called Red Right Hand Rifle Syndicate LLC, founded in Victor, New York.

80. In December of 2020, two unknown FBI special agents, referred to forthwith as Agent Doe and Agent Cardholder, visited Plaintiff Fisher's home under "Duty to Warn" identified as the "requirement to warn U.S. and non-U.S persons of impending

threats of intentional killing, serious bodily injury, or kidnapping".[41] Agents Doe and Cardholder reveal that the agency had arrested a Blood and Honor gang-affiliated neonazi named Stephen Reed Pattison in Hilton, NY on assault weapons charges, and had come to give warning that the Plaintiff's name, among others, was found on a hitlist among Pattison's effects.[42] Agents Doe and Cardholder suggested acquiring personal protection, as deadly threats and plans for terroristic violence had been uncovered between Pattison and other local avowed neonazis.

81. Plaintiff Fisher and founding partner E Flowers launched the LLC on 1/11/21, locally dedicated to providing other marginalized citizens also targeted by white supremacist violence a safe, inclusive imports dealership from which to acquire legal firearms for self-defense from America's largest domestic terror threat.[43]

82. Plaintiff was granted a Federal Firearms License 08 (Import/Export)[44] with a 4/1/2024 expiration date.

83. The Federal Firearms License 08 allows the holder to engage in lawful distribution of firearms in interstate traffic. Possession of "assault weapons", as transferee recipient for the purpose of lawful distribution, is therefore exempt from criminal prosecution under PL § 265.20(a)(8). Charges of possession of firearms are subject to the fifteen exemptions to prosecution listed under PL § 265.20. One of these fifteen exemptions covers those duly licensed by New York State as a dealer in firearms and/or gunsmith:

---

[41] FBI Duty to Warn – Intelligence Community Directive 191: https://fas.org/irp/dni/icd/icd-191.pdf
[42] *Feds link Hamlin man accused of illegal firearms possession to racist group* (12/04/2020), Democrat & Chronicle article: https://www.democratandchronicle.com/story/news/2020/12/04/feds-link-hamlin-man-stephen-reed-pattison-notorious-skinhead-group-blood-and-honour/3815335001/
[43] According to the Anti-Defamation League, between 2012 and 2021, politically motivated extremist violence and murders in the US comprised 55% White Supremacy, 14% Right-Wing Anti-Government, 6% Other Right-Wing, 20% (Right-Wing) Islamic Fundamentalist, compared to only 4% Left Wing and 1% "Other". As ADL data shows, the American political right has a violence problem that has no equivalent on the left. And the 10 victims in Buffalo are now part of this toll. "Right-wing extremist violence is our biggest threat," Jonathan Greenblatt, the head of the ADL, has written. "The numbers don't lie." Most Extremist Violence in the U.S. Comes From the Political Right - The New York Times (nytimes.com)
[44] See Plaintiff's FFL08 (issued 4/1/2021), included as **Exhibit E**

PL § 265.20(10). These particular licenses are only one way by which a person may be exempt from prosecution for possession of firearms. An individual can also be exempt under PL § 265.20 as both a "transferee recipient" of firearms from a manufacturer, not just by virtue of having a New York State dealer in firearms / gunsmith license. The two subsections are clearly mutually exclusive of each other.

84. The Plaintiff filed applications for a DBA (to operate as the Red Right Hand) and an Ontario County Gunsmithing permit in May. In november, the check for the DBA was finally cashed[45]. The check for the Gunsmithing permit was never cashed.

85. In May 2021, the Plaintiff acquired a storefront at 1 East Main Street in Victor NY.

86. The Plaintiff interviewed with both the Victor Mayor and Ontario County Sheriff Kevin Henderson to acquire permission to open, and began business in late June.

87. Sheriff Henderson advised the Plaintiff to purchase (but not take possession of) a handgun to acquire its serial number for a pistol permit, as it would expedite the application. On 6/22/22, the sheriff provided a dispensation requested by the plaintiff by email[46] to allow both Monroe and Ontario County residents as character references.

88. Upon opening, in addition to providing firearms and body armor[47], Plaintiffs also offered free and at-cost emergency medical safety classes and firearms safety training.

89. The classes and training include opportunities to obtain Stop the Bleed certification and free time at a private firing range for all new firearms owners. Id.

90. In addition to offering educational courses, the cornerstone of the business is to do Mutual Aid projects with profits (often mischaracterized as "charity").

---

[45] See DBA check, included as **Exhibit S**

[46] See Emails with Sheriff Kevin Henderson (2/22/22), included as **Exhibit T**

[47] Weapons and Armor are both holy articles of the Plaintiffs' faith, and equipping their community for self defense and offering basic safety training is a spiritual act of worship, as it provides the means of self-defense to those who could not formerly protect themselves in the ultimate fulfillment of the faith's 4th tenet.

91. Mutual aid is defined as a voluntary exchange of services and resources between members of society for mutual benefit. In this way, people are able to build new social relationships, give what they can and receive what they need. In the face of challenges such as economic crises, pandemics, and natural disasters, mutual aid is increasingly needed to fill current gaps in society and to meet people's needs, such as providing food, medical care, and supplies. In the context of labor law, 29 CFR § 553.105 states "An agreement between two or more States, political subdivisions, or interstate governmental agencies for mutual aid does not change the otherwise volunteer character of services performed by employees of such agencies pursuant to said agreement." While the plaintiff is a business, it also dedicatedly acts as a community service organization because of the moral and religious conviction its workforce has to build a safer, healthier community through tangible, positive Direct Action.

92. These moral and spiritual obligations have been a driving force in the plaintiffs' day to day lives, and operation of the LLC is an avenue to engage in active religious worship through action, and live out the tenets of their faith.

93. Plaintiffs' dedication to community safety and religious convictions are evidenced by its emergency medical and gun safety events[48], donating food and Narcan to the homeless, donating DateSafe kits to college coeds[49], donating backpacks to the foster children of the Seneca Nation[50], by supporting 2A for all, by discouraging 3D printing firearms, encouraging firearms owners to stay legal by choosing CBD products over Marijuana as pursuant to letter from the ATF[51], and offering free introductory range

---

[48] See Ghost Hunters Community Range Day event (10/02/21), included as **Exhibit U**
[49] See receipt for case of pepper gel donated to Brockport Pride, included as **Exhibit V**
[50] See receipt for backpacks donated to It Takes A Tribe, included as **Exhibit W**
[51] See ATF's FFL Licensee Newsletter (June, 2021) for information purposefully disregarded by Defendants in malicious prosecution: https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensee-ffl-newsletter-june-2021/download

time on a private commercial-residential property to new shooters after NICS transfer

to teach them the four rules of firearms safety:

- Always treat all firearms as if they are loaded.

- Control your muzzle at all times, never point at what you are not ready to destroy.

- Always keep your finger outside the trigger guard until ready to fire.

- Be aware of your target and what is behind and around it.

94.  Special Discounts were created to support and thank Military Veterans,

Firefighters, Medical First Responders, Social Workers, Service Workers, Sex Workers,

Teachers, Students. members of Educational Nonprofits, sports shooting clubs and

adult-led youth groups, and the extended working class. The plaintiff provided no LE

discount because ⅗ are domestic abusers[52] and many are white power affiliates.

95.  The LLC grew quickly due to excellent business practices and its care for

underserved and marginalized demographics, and from just $700 in operating capital on

opening at the end of June, had generated some $125,000 in revenue by 1/27/22.

96. On 7/20/21, Plaintiff Fisher followed Sheriff Henderson's guidance and purchased a

Springfield Hellcat 9mm (serial #BA432519)[53], requesting the distributor not send the

physical firearm until the Plaintiff sent back the pistol permit the purchased serial

number was supposedly expediting.

97. The high volume distributor missed the hold request and mailed out the single pistol

in error; when it arrived, Plaintiff Fisher made calls and immediate provisions to

properly transfer the firearm via overnight air mail to a gunsmith in Virginia for

---

[52] https://relevantmagazine.com/current/nation/do-40-percent-of-police-families-really-experience-domestic-abuse/
[53] See MGE WHOLESALE receipt for #BA432519, attached as **Exhibit X**

protective cerakoting and elective microstamping[54] of the firing pin to go above and
beyond NY compliance to CA compliance levels, entirely by choice, in the name of full
personal accountability as a future concealed carry holder.[55]

98. According to Defendant Wilkins in his Jan 6th referral, he inspected the Red Right
Hand's premises three times between August 6th of 2021 and December 14th 2021,
with his fourth "inspection" call being a lure into an illegal interagency raid, robbery
and kidnapping on a falsified warrant.

99. Defendant Wilkins, appraised by the plaintiff of the pistol permit pistol arriving by
distributor error and the steps taken to rectify, including microstamping, later reports
the situation in his Jan 6th 2022 Referral as "FFL has acquired and disposed of at least
one handgun without a New York State Dealer in Firearms License". Frustratingly,
Defendant Wilkin's only consistency is *falsus in uno, falsus in omnibusa*. A NY state
dealer in firearms license is not required to sell pistols, exposing this "senior
investigator's" lack of knowledge once again. A pistol permit is required to handle a
pistol in the state of NY, and therefore a pistol permit is the instrument needed to handle
and sell handguns on site in New York. Handguns may further be drop shipped from a
distributor to a proper FFL for physical transfer via NICS with the plaintiff acting as a
middle man, with no breach of any law. The plaintiff did not sell the pistol, nor keep the
pistol, nor use the pistol, nor hide that it had arrived via distributor error, but instead
took every step necessary to rectify another business' mistake to the best of their ability.

---

[54] Microstamping is a proprietary ballistics identification technology. Microstamping legislation was passed in California AB 1471 and signed into law on October 14, 2007, but specifically exempts law enforcement. NY Senate Bill S4116A mandating microstamping in NY passed in June 20, 2022, nearly a year after the plaintiff's pistol was microstamped; *sapiens qui prospicit.*
[55]

100. During the period covered by Defendant Wilkins' inspections, the Red Right Hand reportedly processed approximately 111 firearm transactions[56] and filed Form 6 Imports Permit for large scale 7.62x39mm importation from Tula Cartridge Works (a $4.8M base revenue per year international trade deal denied outright by ATF due to the Biden administration's sanctions on Russia)[57].

101. During her first couple weeks working at the LLC, on 08/20/2021, Plaintiff Krenzer's name and information were included as 1 of the 4 worker-owners of the business on the LLC's AECA application[58] (ATF Form 4587). Correctly, Krenzer was not labeled as an RP (Responsible Person) on this application, while each other member on the FFL was.

102. A $1000 cash.gov receipt for the plaintiff's Arms Exports Controls Act (AECA) registration from 09/02/2021 at 12:03:42 PM EDT[59] shows the application was approved by the ATF Imports Branch. Ostensibly a background check is assumed to have been completed for each listed owner by the approving ATF agent on an application to allow an FFL to conduct arms trade with foreign entities, governments and militaries, and in this enormous capacity the ATF approved of Krenzer.

103. The basic U.S. law providing the authority and general rules for the conduct of Foreign Military Sales and commercial sales of defense articles ("military weapons"), defense services, and training is the The Arms Export Control Act (AECA), which came into existence with the passage of the Foreign Military Sales Act (FMSA) of 1968. An amendment in the International Security Assistance and AECA of 1976

---

[56] See RRHRS LLC A&D BOOK, held by NYS Police
[57] Attached as **Exhibit Y**
[58] See AECA Application (8/26/21), included as **Exhibit Z**
[59] As evidenced by Pay.gov reciept 26T7N6QO, included as **Exhibit AA**

changed the name of FMSA to the AECA. The AECA registered plaintiff's international trade is governed by this act under 22 USC § 2751 *et seq.* and ITAR (International Traffic in Arms Regulations) under 22 USC subchapter M § 120-130. AECA registration gave the plaintiff the legal authority to conduct commerce in Defense Articles found on 22 USC § 121.1[60] United States Munitions List (USML) including **Category I - Firearms and Related Articles** such as (a) Firearms using caseless ammunition, (b) Fully automatic firearms to .50 caliber, (c) Firearms specially designed to integrate fire control, automatic tracking, or automatic firing (e.g., Precision Guided Firearms), (d) Fully automatic shotguns regardless of gauge, (e) Silencers, mufflers, and sound suppressors, (g) Barrels, receivers (frames), bolts, bolt carriers, slides, or sears specially designed for the articles in paragraphs (a), (b), and (d) of this category, (h) Parts, components, accessories, and attachments, as follows: (1) Drum and other magazines for firearms to .50 caliber inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm… plus (i) Technical data (see § 120.33 of the subchapter) and defense services (see § 120.32 of the subchapter) directly related to the defense articles described in this category and classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data, (x) Commodities, software, and technology subject to the EAR used in or with defense articles[61], and these are all articles in just **Category I**. AECA jurisdiction covers many more categories:

---

[60] Full list of articles the military articles the plaintiff is licensed to conduct trade in can be found on the USML: https://www.ecfr.gov/current/title-22/chapter-I/subchapter-M/part-121/subject-group-ECFRf7e5fe639be4566/section-121.1
[61] Defense Articles, or weapons with military features, are defined under Defense article means any item or technical data designated in 22 CFR § 121.1 https://www.ecfr.gov/current/title-22/chapter-I/subchapter-M/part-120

**Category II** allows for (a) Guns and armament greater than .50 caliber, as follows: (1) Guns, howitzers, artillery, and cannons; (2) Mortars; (3) Recoilless rifles; (4) Grenade launchers; or (b) Flamethrowers with an effective range greater than or equal to 20 meters;
**Category III** - Ammunition and Ordnance;
**Category IV** - Launch Vehicles, Guided Missiles[62], Ballistic Missiles, Rockets;
**Category V** - Explosives & Energetic Materials, Propellants, Incendiary agents;
**Category VI** - Surface Vessels of War and Special Naval Equipment;
**Category VIII** - Aircraft and Related Articles;
**Category IX** - Military Training Equipment and Training;
**Category X** - Personal Protective Equipment;
**Category XI** - Military Electronics;
**Category XII** - Fire Control, Laser, Imaging, and Guidance Equipment;
**Category XIII** - Materials and Miscellaneous Articles;
**Category XV** - Spacecraft and Related Articles;
**Category XVIII** - Directed Energy Weapons; and[63]
**Category XX** - Submersible Vessels

104. Before any fantastic claim can be made by the ATF or its co-conspirators to the contrary, the approval of the AECA registration here stands as evidence that Theresa Krenzer was proudly declared as a non RP worker-owner of the LLC to the ATF directly, in writing, on a federal licensing registration to do business with foreign militaries and businesses in any capacity save physically handling the weaponry, which they approved 9/02/21. This fact puts to rest the ATF's claim within its revocation hearing that plaintiff Krenzer was unreported, as Krenzer comes ATF approved and recommended as an international trafficker of Defense Articles "which are licensed or approved for export under § 2778 to, for the use, or for benefit of the armed forces, intelligence, or other internal security forces of a foreign country or international organization under a commercial sales contracts" as of 9/02/21.

105. On 9/9/2021, Plaintiff Fisher applied for their concealed carry pistol permit. In addition, having not yet received their gunsmithing permit in the mail since May and

---

[62] Including Man-portable air defense systems (MANPADS), which the plaintiff could have been selling to the Ukraine all year long.
[63] AECA grants the professional credential to conduct trade of defensive articles worldwide. Accordingly, the AECA registration is a serious professional credential granted by the defendant to the plaintiff that should be treated with as much weight as an FFL

having been told by the New York State Department of State that their DBA application had been "affected by Covid", the Plaintiff filed a secondary gunsmithing permit application and a dealer application with updated information, including AECA registration number, as time and effort had presented them new credentials. While the plaintiff was aware, via understanding of the state, federal and international laws governing their business, that legally a NY state dealer or gunsmithing permit was not necessary for the regular conduct of the LLC's interstate commerce, acquisition of a $35 gunsmithing permit was a point of pride to maintain a full suite of available credentials to list on business cards, professional websites, and because the plaintiff's uncle was a credentialed gunsmith at Turnbull Manufacturing before his death.

106. It is also worth noting that Penal Law section 400.00, which was the governing law at the time the plaintiff submitted a packet application for a concealed carry pistol, ny dealers license and gunsmithing permit, was later deemed unconstitutional by the US Supreme Court in *New York State Rifle & Pistol Association v. Bruen*, 142 S.Ct. 2111 (2022). It is also worth noting that around the time of the plaintiff's pistol permit application, the licensing officer as defined under PL § 400.00 for Ontario County was (former) Sheriff Kevin Henderson.

107. On 9/29/2021, Sheriff Henderson resigned, shortly following his undersherrif, amid a misconduct scandal[64][65], though no contact could be made with the Sheriff's Office concerning the status of *any* of the plaintiff's permits from 6/22/2022 onward.

---

[64] *Ontario County Sheriff Kevin Henderson resigns amid misconduct investigation* (9/29/21, Democrat & Chronicle) at
https://www.democratandchronicle.com/story/news/2021/09/29/ontario-county-ny-sheriff-kevin-henderson-resigns-amid-misconduct-investigation/5923378001/ and a report of the findings is available at
[65] Ontario County Board of Supervisors County Law §209 Investigation Committee: Report
https://ontariocountyny.gov/DocumentCenter/View/33942/209-REPORT-3-31-2022--for-Filing

108. While few NY state sheriff's offices provide clear guidance on the matter, nearby Onondaga County's *Instructions for the New/Renewal of NYS Gunsmith - Dealer in Firearms Applications* provides "it is recommended to apply a minimum of 45 days prior to the expiration date due to the processing time." Using this 45 day standard turn-around recommendation for dealer or gunsmithing permits to avoid a lapse, which are both *shall issue* permits which cannot be denied or rejected by officers based on personal feelings about the applicant, makes sense as these permits are deemed necessary legal instruments of any FFL01-based business (the most common kind) handling assault weapons in the state of NY.

109. To note, the proscribed 45 days turn-around for no lapse of business from September 9th would be October 25th under this guidance. The sheriff's office had some 140 days between the secondary November filing of the updated permit application and the plaintiffs' kidnapping and robbery: *a fortiori*, there is no excuse for 3 full 45-day turnaround windows of a *shall issue* license purposefully not approved in order to assault the applicant merely for its absence. Indicative of the criminal conspiracy of the Defendants, the Plaintiff's unnecessary feather-in-the-cap state gunsmithing permit was ostensibly withheld *sine qua non* the conspirators' attempt to charge the plaintiff as a criminal, based on their blatant misunderstanding of the GCA, SAFE, FFL licensing and NY Penal law, by refusing to serve process on said permit at any point in 2022 and treating the Plaintiff's lack of state permit as the Defendants' sole matter in the criminal charges brought against them. This failure to provide service further establishes the multiagency foundations of the criminal conspiracy under 18 U.S. Code § 1951, 241 and 242 to deprive the plaintiff of their rights under color of

law, despite foreknowledge of the plaintiff's legal status as a Licensed Importer as defined in 26 U.S. Code § 5845(i). *Res ipsa loquitur.*

110. During her first month working at the LLC as Secretary (starting mid August), Plaintiff Krenzer was asked along with each other worker owner by plaintiff Fisher to purchase an Omega-E3 Lower[66] to be taught how to correctly identify and build a proper NY compliant rifle in order to learn about one the LLC's main products, as none of the workers save Fisher had owned an ArmaLite Rifle before. This was Plaintiff Krenzer's first ever purchase that required a NICS background check as all of her firearms were coming of age gifts from parents, and consisted of a receiver (a gun part, not a firearm) with s/n A21936. The plaintiff strangely received a denial on her NICS check for said lower receiver, and it was not transferred to her by the LLC. Without any knowledge as to why she would receive a denial without having a criminal record, Krenzer was distraught and though she already did not handle firearms professionally, she henceforth ceased any recreational handling of firearms including attending public or personal range time, nor going hunting nor sports shooting with her brother, longstanding cultural traditions for her family, until such time as her rights status could be restored. Krenzer had lost the right to enjoy her most cathartic and centering cultural, recreational, and religious activity for reasons unknown.

111. Defendant Wilkins provided "guidance" better described as entrapment to the Plaintiffs concerning Krenzer's NICS denial, listing a number of reasons why a faulty denial might return through NICS including "simply matching the description of a suspect," offering further guidance on restoring NICS rights through Voluntary Appeals

---

[66] At the time of attempted purchase in August 2021, this E3 lower receiver was not even federally considered a firearm, only a gun part, as it could not readily fire a bullet and was not a completed firearm.

File to secure a personal NTN number, for which he suggested procuring a lawyer, and assuring the Plaintiffs that Krenzer could continue to work in her role as a secretary because she was not a RP and had no control of the LLC's firearms inventory. Under Wilkins' direct guidance, the Plaintiff remained in her role as secretary (a non-RP[67] position) and began to pursue the prescribed VAF relief to obtain a personal NTN.

112. On October 2nd, 2021, the LLC hosted its *First Annual Ghost Hunters Community Range Day* at the plaintiff's family Underground Railroad home in Bloomfield. The educational event comprised firearms safety, history, emergency medical, basic survival skills, meals, a marksmanship contest, and a night of camping for those from the city who don't normally get to enjoy nature (NYC folks saw a pack of coyotes, built their first bonfire; life skills learned, community fostered, no criminal or unamerican activities.). A Halloween event, paper targets on the range were of nazi zombies and kkk ghosts, and attendees were given Ghostbusters morale patches[68]. Krenzer did not participate on the range, and instead served lunch and dinner. A promotional image from this community event[69], showing twenty five of the attendees, all carrying obvious NY compliant rifles and the LLC's John Brown[70] flag, frightened the JTTF into full scale investigation while they ignored actual domestic threats like white supremacist terrorist Payton Gendron.[71]

---

[67] A Responsible Person (RP) as defined by the ATF is someone who has the authority and power to direct firearm compliance decisions and operations for an FFL, which Plaintiff Krenzer expressly does not as per the LLC's Bylaws, **Exhibit O**

[68] Photo of "worrying" Ghostbusters morale patch on plaintiff's stolen Beskar'gam (armor), included as DSC_0270 in "Car Photos"

[69] Photo of Community Range Day (10/2/2021), included as **Exhibit AB**

[70] American patriot, Union hero and Republican martyr, as described in the Democrat and Chronicle by Frederick Douglass on January 27, 1874. p. 4: "He was with the troops during that war, he was seen in every camp fire, and our boys pressed onward to victory and freedom, timing their feet to the stately stepping of Old John Brown as his soul went marching on."

[71] *Quidam eorum qui operantur ad copias, sunt idem uri cruces*

113. On October 13th, 2021, Plaintiff's landlord Robert Jones stole a box of 7 AR15 and AK47 CompMags shipped to the apartment in the mail, worth $329.00 USD. Defendant Wilkins, Rochester authorities and the Postmaster General were informed, but no action was ever taken to separate a drug dealer from stolen gun parts. Continued dismissal of Jones' increasing crimes against the plaintiffs emboldened his violent actions in seeking an illegal eviction to further his drug growing schemes.

114. On October 21st, 2021, Plaintiff Fisher traveled by plane to Miami, FL for a business meeting with Tula Cartridge works to remedy the interference of the US government sanctions upsetting the businesses' ammunition imports partnership. The plaintiff proposed a domestic manufacturing venture[72] with the plaintiff maintaining appropriate American ownership, and Tula agreed to the new strategic partnership provided the LLC provided funding for the property and manufacturing equipment. The LLC quickly began the search for manufacturing property and loans for equipment, with Tula to provide branding, source domestic material components, provide the plaintiff's workforce job training from a company established in 1880, and provide an established stateside distribution network hungry for product to ensure the Plaintiff's immediate success. From opening with $700 in the bank in June, the Plaintiff became an international partner of the world's most popular ammo manufacturer in under 6 months through excellent business practices, cultural respect, and viable dreams backed by hard work, research and skill.

---

[72] As everything the plaintiff does is legal and they have nothing to hide, a copy of this strategic partnership proposal presented in October may be read at https://docs.google.com/document/d/1RxBvJeF0w2XIK6mGh5hIBhLMCWDsbfToRjtgy-6Eq0Y/edit?usp=sharing

115. This strategic venture promised the Plaintiffs their American Dream, and was a legal, attainable fulfillment of their pursuit for Life, Liberty and Happiness- with a plan in motion on an aggressive timeline to launch the factory in the second quarter of 2022.

116. On the same day that the Plaintiff met with Tula, 10/21/21, the JTTF spoke with Defendant Wilkins, with Wilkins dismissively writing in his notes that the Plaintiff was "Having issues with White Supremacist org"[73]. The plaintiff's name was found on a neonazi murder list by the FBI, that is not "having problems" with a neighbor or the local HOA: that is being targeted by a genocidal gang of domestic terrorists. All steps taken by the plaintiff toward legally arming themselves and their community can only be seen as acts of self defense.

117. On 10/30/2021, the plaintiffs were target of a Designated Hate Crime as defined by the NY Penal Law § 485.05, specified under section 145.00, when the plaintiff's business premises was vandalized with a large swastika and a death threat[74]. Under 485.05, a person commits a hate crime in NY when he or she commits a specified offense and (a) intentionally selects the person against whom the offense is committed or intended to be committed in whole or in substantial part because of a belief or perception regarding the race, color… ancestry, gender, gender identity or expression… or sexual orientation of a person, regardless of whether the belief or perception is correct. Despite the JTTF's previous knowledge that the plaintiff was on a neonazi hitlist, the only police investigation into the matter seemed to be surveilling the plaintiffs and Grandma spending the afternoon scrubbing the hate symbol off the bricks. The plaintiffs continued normal business undeterred by nazi death threats.

_____

[73] See *Discovery: Misc Notes 01-31-2022* attached as **Exhibit AC**
[74] See image of vandalism, 10/31/21, attached as **Exhibit AD**

118. On Thanksgiving 2021, Plaintiff Krenzer's drug addict landlord Robert Jones cut

the power to her apartment to affect an illegal eviction so that he could finally turn her

apartment into a growhouse, after multiple previous attempts at illegal eviction of the

plaintiff/tenant to expand his drug operation as evidenced by police reports[75]. RPD and

city officials provided no assistance, suggesting the plaintiff stay at a motel, and

plaintiffs spent December in an emergency stay at the Henrietta Red Roof Inn. Wilkins

noted "kicked out of apartment 11/25", and there pretty much has to come a point

where its obvious Wilkins doesnt think of the plaintiffs as human beings. They are only

seen as targets to the defendant and his conspiratorial enterprise, not fellow citizens.

119. On 12/14/21, Defendant Wilkins demanded that Plaintiff Fisher immediately sign

out a semi-automatic JTS M12AK 12ga (s/n MK2101784) to themself in the A&D,

despite the plaintiff still needing to do an in-shop adidas paintjob and fixed-magazine

compliance work post purchase, to the plaintiff's so-called "new address" at the Red

Roof Inn. The plaintiff refused to do so as it didn't sound legal or directed by any

statute they knew, and similarly refused to give Agent Wilkins the hotel room number

they were staying in, stating an emergency stay in a hotel is not a permanent address

and was not relevant to his inspection nor transferring a firearm into the plaintiff's

personal collection from the FFL nor something Wilkins needed to know. Wilkins

demanded to be informed of the plaintiffs' new permanent address as soon as an

apartment was located. It later becomes clear to that Wilkins, the definition of a

scoundrel[76], wished to raid the plaintiffs while they were in the middle of a housing

---

[75] See police report concerning Robert C Jones attached as **Exhibit AE**
[76] SCOUN'DREL, noun [Latin abscondo. ] A mean, worthless fellow; a rascal; a low petty villain; a man without honor or virtue.

crisis caused by a violent drug dealer Robert C Jones (who is currently being sued by his bank and abandoned his dual-rental property in rochester to flee the state).

120. On 12/14/21, plaintiff presented defendant Wilkins with written request[77] to add a 3rd Responsible Person, Audra W, to the FFL. Wilkins told the plaintiffs that no other written request was necessary for Krenzer as she was just a secretary/non RP.

121. On 12/26/21, the plaintiffs secured a new apartment and vacated their emergency stay at the Red Roof Inn. The ATF was promptly informed of the updated address, and the plaintiffs moved their 3 cats and pet snake into the building.

122. On and abouts 12/27/2021, Ontario County Sheriff's Lt. David Cirencione advised Defendant Wilkins that the plaintiff's Dealer, Gunsmithing and Pistol permits had not yet been processed[78], and no action would be taken on the matters. This continued failure to provide service further establishes the foundations of the criminal conspiracy of defendant's enterprise against the plaintiff, and violations under 18 U.S. Codes § 1951, 241 and 242 to deprive the plaintiff of their rights and steal inventory under color of law, despite all agencies' foreknowledge of the plaintiff's legal status as a Licensed Importer and AECA registrant.

123. By January 1st 2022, the Plaintiff had established a Consumer Assembly (similar to a shoppers club at Lori's Natural Foods or any food co-op, or a Costco Buyers Club) with 200+ loyal customers[79] and FFLs from other shops supporting the LLC's transition into a full scale ammunition manufacturer. The LLC built itself to be able to meet its market's needs direct from production to distribution, "eliminating" the competition by

---

[77] 12/14/22 Written Request attached as **Exhibit AF**
[78] See ATF Referral 1-25-22, attached as **Exhibit AG**
[79] See Plaintiff's Ammoready: Hottest Sellers, #1: CLAKA Membership Certificate, which alone generated $21,000 for the LLC in 3 months, included as **Exhibit AH**

becoming the competition's distribution nexus and symbiotically growing with each FFL utilizing plaintiff's procurement services, which include a massive trade network and the ability to almost always find uncommon calibers for their military collector and precision shooter clients. Sweet 16 ga shotgun shells? The Red Right Hand can get that. 8mm Mauser for that 1950's Egyptian Hakim rifle? The Red Right Hand delivers. The plaintiff built up a name, brand and great reputation for themselves, being recommended to Americans online by folks in Europe (here specifically Finish reddit user Joulu-Ilman-natseja[80]'s statement "[I'm] not even American and I know Red Right Hand Rifle Syndicate" truly showcasing the plaintiff's growing popularity as an international defense business.

124. Having faced a recent housing crisis and following the LLC's aggressive expansion plans, Plaintiff Krenzer's work focus heavily transitioned into finding real estate that would serve as the plaintiffs' new home and the new home for their ammo manufacturing business. Many emails with realtors[81] confirm the business was moving to purchase property. Krenzer's goal was to find a multi acre, multi building property lot with suitable space to fence in a commercial/manufacturing unit, a residential unit, and a unit to serve as her emergency domestic violence sanctuary for abused women.

125. According to SIU investigative report[82] filed by Investigator Bonham, on 1/6/2022, ATF Rochester contacted SIU maliciously and with full foreknowledge of making false statements, and reported that "Wilkins also noted several possible SAFE Act violations within the shop. It should be noted that the owners of the shop openly state that they only sell to like minded individuals and they promote the Socialist Rifle

---

Association. During the inspection it was discovered that Krenzer has been deemed ineligible to possess a firearm due to mental health and she is working in the gunshop with unlimited access to all firearms in the store's inventory."; these statements are untrue. This establishes and reiterates the clear political motive driving the enterprise's conspiracy under 18 U.S. Codes § 1951 and 241 to deprive the plaintiff of their rights under color of law, despite foreknowledge of its legal status.

126. On 1/13/2022, an email[83] between Investigator Wilkins and Investigator Bonham admits plainly that the Plaintiff is an FFL Type 08 "Importer of Firearms other than Destructive Devices and ammunition or ammunition for firearms other than destructive devices or armor piercing ammunition" citing that both agencies were well aware of the Plaintiff's rights under SAFE act (should either "professional" ever have bothered to read SAFE) to traffick in so-called "assault weapons" in interstate trade, further establishing the enterprises' conspiracy to violate 18 USC § 1951 and § 241 to deprive the plaintiff of their rights under color of law, despite foreknowledge of its legal status.

127. Business records from the plaintiff's Ammoready commerce platform establish that the plaintiff never sold an assault weapon within New York, maintaining separate NY Compliant and Free State sections of its webstore. These same records provide evidence that a majority of the plaintiff's business was de facto interstate in nature.[84]

128. On 1/19/2022, NYSP Division Council Michael Deyo advised other Defendants to "charge Plaintiff Fisher with Criminal Possession of a Weapon in the 3rd[85] for acquiring non compliant assault rifles and high-capacity magazines without the proper NY State

---

[83] Attached as **Exhibit AK**
[84] Screenshot of final sales before raid on 1/27/22, with NY sales marked with a blue dot and Interstate sales marked with a red dot, attached as **Exhibit AL**
[85] Page 2, Paragraph 1 of ACISS report (1/4/2022), attached as **Exhibit AM**

License". This recommendation does not make mention of charging Plaintiff Krenzer nor any other member of the LLC. As the Plaintiff was an FFL08 with AECA and therefore needed no state dealers license to possess these articles, Defendant Deyo ignored the legal guidance of the GCA and SAFE act and approved of false charges being brought against the Plaintiff, furthering the enterprises' conspiracy to violate 18 USC § 1951 and 18 USC § 241 to deprive the plaintiff of their rights under color of law despite this foreknowledge of its legal status.

129. On 1/20/2022, Investigator Bonham, *contra bonos mores*, abused a well known red flag loophole in SAFE act, fully described below (see Count IV), and either conspired with or forced the compliance of NYSOMH Special Assistant Charles Vaas to procure a letter[86] libelously stating that Plaintiff Krenzer was involuntarily committed to a hospital in 2013/14. This statement is untrue, and the medical records provided by Vaas merely state that Krenzer visited the hospital for voluntary treatment (for care after a sexual assault, to note) on those two occasions, almost a decade ago, and not that either were involuntary stays, comprising a violation of 18 U.S. Code § 1001, "Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—

    (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

    (2) makes any materially false, fictitious, or fraudulent statement or representation; or

    (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

---

[86] Attached as **Exhibit AN**

shall be fined under this title, imprisoned not more than 5 years or, if the offense

involves international or domestic terrorism (as defined in section 2331), imprisoned

not more than 8 years, or both.

Mr Vaas is, according to DoMH, is a lawyer, not a doctor, and has likely never touched

a file regarding the Plaintiff until so ordered by Bonham, who wields power over the

DoMH in the form of being able to threaten compliance with § 195.00  Official

Misconduct charges for not following police directions in an "investigation."

In no instance should a lawyer, on the direction of a corrupt police officer, be able to

misinterpret medical records to favor the officer's maliciously constructed narrative a

decade after a patient's voluntary hospital visit, nor should voluntary mental health

visits ever be weaponized against a victim of abuse or trauma as pursuant to *N.Y.*

*Mental Hyg. Law § 33.01.*

130. Plaintiff Krenzer's doctor has since provided a letter to the ATF[87] confirming she

has not been referred for treatment for any sort of drug addiction nor involuntarily

committed to a mental institution as accused by Wilkins, in expert opposition to any

Defendants' libelous claims against her good name.

131. On January 24th, 2022, the Plaintiff was stalked by Defendants Turton and Blum

(one in a Dodge with eight air fresheners hanging from the rearview). Defendant

provided photographic evidence of surveillance and according to their notes[88] stalking

the plaintiff from 6:30am to 5:15pm  to further the course of the enterprise's conspiracy

against the plaintiff, and also showcases a violation of VAT § 1213 for any citizen who

doesn't wrongfully get to live above the law[89].

---

[87] Attached as **Exhibit AO**
[88] Surv Notes_03-01-2022-152230, attached as **Exhibit AP**
[89] Photosurveillance document submitted to NYS V Red Right Hand discovery, included as **Exhibit AQ**

132.  On January 25th, 2022, Defendant Wilkins sent a recommendation[90] to the NYS

Police investigators SIU to raid the plaintiffs for "possessing non-NY compliant

inventory" which the Defendants, if even passingly knowledgeable on firearms laws as

required by their professional titles, knew the Plaintiff was in legal possession of as a

Licensed Importer under regulations of the SAFE act, furthering the enterprises'

conspiracy to violate 18 USC § 1951 and 18 USC § 241.

133. Within the ATF's Jan 25th recommendation, Defendant Wilkins references an

important compliance product named CompMags, used by SAFE act imposed necessity

by many New Yorkers, as being "non-compliant magazines"[91] and blatantly

mischaracterizes how the plaintiff properly installs such compliance equipment

permanently to a rifle, which can only be removed with power tools or by actively

damaging the firearm after installation. Destructive home modifications by any

end-user using power tools are not a gunsmith's responsibility, and CompMags are a

$75.00 specialty item with installation fee that NY customers pay extra for knowing

they are safe, quality compliance pieces made for CA and NY- to assert a single client

had the plaintiff install a CompMag just to take an expensive NY compliant rifle home

and take power tools to it is laughable. In the plaintiff and many other firearms

professionals' opinions, fixing a magazine to a firearm objectively makes safe

operation of the firearm less achievable, as magazines are designed to be removed to 1)

allow full maintenance of an arm, especially in the event of a jam or misfire and 2)

allows ammunition to be quickly *unloaded* from a firearm to return it to an inert rest

position. Firearms with ejection-port fed fixed box magazines are an especially

---

[90] Attached as **Exhibit M**
[91] CompMags are only produced as 10 round magazines, which are explicitly legal in NY, and cannot be called non-compliant.

dangerous requirement of the so-called SAFE act, as rounds cannot be safely loaded or removed through a firearm's ejection port. The CompMag product removes this danger by providing a sliding door on this side of the magazine itself and a detent spring that allows rounds to be loaded and unloaded safely, especially for newer gun owners. A Memorandum provides support for the plaintiff's assertion of the product's usefulness and legality.[92]

134. On Jan 25th, 2022, at 6:10pm, Defendant Cerretto stalked the plaintiff to gather information for the enterprises' planned kidnapping (see *Cerretto's Notes, Jan 25, 2022*). While the plaintiff was at work, the defendant took pictures of their home to share with the enterprise in furtherance of their conspiracy (see folder: *Misc Photos*), and with a degree of professionalism redundant in this case, Defendant Cerretto mislabels an ARC nurse's car as the plaintiffs' vehicle.

135. On Jan 27th, 2022, around 1:30pm, Defendants Wilkins and Bonham participated as lead conspirators in the enterprise's illicit raid on the plaintiff in violation of their civil rights and economic rights as an interstate trafficker. Conspirators in the enterprise's preparation and execution of the kidnapping and robbery operation include, along with unknown management of the Finger Lakes Railway Corp, NYSP Trooper Jordan Bonafede, Bryan Blum, Investigator David Cerretto, Trooper Jessica A Kuzudal, Investigator Michael S Turton, Investigator Coley S Ellison, Investigator Richard Canino, Senior Investigator Jason D Fifield, Troop Commander Brian J. Ratajczak, SA Lander,  M Pietrzykowski, their direct and individual capacities.

---

[92] COMPMAG LEGAL ANALYSIS FOR NEW YORK STATE (APRIL 15, 2020), Brill Legal Group P.C., attached as **Exhibit AR**

136. Video of the kidnapping is available via worn bodycam footage[93], showing the plaintiffs' entirely peaceful surrender to the armed criminal, in an attempt to avoid their own murders and the possible deaths of other innocent civilians at the defendants' trigger happy hands.

137. The search warrant procured by the NYS Police was invalid, witnessed by the "town of Cndga" and signed "for" the judge[94] by investigators. Knowingly without probable cause[95] and utilizing a forged warrant, the criminal Enterprise can only be seen to have conspired to kidnap the Plaintiffs as defined in 18 U.S. Code § 1201:

(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person… when—

(1) the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary, or the offender travels in interstate or foreign commerce or uses the… instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense;

(b) With respect to subsection (a)(1), above, the failure to release the victim within twenty-four hours after he shall have been unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away shall create a rebuttable presumption that such person has been transported in interstate or foreign commerce. Notwithstanding the preceding sentence, the fact that the presumption

---

[93] Axon Share File List-02-10-2022 0211 provides links to 8 such bodycams, included as **Exhibit Q**

[94] See Search Warrants in State of New York vs Red Right Hand Rifle Syndicate, included as **Exhibit R**

[95] The Plaintiff undisputedly possessed all necessary licenses (FFL08 & AECA) to operate in the LLC's capacity in all internal messages between Defendants, who based their entire theory of prosecution around the "lack" of an unnecessary $35 state dealer permit, which the LLC would only need to sell assault weapons within the state of ny (which can only be sold to police, whom the plaintiff already refuses all service on the grounds they are violent criminals with a 40% reported spousal abuse rate) if it were an FFL01.

under this section has not yet taken effect does not preclude a Federal investigation of a possible violation of this section before the 24-hour period has ended. The Plaintiffs were abducted at or about 1:33pm according to arrest report.

138. In *Malley v. Briggs,* 457 U.S. 335 (1986), the Supreme Court examined immunity for police officers with regard to acting on the basis of a faulty warrant. The Court held that qualified immunity does not apply to a police officer when the officer wrongfully arrests someone based on a warrant, if the officer who could not reasonably believe that there was probable cause for the warrant. Reasonability is determined by the action that an objectively reasonable officer would take. In this case, the officer reasonably should have known the law surrounding the plaintiff's FFL08 and AECA licensing, including firearms those licenses allowed the business to hold as inventory.

139. According to 29 CFR § 776.29 Instrumentalities and Channels of Interstate Commerce defines its (a) Typical examples, "Instrumentalities and channels which serve as the media for the movement of goods and persons in interstate commerce or for interstate communications" including railways, highways, city streets, telephones, and other vehicles "which are regularly used in interstate commerce."

140. Defendant Wilkins used a telephone call (1) and threats of charging the plaintiff with a citation for not being open during listed "by appointment only" hours to force the plaintiff onto the road (2), where a traffic stop had been erected along the plaintiff's path utilizing a freight train and cattle cars (3) owned by co-conspirator Finger Lakes Railway, and from there abductees were transported by highway (4) to the barracks and then jail. Four Instrumentalities and Channels were utilized.

141. As the railroad is so defined as an instrumentality of interstate commerce, its use in the unlawful kidnapping places additional scrutiny on the Finger Lakes Railway and its collusion with agents acting under color of law to interfere with interstate commerce and violate civil rights, especially Court ordered investigation into any payment or remunerations received for their complicity, or subpoena of the Defendants' communications concerning the matter.

Axon_Body_3_Video_2022-01-27_1252_X60A2897U features officer acknowledgement of the use of the train in the traffic stop, "they're coming up on the train."

142. Eliciting use of a freight train to affect the capture of a queer romani and a gay woman, ostensibly over their supposed "socialist politics," is as unsubtle and terroristic a white supremacist message sent to the plaintiff's entire community as the swastika spray painted on their building. The Nazis used the same instruments of interstate commerce to send millions of Jews, Romani, gays, socialists, communists and other "undesirables" to deathcamps like Auschwitz (camps inspired by the American genocide of the First Nations)[96]. These are not distant histories for the Plaintiffs or our communities, they are grim realities that happened less than 100 years ago.

143. Utilizing a freight train to capture supposed 'dissidents and undesirables,' in conjunction with the illicit conspiracy to kidnap, rob, deprive the plaintiff of their rights and imprison them unjustly- to make them slaves under the 13th amendment by abusing the law and make a political statement about power and control to their community-

---

[96] Hitler's Inspiration and Guide: The Native American Holocaust (Jewish Journal, 6/18/2013)
https://jewishjournal.com/mobile_20111212/117824/hitlers-inspiration-and-guide-the-native-american-holocaust/

this white supremacist message can and should be viewed by the Court as a Hate Crime

under 18 U.S. Code § 249 - Hate crime acts:

(2) Offenses involving actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability.—

    (A) In general.—Whoever, whether or not acting under color of law, in any circumstance described in subparagraph (B) or paragraph (3), willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person—

(ii) shall be imprisoned for any term of years or for life, fined in accordance with this title, or both, if—

(II) the offense includes kidnapping or an attempt to kidnap.

(B) Circumstances described.—For purposes of subparagraph (A), the circumstances described in this subparagraph are that— (i)the conduct described in subparagraph (A) occurs during the course of, or as the result of, the travel of the victim—

(II) using a channel, facility, or instrumentality of interstate or foreign commerce;

(ii) the defendant uses a channel, facility, or instrumentality of interstate or foreign commerce in connection with the conduct described in subparagraph (A);

(iii) in connection with the conduct described in subparagraph (A), the defendant employs a firearm [*etc*]; or (iv) the conduct described in subparagraph (A)—

(I) interferes with commercial or other economic activity in which the victim is engaged at the time of the conduct;

or (II) otherwise affects interstate commerce.

144. Once the Plaintiffs' vehicle crossed the Tops intersection in Canandaigua, the

Finger Lakes Railway moved its waiting freight train across the tracks to block the

Plaintiff's path and it strangely stopped. Trapped at the train, plaintiffs became

uncomfortable for their safety for reasons previously stated and attempted to hook a

U-turn and find a new route.

145. Defendant Bonham and Jordan Bonafede, Bryan Blum, David Cerretto, Michael S

Turton, Richard Canino, Brian J. Ratajczak, Bruce Drake, Ryan Bentley, SA Lander, M

Pietrzykowski and officers of Troop E unknown, utilizing the illegal warrant produced

by Investigator Bonham and collusion with defendant Wilkins to lure in their prey,

surrounded the Plaintiffs' vehicle utilizing numbers and firearms to affect the plaintiffs'

surrender and kidnapping in violation of NY PENAL § 135.25 Kidnapping in the first

degree and 18 U.S. Code § 1201(a)(1), § 924(c)(1)(a)(ii), and § 1951.

146. Combining each criminal element comprising the plaintiffs' kidnapping and the

armed robbery of their vehicle, a clear picture of the extent of collusive lawless

agencies exacting Gestapo Justice against their perceived political enemies emerges, in

which the only terroristic behavior at any point was from said government agencies and

their criminal agents.

147. 18 USC § 2331(5) defines the term "domestic terrorism" to mean activities that:

    (A) involve acts dangerous to human life that are a violation of the criminal laws

of the United States or of any State;

      (B) appear to be intended— (i) to intimidate or coerce a civilian population; and

      (C) occur primarily within the territorial jurisdiction of the United States.

148. Predictably, 18 USC § 2337 (1) grants protection against terrorism claims "to the

United States, an agency of the United States, or an officer or employee of the United

States or any agency thereof acting within his or her official capacity *or under color of

legal authority"*; while the defendants' actions technically constitute domestic

terrorism, they are protected by their parent corporation even when only acting under

color of law, ostensibly as the US knows that its agents commit domestic terror actions

regularly by engaging with white supremacists[97] and such organizations, and, as with

the 13th Amendment, the US reserves its agents the sole right to commit inhuman

criminal acts while granting itself protections from facing Justice.

---

[97] Law Enforcement and White Supremacy are a revolving door; see: Racist retired FBI Agent's contact with Buffalo mass murderer *Authorities investigating if retired federal agent knew of Buffalo mass shooting plans in advance* (Buffalo News, May 26, 2022) https://buffalonews.com/news/local/crime-and-courts/authorities-investigating-if-retired-federal-agent-knew-of-buffalo-mass-shooting-plans-in-advance/article_bd408f18-dd39-11ec-be53-df8fdd095d6f.html

149. Without probable cause or a legal warrant, the Defendants directly involved in their individual capacities in the kidnapping stripped Plaintiffs Fisher and Krenzer of holy articles of their Mandalorian faith, weapons and armor, in violation of first, second and fourth amendment rights. Body cam footage of the kidnapping shows the plaintiffs were immediately handcuffed and stripped of their legal weapons. Aggrieved by the unconstitutional theft of their holy vestment, the plaintiffs believe this individual act to be a violation of NY Penal § 155.30(9), Grand Larceny in the fourth degree, as "the property consists of a... religious vestment... comprising a display of religious symbols which forms a representative expression of faith and (a) has a value of at least one hundred dollars" in addition to being another violation of 18 U.S. Code § 242.

150. The plaintiffs were handcuffed, placed in a cruiser, and taken to a secondary location: Troop Barracks E. Plaintiffs were not told why they were being abducted.

151. After being forced out of their vehicle by armed police, the plaintiff's car was taken by the defendants to a second location without the plaintiffs' permission, and carjacking, pursuant to New York Penal Law section 155.30(8), is a felony in New York State if the value of the stolen motor vehicle is over $100.

152. In addition to the plaintiffs' carried articles, the Defendants stole three firearms in manufacturer's boxes belonging to the inventory of the LLC from the trunk of the plaintiffs' vehicle, violating 27 CFR § 478.33a Theft of firearms, wherein "No person shall steal or unlawfully take or carry away from the person or the premises of a person who is licensed to engage in the business of importing, manufacturing, or dealing in firearms, any firearm in the licensee's business inventory that has been shipped or transported in interstate or foreign commerce."

153. Plaintiffs waited through 5 hours of interrogation, chained where they sat, while the Defendants robbed their home and business of all valuables, including the plaintiff's television, ny compliant rifles, a paintball gun, and items unlisted on the warrant in acts of blatant secondary theft in violation of NY Penal Law § 155.40 (Larceny 2nd).

154. Krenzer was interrogated first, accused of having been ruled mentally incompetent by a judge and questioned her about her "father's conservatorship" over her (both wild defamatory claims made to state police by defendant Wilkins, repeated and dismissed in his accusations in the ATF revocation hearing). During the course of the interrogation, officers asked Krenzer, *mala fide,* if she was a "responsible person". Not knowing the definition of Responsible Person as defined by the ATF or its relation to the FFL license as she is not a gunsmith but just a secretary, she replied *in nimirum* as any non-FFL/RP would to such an inconspicuous question. Hearing the term on its face, would you not also agree that you are a responsible person? Defendants Burke and Wilkins were on hand for Krenzer's investigation, providing such malicious lines of questioning to support their ATF license revocation case by acquiring a coerced "confession" to being a non-reported FFL, made in complete ignorance to legal definitions and under duress, not to mention standing in stark contrast to the facts.

155. Evidence held by the police was insufficient to establish reasonable cause (i.e., probable cause). As outlined above, police erroneously believed that Plaintiffs valid FFL08 did not authorize Fisher to possess assault weapons and high-capacity magazines. In fact, the plaintiff was told directly by the charging officer that he was being charged with criminal possession of a weapon "primarily because you do not have your state licensing." (see body worn camera footage 2022-01-

27_1253_X60A2722U, at 18:16:17). The defendant further advised the plaintiff that they cannot receive non-compliant guns without a state license. (see body worn camera footage 2022-01-27_1253_X60A2722U, at 18:17:00). This erroneous opinion is insufficient to establish reasonable/probable cause justifying arrest.

156. In the police barracks, ATF agent Wilkins would cite Plaintiff Fisher with a binder of over 170 different supposed violations and accusations with no factual basis, including Krenzer having a drug addiction and being insane, straw purchase to criminal Italians, illegal firearms purchases, and secretary Krenzer being an unreported RP with unrestricted firearms access sending and receiving firearms shipments[98] and investing an imaginary $18,000 of her personal money into the business.

157. The enterprise's agents informed the plaintiff that they may not do any business until they are found innocent in court or they would be arrested again; furthering the enterprise's conspiracy to violate 18 U.S. Code § 1951 and 242.

158. The defendants' robbery of the plantiffs' armory and workshop (business premises) lasted between 2:14pm and 5:52pm according to Defendant Kuzdzal's Digital Photo Record[99] which provides a vast quantity of images, video and documentation of their crimes, as well as their criminal dispositions, as presented to the plaintiffs in Discovery. Images DSC_0239 to DSC_0252 (a series of 13 unbroken images) documents the LLC's week's cash on hand ($2,861.32) in a variety of "drug bust" style spreads on a table. DSC_0253 then displays a drawn garbage bag in a trash can. DSC_0254 once again depicts the table of cash from a new angle, then in DSC_0255 the garbage is shown needlessly strewn across the office floor.

---

[98] See Wilkin's binder of baseless accusations to the ATF's revocation hearing, included as **Exhibit AS**
[99] See Digital Photo Record (Genl 34D Victor_02-09-2022), attached as **Exhibit AT**

159. With similar disregard for property, DSC_0722, DSC shows the negligence with which the plaintiffs' firearms were treated, revealing thick, sweaty latex prints on a rifle. Many stolen firearms were taken without being placed back in their factory boxes, and each requires regular maintenance and oil to stay unrusted, though leaving the oil cans behind likely means none have been cared for since in defendants' possession, degrading each firearms' market value.

160. DSC_0673 shows two officers displaying a box from the business' packing and shipping center. Under review of the photograph, who appears to be Defendant Fifield by his badge is shown displaying a loaded pistol on his belt in reminder that this was an armed robbery by an enterprise dedicated to violating 18 § 1951 under color of law.

161. During the robbery, in a display of profound firearms safety knowledge as seen in DSC_0595, an investigator wearing a Troop E Crash Reconstruction Unit shirt displays a firearm that the officer personally *Manufactured* on site out of two separate parts that did not constitute a firearm, an upper receiver belonging to owner E Flowers and a lower receiver (s/n A21936), that were never at any point previously attached, as seen in DSC_0589. This note is important, because not only did the officer manufacture an assault rifle on site out of gun parts that belonged to an individual owner and the inventory, but Flower's lower receiver (s/n A21946) is shown on the workbench with a NY compliant grip installed, and the investigator ignored the Plaintiff's Warning Note on the upper receiver informing that a live round was trapped inside. This investigator not only chose to manufacture an "assault weapon" to photograph as falsified evidence, but assembled an assault rifle with a live round jammed inside the chamber and then Transported that assault rifle to secondary locations, constituting a danger to every

citizen on the road as it traveled. Evidence the manufactured assault weapon was transferred, in what can only be described as a criminally negligent act, is seen in DSC_001 and DSC_002 (spreads of the plaintiff's "full inventory" at Troop E), with a retail value of all such seized property

162. Defendants Bonham, Kuzdzal, Ellison, Fifield, and all other such defendants who assisted in the direct theft and transportation or receipt of stolen firearms have committed violations of 27 § 478.33a Theft of Firearms, stating "No person shall steal or unlawfully take or carry away from the person or the premises of a person who is licensed to engage in the business of importing, manufacturing, or dealing in firearms, *any firearm* in the licensee's business inventory that has been shipped or transported in interstate or foreign commerce." Every single one of the plaintiff's firearms has been shipped in interstate commerce, and the robbery precluded multiple interstate sales from shipping. Based on the wording "*any firearm*," a single violation of §478.33 exists for the theft of each the following 34 firearms from the business premises and work vehicle:

(a)  Zastava Arms Model ZPAPM70 7.62x39mm (s/n Z70099922)

(b)  Kriss Vector .45 ACP (s/n 45CO26430)

(c)  JTS M12AK 12ga (s/n MK2101784)

(d)  Palmetto State Armory Model Px9 9mm (s/n X9-032262) & 50 rnd drum

(e)  Palmetto State Armory Model PA15 Banana Cerakote (s/n SCD944795)

(f)  Palmetto State Armory Model PA15 (s/n SCD402374)

(g)  Palmetto State Armory Model PA15 (s/n SCD402372)

(h)  Palmetto State Armory Model PSAK47 (s/n AKB051772)

(i)  Palmetto State Armory Model PSAK47 (s/n AKB058135)

(j)  Palmetto State Armory Model PSAK47 (s/n AKB058130)

(k)  Palmetto State Armory Model PSAK47 (s/n AKB058134)

(l)  Riley Defense RAK47 7.62x39mm (s/n B35247)

(m) Riley Defense RAK47 7.62x39mm (s/n B34881)

(n)  Riley Defense RAK47 7.62x39mm (s/n B34927)

(o)  Ruger AR556 (s/n 1852-14306)

(p) RIA Imports VRPA40 12ga (s/n R380581)

(q) RIA Imports VRPA40 12ga (s/n R379595)

(r)  RIA Imports VRPA40 12ga (s/n R293831)

(s)  RIA Imports VRPA40 12ga (s/n R293818)

(t)  RIA Imports VRPA40 12ga (s/n R379559)

(u) RIA Imports VRPA40 12ga (s/n R379595)

(v)  Springfield Model 67 12ga (s/n A881976)

(w) Remington Wingmaster Model 870 (s/n 650012V)

(x)  Appeal IT-21 (s/n APL00543)

(y)  Mossberg 12ga 2-in-1 (s/n 1454834)

(z)  Mossberg 12ga 2-in-1 (s/n 1454818)

(aa)   Diamondback DB15 (s/n DB2517690)

(bb)   Hi-Point model 4095 40 S&W (s/n H86778)

(cc)   Hi-Point model 4095 40 S&W (s/n H86775)

(dd)   Omega E-3 lower (s/n A21936)

(ee)   Omega E-3 lower (s/n A21945)

(ff)     Omega E-3 lower (s/n A21946)

(gg)    Anderson AM-15 lower (s/n 21290451)

(hh)    Anderson AM-15 lower (s/n 21328925)

(ii)     Anderson AM-15 lower (s/n 21310071)

(jj)  Among with this $25,000.00 in stolen firearms, the robbers took boxes of

magazines, cases of ammunition, accessories, equipment and merchandise, and

the police reports list an HDS "double barrel shotgun (s/n 21J065574)" on the

search & seizure receipt from 1 East Main, displaying their profound ignorance as

to what even constitutes a firearm and what is obvious paintball equipment.

163. While the business premises was robbed, the plaintiffs' home was also robbed of

valuables[100], constituting a violation of §478.33 for the theft of each of following 2 firearms:

(kk)     RAK47-P-TSNY 7.62x39mm with Adidas Stripes (s/n B27035)

(ll)     Revelation Model 300F 20ga shotgun (no s/n, family heirloom)

Once more, aggrieved by the unconstitutional theft of their personal holy articles, plaintiff Fisher

the theft of their personal arms and ammunition to be a violation of NY Penal § 155.30(9), Grand

Larceny in the fourth degree, as "the property consists of a… religious vestment… comprising a

display of religious symbols which forms a representative expression of faith and (a) has a value

of at least one hundred dollars" in addition to being another violation of 18 U.S. Code § 242.

164. The enterprise sent a number of vehicles of defendants to rob the plaintiff's home

including: Bonham's gunmetal Subaru witnessed by the plaintiffs during their carjacking, a

Silver Jeep (KMH9317), gunmetal Chrysler 200 (HFN7347), and another vehicle with

unidentifiable license plate numbers (Scene Photos Palmyra DSC_001). According to the FIU

---

[100] Photographic evidence available in Scene Photos Palmyra, beginning with DSC_001 which shows four of the defendants' vehicles filling the plaintiff's driveway, included as **Exhibit AU**

Report, these Defendants included Bonham, Richard Canino, Justin Prusak, plus "several [unnamed] SIU-Rochester members and federal agents." The burglars were advised on scene by Bonham, while Defendant Turton signed the copy of the search warrant left behind.

165. Scene photographs show a near empty home and a porch covered in snow. The plaintiffs still hadn't been able to afford a bed since moving in as they were sleeping on the floor to save money for the business' ammo factory property and their forever home, sacrificing for the dream. Mirroring their behavior within the business premises, defendants threw anything they didn't steal on the ground, then dumped used tampons and trash on top, seen in DSC_0111.

166. DSC_0015 and DSC_0037 show a plugged-in cat-safe safety heater in each room of the house. These were the apartments only heat source as the plaintiff couldn't afford to use the central air on their budget. They are specifically low-temp output and cat-safe, and do not need to be unplugged. These heaters were unplugged by the defendants as they left, leaving the cats (one of them with serious special medical needs) in the cold without food, as evidenced in DSC_0127. Each defendant present within the plaintiffs' home has violated the cruelty to animals statue NYPL § 353. "Failure to Provide Proper Sustenance" in that the enterprise engaged in the conspiracy unjustifiably deprived any animal of necessary sustenance, food or drink, or neglected or refused to furnish it such sustenance or drink, or causes, procures or permits any animal to be deprived of necessary food or drink, or who wilfully sets on foot, instigates, engages in, or in any way furthers any act of cruelty to any animal, or any act tending to produce such cruelty, is guilty of a class A misdemeanor and for purposes of paragraph (b) of subdivision one of section 160.10 of the criminal procedure law.

167. Defendants who stole from the plaintiffs' apartment have violated NY Penal Law § 140.30(1): Burglary in the first degree: A person is guilty of burglary in the first degree when he

knowingly enters or remains unlawfully in a dwelling with intent to commit a crime therein, and

when, in effecting entry or while in the dwelling or in immediate flight therefrom, he or another

participant in the crime is armed with a deadly weapon. Burglary in the first is a class B felony.

168. The aforementioned stolen firearms from the apartment, business premises and

vehicle, along with other stolen merchandise and valuable personal items, were transported to

Troop E FIU on 1/27/22, and then to Troop E Vault on 2/2/22.

169. Around 6pm, the plaintiffs were then erroneously charged with CPW 3rd, citing five

firearms that were supposedly in the LLC's inventory at the business premises at the time of the

plaintiffs illegal abduction on the road (those s/n's being SCD402372, SCD402374, SCD944795,

X9-032262 and DB2517690). The plaintiffs were transported to the jail together, kissed, were

separated again, stripsearched and illegally jailed overnight, to be released on their own

recognizance by the Court on $0 bail the next day, 1/28/2022. It is worth noting that (s/n

SCD402372) does not appear in inventory photos at the Trooper Barracks, and was possibly

already trafficked to a third location by defendants if not erroneously reported and already sold.

170. Assistant District Attorney Jeffery Friesen, in his only personal addition to the

enterprise's conspiracy, recommended to the Court that the plaintiffs be set a bail and remanded

back into custody, attempting to further the conspiracy through a violation of 18 USC § 241,

targeting the plaintiff's 4th, 8th, 13th and 14th  amendment rights under color of law by keeping

them falsely imprisoned (and their pets unfed and in the cold) in violation of Code § 242, §

1201(c) and §1959(5)

171. 1/28/22, Investigator Kupka of the Monroe Crime Analysis center published an

"Officer Safety[101]" bulletin stating that "NYSP would like to make officers aware of [the

plaintiffs]..." accusing them of illicit "assault weapons, high capacity ammunition feeding

---

[101] See page 62 of "SW Paperwork SIUROC 22-9 FIU 2022-028", included as **Exhibit AV**

devices, <u>body armor</u>[102] along with a large amount of assorted rifle, shotgun and pistol ammunition were located. **These subjects may have access to other weapons**[103]. It is believed that the subjects are anti-law enforcement and anti-government... It should be noted that Fisher participated in the C/Rochester Protests in 2020." In addition to false statements about "anti government rhetoric" (the LLC is duly licensed through the US government, the plaintiffs vote, the LLC publicly discourages foolish notions of "armed revolution" and 3d printing firearms, support US military vets. Baseless accusing them of being public dangers possessing illicit weapons, this politically charged memo includes images of the plaintiffs and their vehicle for identification, targeting and harassment by the blue line gang members associated with the Enterprise, and reiterates the clear political motive driving the enterprise's § 1962(d) conspiracy to violate 18 U.S. Codes § 1951, 242, and so on to deprive the plaintiff of their rights under color of law, despite foreknowledge of its legal status as ATF-approved international arms dealers.

172. Robbery of the contents of the plaintiff's stolen vehicle by defendants Bonham, Drake and Kuzdzal would not occur until 1/28/22 at 9:19am, and the vehicle was not immediately returned upon the plaintiffs' release from kidnapping. In addition to the LLC's brand new macbook[104], the defendants stole 3 firearms in their manufacturer's boxes (as noted above, s/n's 45CO26430, H86778, H86775).

173. The plaintiffs were not charged with violating any federal laws or regulations, but erroneously under Article 265 "Firearms and Other Dangerous Weapons" of the New York State Penal Law. Under Article 265, possession of restricted firearms (including those defined as assault rifles) and large capacity ammunition devices is criminally

---

[102] Once more targeting the Plaintiff's religious rights to body armor, which is federally legal and not in any sense a weapon or a dangerous article. The defendants want the plaintiff unarmed, unarmored and ripe for abuse. It will never be so.

[103] Obviously plaintiff Fisher could not allow themself to be disarmed at any point, and had contingencies to civil rights abuses by defendants in place. Further, the insomniatic trauma of kidnapping and being forced back to the brink of destitution led to the plaintiff to invent a completely legal, felon-legal, armor piercing machine crossbow for home defense and coyote hunting.

[104] It was a huge source of pride to the Plaintiff to be able to purchase a Macbook with profit from the LLC.

prohibited, and the plaintiff was charged with offenses under PL § 265.04(2), 265.02(7), and 265.02(8). However, PL § 265.20 "Exemptions" states that sections 265.04 and 265.02 shall not apply to fifteen specified subcategories of individuals, which includes members of law enforcement, those competing in licensed shooting competition, firearms trainers, and *licensed manufacturers and importers*.

174. The exemption for Subsection 8 of Penal Law section 265.20(a) states that the law proscribing possession shall not apply to: "The manufacturer of … assault weapons … large capacity ammunition feeding devices … as merchandise, or as a transferee recipient of the same for repair, lawful distribution or research and development." The term transferee is not defined in the Penal Law, though the common meaning of it is a person to whom a transfer of property is made. In other words, the manufacturer is exempt under the law, as is the one who receives the firearm from a manufacturer for the purpose of lawful distribution.

175. None of Defendant Wilkins' accused violations resulted in a prohibited possessor obtaining a firearm, nor straw purchase, nor sale to any criminal element.

176. None of the Defendants' baseless accusations surrounding Krenzer could be proven true, with Wilkins later admitting in ATF revocation hearing testimony to DIO Curtis that he has no evidence to say his accusations about Krenzer's mental health or being a drug addict are actually true[105]. These baseless accusations are harmful and explicitly false, and the ATF withdrew associated charges from its revocation hearing. Id.

177. None of the Defendant Wilkins's accused violations resulted, or could result, in the inability to track a firearm. Wilkins' citing "9/9/21" as a 4473 violation that must be

---

[105] See ATF revocation hearing testimony, labeled as **Exhibit AW**

written out as 09/09/2021 or "hinder the ability of an ATF professional to track" said firearm because the agent cannot determine if the year is 1921, 2021 or 2121 is either an admittance that ATF agents are not smart enough for the job they are supposedly assigned to or a bad faith argument made against a few month old shop in a desperate attempt to call its operation criminal.

178. Clerical errors on 4473 forms found during his first three inspections were corrected according to Wilkin's extensive sticky notes (currently assumed to be held with all other effects stolen by NYS police), though ATF refused to accept the 100+ amended documents as evidence of dedication to quality and improvement in its kangaroo revocation hearing held by John Curtis, in which the Plaintiffs were barred from speaking on the LLC's behalf and only allowed a written statement in its defense. Under the new policy, there is no room given for the smallest of "violations," and agents have used this unconstitutional law to steal the plaintiff's livelihood in violation of its right to conduct interstate business unmolested by conspiratory government overreach in retaliation to their use of free speech and 2A rights.

179. The plaintiff's pistol-permit pistol, being serviced and microstamped in Virginia at Thousand Pikes LLC, was unlawfully seized from that interstate business by two John Doe agents of the ATF at the behest of Defendant Wilkins, Curtis, Burke, and/or other members of the conspiracy, and transported the pistol to an unknown secondary location, constituting a final violation of §478.33 against the plaintiff upon the Defendant's Criminal Enterprise for the ordered theft the following firearm:

  (a) Springfield Armory Hellcat Micro-Compact OSP 9mm (serial #BA432519)

In addition to being a violation of 27 §478.33, the Enterprise crossing state lines to extort a business under color of official right, seize property legally held by a licensed gunsmith and interfere with interstate commerce is a daylight robbery in blatant violation of 18 U.S. Code § 1951(a), 18 U.S.C. § 922(u) and 18 U.S.C. § 922(j). John Doe agents were provided with a bill of service[106] for the plaintiff's pistol, which the business provided to the plaintiff.

180. The Plaintiff's legally held property stolen through the Defendants' conspiracy against it includes all such articles listed on the Warrant Returns, including over 35 firearms, thousands of dollars worth of ammunition, computers, firearm accessories, a vehicle, cash and tools accounting for over $50,000.00 in total value. Each member of the criminal enterprise engaged in conspiracy against the plaintiff's interstate commerce is therefore in violation of both NYPL § 155.40 and 18 § USC 1951.

181. In addition, there are further criminal penalties for robbery of an interstate FFL;

   (1) 18 U.S.C. § 922(j). Prohibits the receipt, possession, concealment, storage, bartering, selling, or disposing of stolen firearms and ammunition knowing or having reason to believe the firearm or ammunition is stolen. Punishable by up to 10 years.

   (2) 18 U.S.C. § 922(u). Prohibits stealing or unlawfully taking away firearms from the business inventory of a Federal firearms licensee. Punishable by up to 5 years.

   (3) 18 U.S.C. § 924(l). Prohibits stealing a firearm which has moved in commerce. Punishable by up to 10 years.

---

[106] See Thousand Pikes Armory invoice for unpaid services, included as **Exhibit AX**

181. Unable to do any commerce by the defendant's direct threat of continued violence, the business suffered immensely, acquiring over $20,000.00 in debt from credit card chargebacks[107] before the courts had even brought the case before a grand jury.

182. Shortly after her phone was stolen on 1/27/22, plaintiff Krenzer's OnlyFans account notified her of a log in Albany NY, accessed on said stolen phone by an unknown defendant in Albany, NY. The only reason to access and adult account is to view private adult content. Pursuant to CPL § 245.30(3), the plaintiff requests that the Court order the Defendants to provide as discovery all documentation prepared by Investigators during their job-related duties and personal capacities concerning Theresa Krenzer and her business. A demand is made to know the name of the agent or officer whom accessed Krenzer's adult content, with a secondary demand is made to determine if any such sensitive images or videos were stolen or disseminated by the criminal in possession of the phone in violation of NYPL § 245.15 (Unlawful dissemination or publication of an intimate image). In the event that Defendants decline to provide this information or provide the information in limited form, the plaintiffs would at least be in an appropriate position to determine what course of action to take, such as requesting a subpoena or some form of sanction/preclusion.

183. On 1/28/2022, defendant Wilkins accused the plaintiff by phone and email[108] of losing two firearms that "professional" investigators could not account for, threatening to harass the clients whom legally received the rifles if records could not be produced. The plaintiff readily produced the records the senior investigator could not locate despite all their paper records and electronics being stolen by the enterprise.

---

[107] See Fortispay Demand for Chargebacks, included as **Exhibit AY**
[108] Wilkins 1/28 email, included as **Exhibit AZ**

184. On 1/28/2022, in fear for her life and the safety of her family, RP A Wessner, a non-firearms owner whom only was able to work at the business for 2 days before taking a leave of absence to care for sick parents and whom never sold nor handled a firearm, sends a formal request to quit her position at the Red Right Hand and divest her ownership back to the LLC. In fear of being unjustly terrorized and retaliated against by the Enterprise personally, she cuts off communication with the plaintiffs. The plaintiffs process her request dissolving her ownership.

185. On 2/22/2022, on or around 4:00pm, ATF special agent Andrew O'Connell and NYSP TFO William Pearsall conducted a raid on the plaintiff's costumers (herein referred to as "Couple C") as evidenced in *ATF Report of Investigation 03-01-2022-145500*[109]. Agents confiscated a NY legal pump shotgun (VRPA40, s/n R379561) that Wife C had purchased as a christmas gift for Husband C, a legal immigrant and citizen, including erroneously labeling the pump shotgun as a "rifle and magazines" in the report. Defendant John Devito is listed as the special agent in charge of the operation, which removed legally held property from citizens and violated the 2nd, 4th and 14th amendments of the plaintiffs' customers, further establishing a pattern of violations of 18 USC § 1951, 241 and 242 common to the Enterprise. This action is a violation of 18 U.S.C. § 924(l) Theft of a Firearm Moved in Interstate Commerce and NY PEN § 155.30(7) Grand Larceny in the Fourth degree. Court ordered relief for the plaintiff's clients for an apology and return of property stolen under color of law is entirely justified, as by information and belief, these clients were harassed expressly because of immigration history.

---

[109] Included as **Exhibit BA**

186. On 2/23/2022 at 10:05am, Defendants Steven Mowers and Christopher Bonham, as reported in the BCI-54 Firearms Operability Statement[110], took 13 of the plaintiff's firearms, transporting them to Williamson Sport & Cons. at or around 10am and finishing here at 11:43, and after lunch transporting the stolen firearms to Troop E Range in Farmington at or around 1:42pm; defendants utilized the plaintiff's stolen ammunition to operate the firearms. There is no record of cleaning the firearms after use, greatly degrading the value of each from lack of proper care. This record also shows that the defendants spent over 5 hours testing just 2 rounds through 13 firearms in a gross misuse of taxpayer funded work hours that should have been spent investigating buffalo shooter Peyton Gendron before he could affect a white supremacist attack on 5/14/2022 or others with simiilar genocidal, terroristic ideologies.

187. On and around June 1st, 2022, Defendant Bonham returned receipt on an unnecessary search warrant of all of the plaintiff's electronic records[111], viewing thousands of private texts, pictures, videos, calendar dates, and aggregating the plaintiff's customer information for targeted harassment to further the Enterprise's assault on the 1st, 2nd, 4th, 13th and 14th amendment rights on the plaintiff's clients while digging for anything criminal about either of the plaintiffs in their personal communications. Once again, intimate photographs were accessed by a defendant under the guise of "criminal investigation."

188. On or about June 23rd, 2022, before the Ontario county grand jury[112], Senior Industry Operations Investigator Kyle Wilkins, SIU Sgt. Steven Mowers, SUI Investigator Bonham, and Assistant District Attorney Van Dellon conspired to violate

---

[110] Included as **Exhibit BB**
[111] SW Google Returns Signed_06-01-2022-140629, included as **Exhibit BC**
[112] See Grand Jury Transcript

18 U.S. Code § 1623 False declarations before grand jury or court, by providing misleading and patently false information to the jury to secure an indictment in an effort to, directly, legally enslave the plaintiffs as provided by the 13th amendment in the ultimate deprivation of their rights. In the GJ Transcript, each of the defendants disguises the fact that there are multiple types of FFL licenses with different rights.

189. To the Grand Jury, Defendant Wilkins testified that he is well trained in New York regulations with regard to the possession, manufacture and sale of firearms, mostly with the New York State Police Pistol Permit Bureau in Albany. (GJ Transcript, p.13). Investigator Wilkins further testified that once a federal firearms license (FFL) is issued by the ATF, the licensee must apply for a New York State dealer and firearms license and/or a New York State gunsmith license should they wish to conduct business in semiautomatic firearms as well as handguns. (GJ Transcript, p.14). Investigator Wilkins also testified that in order to legally operate as a gun shop that purchases, sells and modifies firearms, the defendant's LLC would have to possess either a New York State dealer license or a New York State gunsmith license. (GJ Transcript, p.21). This testimony is untrue, and misled the grand jury regarding the sole issue in the case. It stands undisputed by the People that at the time of the alleged offenses, the Plaintiff possessed a valid, Type 08 Federal Firearms License and an AECA registration, which authorized the LLC to be an "importer of firearms other than destructive devices." (see attached). Pursuant to 27 CFR §478.41(b):

> "A license as an importer or manufacturer of firearms or ammunition, or a dealer in firearms shall, subject to the provisions of the Act and other applicable provisions of law, entitle the licensee to transport, ship, and **receive firearms** and ammunition covered by such license in interstate or foreign commerce and to engage in the business specified by the license, at the location described on the license, and for the period stated on the license. However, it shall not be

necessary for a licensed importer or a licensed manufacturer to also obtain a dealer's license in order to engage in business on the licensed premises as a dealer in the same type of firearms authorized by the license to be imported or manufactured."

Clearly, the controlling federal regulation states that the defendant's FFL authorized the LLC's RPs to "transport, ship and **receive firearms**" covered by the license, and therefore the LLC's inventory could not provoke any probable cause to any reasonable "senior investigator," precluding Defendants from seeking a defense of ignorance under 18 U.S. Code § 1623 stating it "shall be a defense to an indictment or information made pursuant to the first sentence of this subsection that the defendant at the time he made each declaration believed the declaration was true." As sworn professionals expected to know the GCA, SAFE and other applicable laws, at no point can the Defendants claim they believed their false testimony was true without admitting that their testimony that they are "well trained" in these laws was also untrue.

190. ADA Van Dellon called Ms. Keefe, who is employed by the Ontario County Clerk's Office as an index clerk, to testify before the grand jury. The sole purpose of Ms. Keefe's testimony appears to be to establish that at the time of the alleged offenses, the plaintiff's LLC did not possess a valid New York State dealer and firearms license or a New York State gunsmith license in Ontario County. If, as the Defendant Van Dellon informed the plaintiff's counsel, the People's theory did not allege that the defendant's failure to obtain a State license negates the LLC's FFL, then the entire testimony of Ms. Keefe was irrelevant and highly misleading to the grand jury. It served no valid purpose other than to improperly convey to the jury the idea that the LLC's lack of a State license rendered the mere possession of the

charged firearms and magazines unlawful. In this capacity, Defendant Van Dellon misled the grand jury in violation of 18 U.S. Code § 1623.

191. Colluding with Van Dellon and Wilkins, Defendant Mowers' testimony to the grand jury was similarly untrue, misleading the grand jury in violation of 18 U.S. Code § 1623 and 242. Van Dellon elicited practiced, misleading testimony by never mentioning the plaintiff's licensing status, and only the weapons were illegal to possess by the average NY citizen.

192. Colluding with Van Dellon, Wilkins and Mowers, Investigator Bonham's testimony to the grand jury was similarly untrue, misleading the grand jury in violation of 18 U.S. Code § 1623 and 242. Van Dellon elicited practiced, misleading testimony, regarding the LLC's FFL rights and NY law:

Mr. Van Dellon: "Applicant Certification.  30 days after the application is approved a business/activity will comply with the requirements of state and local law applicable to the conduct of the business activity".  "Investigator Bonham, based on your investigation, was that compliance with state and local law ever done?"

Bonham: "No."

Mr. Van Dellon: "Is that the issue here?"

Bonham: "Yes, it is." (GJ Transcript, p. 100).

The first guideline of Rule 3.8: Special Responsibilities of a Prosecutor is (a) "refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause," and under Standard 3-1.2 Functions and Duties of the Prosecutor (c), "The prosecutor should know and abide by the standards of professional conduct as expressed in applicable law and ethical codes and opinions in the applicable

jurisdiction." Purposefully misleading a grand jury is not professional conduct, and destroys the People's trust in and credibility of the Ontario County District Attorney's Office. It is, as much as it is ringleaders Wilkins' and Bonham's responsibility, the responsibility of every member of the ATF, NYSP, JTTF and Sheriff's Office to know the laws they enforce, and by extension to understand the laws under which charges are brought against those they target and the rights of those individuals. Any claim of ignorance of the law is simply unacceptable, for *ignorantia juris non excusat* must first and foremost apply to the arbiters and enforcers of the law.

193. Through deception, conspirators Van Dellon, Wilkins and Bonham secured an indictment from the grand jury. Count One of the Indictment, Criminal Possession of a Weapon in the First Degree, carries a mandatory determinate sentence with a minimum 5 years in the Department of Corrections and a maximum of 25 years (not including post-release supervision). As a class B violent felony, it is similar in class to Assault in the First Degree (serious physical injury to another with a weapon); Manslaughter in the First Degree (death to another while only intended to cause them serious physical injury); Rape in the First Degree (sexual intercourse with another by forcible compulsion); Course of Sexual Conduct Against a Child in the First Degree (repeated acts of sexual conduct including one act of intercourse against a child less than 13 years old); Burglary in the First Degree (entering a dwelling with the intent to commit a crime while armed with a weapon); Arson in the Second Degree (burning a building while knowing another person is inside); and Robbery in the First Degree (causing serious physical injury to another while forcibly stealing their property, or forcibly stealing property while armed with a weapon). A necessary element to all of

the above offenses is that another individual was seriously harmed by the actions of the accused. The plaintiffs' only "crime" was refusing to serve the police, and as established by the evidence are law abiding citizens and international arms dealers.

194. The plaintiffs were charged via Indictment 22-07-085A and 22-07-085B with one count of Criminal Possession of a Weapon in the First Degree, in supposed violation of Penal Law § 265.04(2); thirteen counts of Criminal Possession of a Weapon in the Third Degree, in supposed violation of Penal Law § 265.02(7); and forty-four counts of Criminal Possession of a Weapon in the Third Degree, in supposed violation of Penal Law § 265.02(8).

The plaintiffs were charged as Lords of War with the worst of the worst.

195. Each of Wilkins', Bonham's and Van Dellon's violations of 18 U.S. Code § 1623 individually served to impair the integrity of the grand jury. Collectively, they overwhelmingly impaired the integrity of the grand jury proceedings, resulting in the severe prejudice to the plaintiffs needed to secure their indictment.

196. Defendant Van Dellon, confident in his criminal enterprise's expected success, offered an obscene plea deal to the plaintiffs to hasten police victory: 5 years for Krenzer and 7 years for Fisher, for complete lawful operation of business that did not serve police. For reference, within the year, at the same intersection the plaintiffs were abducted from, a drunk man ran over a man in a wheelchair, killed him, fled the scene and hid the truck, and only received half the time in a plea bargain plaintiff Fisher was offered. As innocents, the plaintiffs obviously refused to entertain any plea whatsoever, but this evidences defendant Van Dellon's behavior is less indicative of him being an upstanding instrument of justice than him being a greasy human

trafficker who, throwing professional responsibilities aside by prosecuting a case he knew to be baseless and attempting to scare the victims of his enterprise's conspiracy into taking his plea deal, has violated 18 U.S. Code § 1583 - Enticement into slavery.

*(a) Whoever— (1) kidnaps or carries away any other person, with the intent that such other person be… held as a slave; or (2)entices, persuades, or induces any other person… with the intent that he or she may be made or held as a slave… shall be fined under this title, imprisoned not more than 30 years, or both.*

Considering the *exception* clause of the 13th Amendment, there was no other goal for Van Dellon than securing both defendants as slaves owned by the United States.

197. In addition, concealing the plaintiff's FFL 08 and AECA licenses from the Grand Jury to coerce them represents a violation of 18 U.S. Code § 1592 - Unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor as Van Dellon knowingly concealed and possessed any actual or purported government identification document (FFL, AECA), of another person— (2) with intent to violate section 1583 [or] 1590 shall be fined under this title or imprisoned for not more than 5 years, or both.

198. Despite the insinuations and suggestions to the grand jury and present in the search warrant application, there were no allegations in the Indictment that the plaintiff sold any assault weapons whatsoever to anyone within New York State. There were no allegations that the firearms recovered were modified beyond federal restrictions. None of the firearms recovered were defaced in any way (i.e., had serial numbers removed), and most were discovered in the manufacturers packaging. Despite the suggestions from the search warrant application, there is nothing to suggest that the plaintiff was operating with any nefarious intent. To the contrary, the plaintiff was operating a completely conspicuous business, advertising openly, and

promoting regularly through social media and other traditional means. This business

was lawful and proper in every way, servicing customers in 48 states, DC, and the

residents of Ontario, as Canadians can purchase up to 5,000 cartridges a person from

the Plaintiff and declare it at the border as (partially duty-free) personal imports under

the Canadian Explosives Act and guidance held under D19-6-1[113]. In addition to

needing to know America's gun laws, the plaintiffs must know foreign laws to service

their international business interests.

199. The plaintiff was not charged with facilitating illegal gun sales or any form of

unlawful firearms distribution, and no evidence was presented to the grand jury to

support such an inference as none exists.

200. On or about 8/16/2022, ATF director Curtis revoked the Plaintiff's FFL[114],

purposefully destroying the business, citing false claims that Theresa was an

unreported owner and unreported Responsible Person, despite her personally meeting

and being interviewed by Wilkins about her role as secretary-treasurer. Wilkins stated

to the plaintiffs that Krenzer did not need to file any additional paperwork with ATF

in her non-firearms related role answering the telephone[115], and to further refute the

ATF's claim of non-reported ownership completely one must only look at the LLC's

ATF Imports Branch-approved AECA license bearing Krenzer's name and position.

201. The plaintiff immediately made a written request for a sty of revocation until the

shop's inventory may be sold to another FFL, which pursuant to *Henderson v. United*

*States,* in which the Supreme Court's unanimous (9-0) ruling provided that even a felon

---

[113] Government of Canada's guidance on *Importation, Exportation and Transportation In-Transit of Ammunition*
https://www.nrcan.gc.ca/our-natural-resources/minerals-mining/mining/explosive-regulations/importation-exportation-and-transportation-transit-ammunition/9909
[114] See Revocation letter, attached as **Exhibit N**
[115] See the Red Right Hand Rifle Syndicate Workers Assembly Constitution & Bylaws, which explicitly states Theresa's responsibilities as Secretary-Treasurer as a non-FFL position, attached as **Exhibit O**

can sell their firearms collection even after being convicted of a felony, the plaintiff

should have been afforded to avoid massive economic damages. Defendant Curtis'

actions are another violation of 18 U.S. Code § 1951:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence[116] to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

(1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession…

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right. The ATF's long history with murdering American citizens and their dogs for minor violations or imaginary charges is well known, and the Plaintiffs have good reason to fear the continued threat of violence posed by malicious ATF agents.

(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

202. It is hard to say that any transaction made at the LLC other than locally printed

tee-shirt sales to locals was not defined as interstate commerce. The plaintiff imported

products and firearms from across state lines into its inventory, then shipped the

majority of those products and firearms back across state lines to lawful recipients

(customers and preferred FFLs) save for NY compliant items it sold within state.

Not one inch of the plaintiff's operation was illicit.

202. Revocation of the FFL on such unlawful grounds also invalidated the plaintiff's

$1000 AECA registration, $35 New York State Gunsmith and Dealer in Firearms

---

[116] The threat of the agency conducting another Kidnapping, Robbery, Intimidation attempt and malicious prosecution for enjoying lawful rights to interstate business constitutes a continued threat of physical violence post unlawful revocation.

licensing fees, NYS Incorporation fees and DBA fees (and the registered agent fees associated with both), profiting all such state and federal agencies these fees were paid to while stripping the plaintiff of their constitutional rights and economic future. The plaintiff holds that each of these state and federal licensing payments would each therefore constitute their own count of extortion by the Enterprise under 18 U.S.C. § 872 (Extortion by officers or employees of the United States) and a violation of 18 U.S. Code § 1962 (c)  reading "It shall be unlawful for *any person* employed by or associated with any enterprise engaged in, *or the activities of which affect*, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

203. Common practice before the ATF policy change, an industry operations investigator's report would instruct Plaintiffs to take simple corrective actions, as he provided on sticky notes. For instance, Plaintiffs were instructed to "ensure that when executing an ATF form 4473, all of the information called for [on the form] is accurately and completely provided"; with the Plaintiff's dedication to continuing and improving their compliance demonstrated in appending each form 4473 to Wilkin's exact specification and showing a vast improvement from month 3 to month 6 (where the Plaintiff already was displaying no 4473 clerical paperwork errors).[117]

204. Plaintiffs seek to abide by the Gun Control Act and have instituted corrective and operational measures in order to comply with the law. Id.

---

[117] See the Plaintiff's 4473 documents, January folder, seized by NYS Troopers on 1/27/22.

205. Nevertheless, the new standard applied by the ATF would be virtually impossible to meet by a long established and experienced FFL, let alone an FFL in its opening months actively seeking direct guidance promised by the ATF to ensure its compliance.

206. Specifically, as applied to the Plaintiff's inspections and hearing, a compassionless revocation recommendation was given, despite the fact that Wilkin's thick binder of baseless criminal accusations were all disproved, none of the clerical error violations were actually willful, and such errors were corrected.

207. The ATF recommended revocation despite the fact that there is no evidence Plaintiffs were reckless or indifferent to their duty to fill out the forms accurately.

208. Furthermore, it can be inferred that the ATF never intended to allow the Plaintiff to actually operate, and instead saw an opportunity to trap civil rights activists on false charges and punish the Plaintiff for not serving the police to send a stark message to the plaintiff's customers (women, minorities, and the lgbtq community).

209. In all instances, Defendant Wilkins, and any other Defendant, might try to excuse their conspiratorial behaviors in stating they were simply ignorant of the law and made a mistake, but *ignorantia juris non excusat,* especially across a multi-agency Enterprise made of veteran law enforcement. As an supposedly experienced senior investigator, and just one among many supposed experienced lawmen, how many documented baseless accusations and outright lies are necessary for Wilkins' behavior to establish a very clear pattern of malicious prosecution, Mccarthyism, and a willingness to disregard the law and his victim's rights entirely to persecute a "political enemy," believing himself Immune to justice for his crimes?[118]

---

[118] Wilkins mischaracterized the Plaintiffs as political radicals by baselessly stating they were both the SRA in his letters to NYSP and alternatively members of the "Sovereign Citizen" movement in his request for Order of Protections via the ADA Van Dellon in Ontario County court. Wilkins can't even seem to decide what poltical affiliation the Plaintiffs hold, but pushing a "radical" label is all

210. False statements made to acquire a search warrant, regardless if made through laughable ignorance of the governing statutes or actual malice, qualify as a Class A misdemeanor pursuant to section 210.45.of NY penal law. Investigator Christopher Bonham, who's signature seems to match that of the officer who forged the search warrant by signing "for" the judge, conspired with Investigator Wilkins and other Defendants, directly and indirectly, to use such false statements to effect a kidnapping and conspiracy to rob an interstate business in furtherance of the Enterprise's goals.

211. When it comes to Defendant Wilkin's reports concerning paperwork violations, it is unreasonable and inconsistent with the GCA to require a licensee to be perfect when seeking to comply with the Act. This is especially true given that the Plaintiff's business had been in operation just 3 months before its first inspection and was actively seeking the promised guidance of the agency in learning the minutiae of the business and improving compliance (which evidence shows the plaintiff did). Id.

212. Plaintiffs petition for an overturning of the FFL revocation by the Court de novo, yet even upon being granted such relief rightly fear future assaults on its rights and economic freedoms based on Defendants' enforcement policies and documented disposition to defamation, malicious prosecution and violence against the Plaintiff.

213. Plaintiffs are aware of at least one other local FFL licensee who received a recommendation of revocation recently because the ATF's Deputy Associate Chief Counsel, Matthew Meyerson, 'accidentally' and according to the email's own text, illegally, sent the Plaintiff the private revocation hearing paperwork of M SENGILLO

---

that matters to the agent. The Defendant's faulty information from the JTTF attempts to paint the Plaintiffs as "rioters" and communist "militia" despite no evidence, and despite the undeniable facts to the contrary. #RedScare

d/b/a SEVENTEEN NINETY-ONE GUNS & AMMO in a display of sheer incompetence seemingly quite common among the "professionals" at the ATF.[119]

214. Similarly signed by Defendant Curtis, ATF Director of Industry Operations, a pattern emerges of the ATF utilizing its new policy as a vector of attack to impede the operations or and place undue financial burden for the plaintiff's colleague FFLs, and by extension of the 500% raise in revocation hearings, establishing on a wider scale the scheme of the defendants' enterprise is to violate 18 USC § 1951 and citizens rights. Though 1791 Guns & Ammo is an FFL01, its shop still engages in regular interstate traffic to secure inventory- importing firearms, ammunition and accessories from outside the state of New York to service its local customers.

215. With June 2022 reports the ATF had increased its revocations by 500%[120], Defendant Curtis has clearly directly participated in many other violations of 18 U.S. Code § 241, 18 U.S. Code § 242, and 18 U.S. Code § 1951, establishing a larger pattern of predicate offenses affecting millions of Americans' constitutional rights.

216. "Federal Firearms Licensees are being denied renewals or their licenses are being taken away at a rate of about 500% greater since Biden was in office [than in] previous years," said Rep. Andrew Clyde, "So it is definitely obvious that the Biden administration is targeting Federal Firearms Licensees because they are the link between manufacturers and people being able to access their Second Amendment rights." Each shop being its own nexus within interstate commerce, the ATF Zero Tolerance Enforcement policy is violating § 1951 on a grand scale.

---

[119] See improper documents attached to email "In the Matter of the Notice to Revoke FFL 6-16-069-08-8D-05049 issued to Stea Rosie Rifle Syndicate LLC" from ATF Deputy Associate Chief Counsel Matthew Myerson (May 27th, 2022), included as **Exhibit P**
[120] Washington Times, June 8 2022
https://www.washingtontimes.com/news/2022/jun/8/andrew-clyde-atf-revoking-more-gun-dealers-license/

217. Ontario County Communications Officer Bryan Housel contacted the plaintiff to inform Fisher that no action had been taken on their pistol permit nor any other permit and all had been sent back to the County Clerk's Office without action. When asked on what grounds the state permits had been withheld, the defendant said they didn't have to answer any questions.

218. On or abouts 8/16/2022, Defendant Wilkins came to the plaintiffs' apartment to deliver a paper copy of the ATF's FFL revocation and gloat. Plaintiff Fisher took the revocation letter and read it in its entirety, noting aloud that it offered remedy via de novo Judicial Review in District Court along with listing each of the agent's lies. The plaintiff told Wilkins and his partner (presumed to be Agent Sean Burke, though is offered as ATF Agent Doe 5), that they'd see them in court seeking reinstatement and would highlight defendant's lies and civil rights abuses. The plaintiff, dressed only in leggings and obviously unarmed, signed Wilkin's and his partner's receipt and told the agents to get off their porch.

219. On and abouts 8/18/2022, Defendant Wilkins, nervous about his lies being exposed to a District Court, conspired with Special Agent John DeVito to launch another illicit joint ATF-NYS Trooper operation via the enterprise against the plaintiffs to terrify them into submission. A squad of 8 John Doe members of the New York State Police assisted ATF John Doe #3 and #4 (on behest of a "scared" Investigator Kyle Wilkins) in serving unnecessary documents to the plaintiffs at their residence. These documents were a "Warning Notice Against Unlawful Activity"[121] with reference to 18 USC § 1521, noting the federal statute protects federal law enforcement against certain forms of retaliation by the general public. In addition to the Warning from the desk of

---

[121] Plaintiff's copy given by ATF Agent John Doe #3, attached as **Exhibit BD**

John Devito, the defendants on scene informed the plaintiffs that taking *any* legal action against the defendant was illegal, and unless they signed Devito's unofficial paperwork and vocally promised not to sue Wilkins, they would be *immediately arrested* and prosecuted for a 10 year prison sentence. Arguably speaking, these actions and the documents themselves were designed to harass and intimidate the plaintiffs, as there is no reason why armed and armored law enforcement needs a multi-agency 10-man operation to notify civilians about a law, never mind providing personal armed service of an unofficial Warning prior to the commission of any such crime.

220. As with Wilkin's visit, Plaintiff Fisher met the ATF/NYStormtroopers on the porch wearing only leggings, and clearly unarmed. Plaintiff Krenzer, also in pajamas, attempted to call her lawyer before signing any document but the lead ATF agent on the scene (ATF John Doe 3) pushed inside the home without a warrant to drag Krenzer outside force the plaintiffs to comply with singing their papers under violent duress. Plaintiffs showed great restraint when Krenzer was unconstitutionally physically assaulted by ATF John Doe 3, the smaller ATF John Doe 4 indicated to the lead agent to take his hands off of her. Fisher convinced Krenzer to sign the document to avoid further violence and wrote "Signed under duress, obviously" beneath their signatures before telling the Enterprises' gang members to get off their porch.

221. The Plaintiffs' Defense counsels reached out to the Prosecutors about preserving and disclosing New York State body camera footage of this incident on September 1. Defendant Van Dellon in response asserted the position that disclosure of this footage was not required of them under CPL§ 245, as it related to a separate federal matter against the defendants. However, if it was related to a separate "federal administrative

proceeding," why was a squad of New York State Police involved? Where in CPL §

245.20 is there an exception to disclosure for documents related to a- to wit- no longer

pending "federal administrative proceeding"? The New York State police, by statute,

are deemed to be in the People's control under CPL § 245.20(2). Additionally, and

contrary to Van Dellon's posture, the standard for disclosure does not simply require the

People to provide information that "is part of" a pending case. The legal standard is "all

items and information that relate to the subject matter of the case."

222. Bodycam footage that would damn ATF and State Stormtroopers as aggressive

brutes who believe they are above the law, showing them directly lying about the law to

the victims, entering a home without a warrant, and using violence to acquire

compliance under duress being suppressed by the DA only serves to reinforce the

multiagency conspiracy and collusion outlined in this case. *Res Ipsa Loquitur.*

223. In the 8/18 police intimidation event to "protect" Defendant Wilkins from,

ostensibly, the plaintiff saying they would be seeking a judicial review of their FFL

revocation hearing in court, all such defendants individuals are ironically in violation of

18 U.S. Code § 1512 - Tampering with a witness, victim, or an informant as judicial

review of an FFL revocation hearing is a federal matter and the plaintiffs are the

victims and witnesses to this exact case presented before the Court today.

224. In addition to Witness Intimidation, Defendants' actions on 8/18 are clear

violations of 18 U.S. Code § 241 and Code § 242, seeking to use violence and the threat

of *another* kidnapping, false imprisonment and 10 years as a slave under the 13th

amendment to dissuade the plaintiffs from seeking justice, and violating their First,

Sixth and Fourteenth Amendment protections to due process under the law and freedom to petition the government for redress of grievances.

Ad nauseum, defendant Wilkins proves in word, action and deed that he is not an honest or honorable man, nor does he keep the company of honest and honorable men. Separate the defendants from the presumptive immunity of the badge, and their actions are the actions of gangland thugs and mobsters. *Quis custodiet ipsos custodes?*

225. On two separate court dates in November,[122] ADA Van Dellon petitioned the Court for an Order of Protection on behalf of defendant Wilkins against each of the plaintiffs. In each instance, Van Dellon baselessly claimed Wilkins "fears for his life" and mischaracterized the plaintiffs as "ideologically aligned with the Sovereign Citizen movement" and willing to "use the law" against the agent. The Court denied both requests. Conspirator Van Dellon, however, has here furthered the commission of 18 U.S. Code § 1512 - Tampering with a witness or victim, in order to:

(A) influence, delay, or prevent the testimony of any person in an official proceeding;
(B) cause or induce any person to—
　　(i) withhold testimony, or withhold a record, document, or other object, from an official proceeding; (see: bodycam footage suppression concerning 8/18 violation of § 1512)
　　(ii) alter, destroy, mutilate, or conceal an object with intent to impair the integrity or availability of the object for use in an official proceeding;
　　(iv) be absent from an official proceeding to which that person has been summoned by legal process;
(C)  hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense

Defendant Van Dellon's actions in this matter can only be seen on their face as defending his criminal conspirators while once more violating the 18 U.S. Code § 241

---

[122] Court minutes for plaintiff's maliciously prosecuted criminal cases

Conspiracy against Rights. Despite his request being denied by the Court, it is still on record, and the absence of his success in the matter does not assuage his guilt.

**E. Plaintiffs reasonably fear that Defendants have targeted them for political and discriminatory motives in violation of their civil rights.**

226. Governor Hochul also announced that New York State Police seized thousands of civilian firearms that are perfectly legal in 40 states from August 2021 to July 2022: the highest number in the history of the agency. This represents a 140 percent increase when compared to August 2020 to July 2021, when the State Police seized 612 guns. "My administration is laser focused on stopping the devastation caused by gun violence in communities across the state, and we continue to take bold action to face this crisis head on."[123] Governor Kathy Hochul's bold actions included destroying the plaintiff's entirely legal small business: a minority-owned, women-owned, lgbtq-owned at that, under the flimsy pretense of "community safety."

227. Investigators notes from the JTTF incorrectly mischaracterize Plaintiffs as "Present at Rochester Riot" with no factual backing[124]. Personal donations of medical supplies and bottled water to organizers of civil rights protests over nationwide brutality and the local police murder of Daniel Prude doesn't make the plaintiff a "rioter" nor create actionable suspicion to be investigated as a criminal. The plaintiff maintains their role in community safety at protests is to de-escalate emotional confrontations and youth taking bait like the stacks of bricks left around the march route, provide for common security by identifying and removing armed racist infiltrators and identifying and exposing undercover police agitators who's direct

---

[123] https://www.governor.ny.gov/news/governor-hochul-announces-more-6000-illegal-gun-seizures-result-interstate-gun-task-force
[124] See "Misc Notes 1-31-22" document, included as **Exhibit BE**

mission is to create property damage, violence and catalog civilians for harassment[125].
Rochester's autonomous, community defense minded citizens dedicatedly policed bad
actors taking advantage of the community's pain and constitutional rights to peaceful
demonstration. It is the plaintiffs' constitutional right, both as an entity and as an
individual citizen, to peacefully gather in protest with the community, as they did for
the overturning of *Roe v Wade* demonstration in Geneseo. The plaintiff joined the
protest, provided for community safety[126], broke nothing, promoted women's self
defense to the public, and then got lunch with grandma and the aunties, who are what
patriotism looks like[127].

228. Defendant Wilkins's note cites the JTTF incorrectly mischaracterizing Plaintiffs as
operators of the "Socialist Rifle Association" with no factual backing. This strange
accusation is reinforced by eleven Upstate New York Socialist Rifle Association social
media posts being used as evidence in the discovery of New York State vs Red Right
Hand.[128] The plaintiff is NOT the Socialist Rifle Association and holds no friendships
with the SRA. The Plaintiff is taking civil action against the SRA after it was damaged
via cyberattack in October and November 2022 by their Outreach Director, confessed
rapist and molester Kyle Arthur Sopko[129] and other members of the organization's
shady leadership. SRA members numbered just a few of the Plaintiffs customers and
never constituted more than 8% of monthly sales revenue. As the Plaintiff has stated to

---

[125] *Police Infiltration of Protests Undermines the First Amendment* (Brennan Center for Justice, August 4, 2020)
https://www.brennancenter.org/our-work/analysis-opinion/police-infiltration-protests-undermines-first-amendment
[126] The U.S. Supreme Court has ruled that police have no specific obligation to protect the People in *DeShaney v. Winnebago*, so
the People must provide for their own community defense as is the Peoples' Constitutional right.
[127] Attached image picturing plaintiff's family and Grandma Hudson, who was investigated by JTTF for no reason, exercising their
constitutional rights at *Geneseo Rally Backs Abortion Rights* (Livingston County News (7/7/2022), included as **Exhibit BF**
https://www.thelcn.com/news/local/geneseo-rally-backs-abortion-rights/article_1771f6d1-4026-56fe-9ae5-7d6b12495c95.html
[128] See SRA social media posts from NY v RRHRS Discovery, included as **Exhibit BG**
[129] See attached confession of SRA predator Kyle Arthur Sopko under alias Phoenix Drake, included as **Exhibit BH**

ATF[130], the SRA is the trans girlscouts, not a paramilitary organization, and only a true coward fears citizens exercising their rights.

229. Though the plaintiff heavily marketed to the membership of the SRA early on to grow a customer base, the plaintiff is not "socialist" or "communist", nor as the DA's office has implied on defendant Wilkins' behalf, "Sovereign Citizens"/Libertarians or any such political association. The plaintiffs voted for republican Lee Zeldin in the NY governor's race. Defendants keep trying to apply subversive labels to the plaintiff as a reasoning for their actions against them, both as individuals and as a business enterprise. To make it very clear to the Court, the Plaintiff LLC holds no political affiliation, with a stated opposition to divisionary political parties in its bylaws[131], and the LLC's membership are not all "avowed" anything. Most were registered as Green party and voted for Bernie a few years ago. The LLC does business with all political ideologies: leftists, libertarians, centrists, republicans, democrats, greens, the totally politically apathetic- just *not* white power fascists or members of any police force. The business' name spells out what it is quite clearly: a Syndicate, which is simply a business managed by its workers. Such a business is governed by a face-to-face meeting of everyone who works there, in which each worker has one vote. From the word's French origin, a *syndicat* is a trade union, usually a local union. This perfectly describes the LLC, and the plaintiffs openly support the *economic* theory of syndicalism to best protect each of its workers' rights: the plaintiffs' only planned "revolution" was to encourage, and one day be able to help fund, the launch of other

---

[130] See plaintiff's response to ATF revocation hearing, included as **Exhibit BI**

[131] From Plaintiff's Worker Constitution and Bylaws, Title VII, Section 8.6 *Political Alliances Prohibited:* "To the end of promoting worker unity and of securing necessary discipline within the Syndicate, the Red Right Hand refuses all alliances, direct or indirect, with any political parties or anti-political sects"

small businesses in every industry to help struggling people create their own jobs and bring back the "Mom & Pop" murdered by corporate greed. There is nothing unamerican or threatening about the word syndicate, and its far more modern popular culture association with organized crime is not probable cause for a multi agency investigation. Common sense would dictate that a Mafia would never openly advertise itself as such. The plaintiff's neighbor, the Irish Mafia Brewing Company, is not a sect of IRA radicals openly advertising burgers and locally brewed IPA drafts no matter how many times a customer plays "Come Out Ye Black & Tans" or "What's Left of the Flag" on the juke. The plaintiffs' shop is named "Red Right Hand"[132] after the theme song to tv show "Peaky Blinders.". The plaintiff's naming intentions and marketing have only ever been playful and effective pop culture allusions, not evidence of criminality nor the basis for reasonable cause, just like their neighboring restaurant.

230. It is worthy to note that the SRA social media posts included as "evidence" in NY vs Red Right Hand expose a number of prejudices by investigators; namely the overt mccarthyist political[133] bias and inherent racial[134] and islamophobic bias.

231. The plaintiff hosted the SRA for safety events and let them keep brochures at the gunshop, but to *any* unbiased mind there is no difference between how the plaintiff interacted with the SRA and how every right wing gun shop interacts with the NRA, an entirely parallel organization. Under the first and fourteenth amendments, a citizen is guaranteed protection from government retaliation for exercising their rights regardless of their supposed politics. The government may not police thought or theory.

---

[132] Included for reference:  ▣ Nick Cave & The Bad Seeds - Red Right Hand (Official Video)
[133] See SRA social media post from initial Discovery, labeled FB3, FB6, FB7, FB8 and FB9
[134] See SRA social media post from initial Discovery labeled FB1 and FB8, exposing obvious prejudice against BIPOC and islamophobia; it's easy to see what investigators are afraid of based on what they label threatening, and palestinian girls armed with a slingshot vs israeli tanks belies the same reason investigators fear the plaintiff: both the plaintiff and the palestinian girls aren't afraid of the police state and recognize their rights to be more important than police feelings and will not be silenced. The girls photographed in FB8 are not terrorists, they are oppressed women in an apartheid state. An oppressor always fears the oppressed.

232. According to Defendant Wilkin's referral to raid the Plaintiff "the FBI Joint

Terrorism Task Force has expressed concerns to the ATF that [the Plaintiff's] private

shooting range may be used by the "SRA" as a training ground in the event of future

civil unrest, like the riots that took place throughout the United States in 2020 after the

death of George Floyd, and that the SRA may be forming a quasi-militia."[135] The 100

yard private range at Plaintiff Fisher's childhood home is in no way a militia training

ground, and has only ever hosted educational public safety events, though NY JTTF

exposes its long held FBI fear of working class women, minorities, gays and civil rights

activists getting a firearms safety education and exercising their 1st and 2nd

amendment rights, as these rights make it dangerous to violate their 4th, 13th and 14th

while acting under color of law. The JTTF's terrifying 'civil unrest militia training

ground' is in reality just a grandma's backyard, and to wit a verified stop of the

Underground Railroad, which also hosts events like the Wild Carrot Festival and

fundraiser concerts for the local church, and just sold a parcel of farmland to US

military veterans to support local small business. It is homestead to a family of true

Union patriots, and Grandpa Theo's confederate-slaying Remington 1863 Contract

percussion rifle hangs on the mantle. One grandson attends West Point, another joined

the Navy. The aunties are teachers and hospital admins. The family is active in the

church. There is no antifa supersoldier training program or gay commie militia, there

are just lawful citizens learning to shoot safely at a peaceful sanctuary that's been

offering protection to those oppressed by white supremacists since the early 1800's.

233. The Defendants have even investigated the plaintiff's grandparents, the Hudsons, a

member of the hospital board, historical society, and local business leader, in what can

---

[135] Wilkin's Referral, **Exhibit BJ**

only amount to ridiculous Red Scare policing[136]. It's now clear to all civilians watching this struggle who the domestic terrorists in this situation actually are: the cowardly agents of the ATF, JTTS, and NY police et all, desperately trying to destroy a would-be successful trade union-owned small business for political means while holding the same racist fears surrounding an Underground Railroad property their collective agencies' forefathers, the slave catcher patrols[137], did the mid 1800's.

*Nihil mutantur, omnia interit[138].*

234. One of the few factual statements Defendant Wilkins makes in his Jan 25th recommendation is "According to Fisher, use of the range is invitation only for "likeminded" friends and customers." This quote is undisputed by the plaintiff: white supremacists, abusers, and cops aren't invited to grandma's house- and none of these designations are a protected class, so it is well within the Plaintiff's rights to deny such individuals any form of service or access to purchasing firearms or private instructive range time at their family home. Along with many outright fabrications, Defendant Wilkins attempts to twist any truthful statement he makes to pose law abiding citizens as a political threat because of their lawfully exercising constitutional rights in violation of 18 U.S. Code § 241, which states

"If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured— They shall be fined under this title or imprisoned not more than ten years, or both; and… if such acts include kidnapping or an attempt to kidnap… or an attempt to kill, they shall be

---

[136] See investigative report on P Hudson, included as **Exhibit BK**
[137] THE ORIGINS OF MODERN DAY POLICING https://naacp.org/find-resources/history-explained/origins-modern-day-policing
[138] Ovid's Metamorphoses proposes "Omnia mutantur, nihil interit" ("Everything changes, nothing dies") though the plaintiff refutes the notion as without positive change, all a nation can do is die.

fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

235. Defendants including Wilkins, Bonham, Van Dellon, the JTTF, etc included accusations about the plaintiffs perceived politics in many aspects of the case. While the defendants may think their mischaracterizations and blatant fabrications provide actionable context and relevance to their malicious claims against the Plaintiffs because their own far right-wing political biases are shared by other agents, police and prosecutors, the objective facts provide that the Plaintiffs are law abiding citizens dedicated to community safety and the only criminals in this case are listed as Defendants.

236.  Despite the LLC being forcibly closed post 1/27/22 by the Defendants on threat of continued violence, the Plaintiffs would go on in October of 2022 to help raise $8,600 for the WAVAW Rape Crisis Center's Streaming For Survivors event[139] (via donating their award winning books to every supporter). The plaintiff's dedication to mutual aid, doing the right thing and selflessly providing for community betterment continues even when being emotionally and economically assaulted and financially starved by the Defendants.

**F. Calculating Direct Economic Damages to the Plaintiff**

237. As a result of the Defendants' conspiratorial enterprise to interfere with the plaintiff's interstate traffic, the plaintiff has suffered immense economic damage.

238. In the fortnight prior to the raid, the Plaintiff earned $9,993.16 in interstate sales by card; ($9,993.16/2 = $4,996.58 average a week).

---

[139] See WAVAW thank you email, included as **Exhibit BL**

239. In the week prior to the raid, the Plaintiff earned $2,861.32 in interstate sales by cash or check; $4,996.58 + $2,861.32 = $7857.9 average weekly income at the time the defendant's conspiratorial enterprise engaged in RICO violations against it.

240. A $7857.90.00 weekly retail average over 52 weeks of lost wages (from abduction 1/27/22 through the baseless criminal trial purposefully drawn out by the defendants to further damages til 2/14/23) equals $440042.40 based on its performance at the time of damages incurred. Treble increases this to $1,225,832.40.

241. The Plaintiff was engaged in purchasing land and opening an ammunition factory with permanent, safe housing for its previously homeless workers planning to launch manufacture of products at the end of 2022 Q2. Base revenue from the plaintiff's trade partnership was $4.8M per year at lowest actionable production levels.[140] 26 weeks of ammunition manufacturing would have brought in a baseline of $2,400,000.00 (with the tertiary benefit of free housing). Treble increase this to $7,200,000.00.

242. The plaintiff's books show a $10,913.02 take for their first two gunshows (a $5,456.51 average). NY state hosts more than 30 gunshows a year, representing a $163,695.30 retail profit loss opportunity for the plaintiff. Trebel increases this to $491,085.90.

243. The plaintiff acquired massive debt from its credit card company for chargebacks on undeliverable orders after being forcibly closed in the amount that was sent to collections in June because the plaintiff couldn't afford the $500/month payment plan and also pay for rent having experienced an armed robbery of their interstate commerce.

244. Treble sum totals of the figures above are $9011213.1 for the year.

---

[140]   The lower of the two figures from the LLC's 2 trade agreements with its foreign partner is presented here.

## COUNT I

## AGENCY ACTION VIOLATES THE GUN CONTROL ACT

245. Plaintiffs repeat, reiterate and reallege and incorporate by reference each and every allegation contained in paragraphs "1" through "244" of this complaint, with the same force and effect as if more fully set forth at length herein.

246. This Count is against Defendants Bureau of Alcohol Tobacco and Firearms, Steven Dettelbach in his official capacity, Attorney General Merrick Garland in his official capacity, Director of Industry Operations John Curtis in his individual capacity (the "Count I Defendants").

247. The ATF is an enterprise whose activities affect interstate commerce. The Count I Defendants are employed by or associated with the enterprise.

248. An agency conclusion regarding the applicability of federal law is final agency action if it marks the end of the decision-making process and all that is left is enforcement.

249. Defendants' intent to apply the Enforcement Policy has been confirmed by their subsequent actions against the Plaintiff in administrative hearings.

250. Congress's intent is best determined by the words of the Act.

251. Every word of the statute must be given effect.

252. The Act requires violations to be "willful" in order to result in revocation of FFL.

253. The Enforcement Policy is inconsistent with the Act because it sweeps in inadvertent violations and does not require violations to be intentional, reckless, or that licensees were indifferent to the Act's requirements.

254. Through their unconstitutional revocation hearing leaning on the new ATF
Enforcement Policy, defendants Curtis, Burke and Wilkins conspired with the
enterprise, in their individual capacities, to utilize their agency to interfere in interstate
commerce in violation of 18 USC Code § 1951, 241, 242 and 1001.

255. As a result, Plaintiff was subject to a regulation and enforcement of a cruel and
unusual punishment that is contrary to law, and is entitled to a declaratory judgment and
permanent injunction barring Defendants from applying the Enforcement Policy to the
plaintiff and all those FFLs so similarly situated.

## COUNT II

## DEFENDANTS ACTION VIOLATES PLAINTIFFS' SECOND AMENDMENT RIGHTS

256. Plaintiffs repeat, reiterate and reallege and incorporate by reference each and every
allegation contained in paragraphs "1" through "255" of this complaint, with the same
force and effect as if more fully set forth at length herein.

257. This Count is against Defendants the Bureau of Alcohol Tobacco and Firearms
(ATF), Steven Dettelbach, NY Joint Terrorism Task Force (JTTF); New York State
Police and acting NYSP Superintendent Nigrelli, Field Commander Richard Allen,
Deputy Superintendent Col. Dominick Chiumento, Deputy Superintendent Col. George
Nohai (JTTF), Kathy Hochul and the Special Investigations Unit (SIU), in their official
capacities;

258. This count is against the County of Ontario in *respondeat superior* to the Ontario
County Sheriff's Office and Ontario County District Attorney's Office, and each of the
following conspirators in their individual capacities: IOI Kyle Wilkins, IOI Sean Burke,

DIO John Curtis, Special Agent John Devito, SUI Investigator Christopher D Bonham, Jordan Bonafede, Bryan Blum, Investigator David Cerretto, Trooper Jessica A Kuzudal, Michael S Turton, Richard Canino, TFO William Pearsall, SA Andrew O'Connell, Coley S Ellison, Jason D Fifield, Brian J. Ratajczak, Michael Manley, Bruce Drake, Ryan Bentley, SA Lander, M Pietrzykowski, frmr Sheriff Kevin Henderson, Sheriff David Cirencione, CO Bryan Housel, ADA Peter Van Dellon, (collectively, the "Count II Defendants").

259. The Count II Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of violence and racketeering activity and for the unlawful purpose of intentionally interfering in interstate commerce with the goal of damaging the Plaintiff.

260. As a vendor, Plaintiff is also able to bring claims on behalf of their customers. *Craig v. Boren*, 429 U.S. 190, 195 (1976).

261. The right to "possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011).

262. After the plaintiffs' unlawful arrest and abduction, the ATF filed an unconstitutional petition against the Red Right Hand Rifle Syndicate and Keenan Fisher, formally revoking the Federal Firearms License by administrative kangaroo. Absent some civil remedy, it is hard to fathom that the plaintiff will ever be able to obtain firearms licensing ever again. The plaintiff has no criminal history that would

suggest any members will commit any criminal acts in the future, and is aggrieved by the unconstitutional violation of its rights.

263. At least one of the plaintiff's customers were harassed and had firearms stolen from them under false pretenses and unconstitutional grounds by defendants O'Connel and Pearsall on the orders of Devito and Wilkins, further interfering in the plaintiff's business by violating 18 U.S.C. § 924(l) Theft of a Firearm Moved in Interstate Commerce.

264. At least one of the plaintiff's business associates were harassed and had firearms stolen from them by John Doe ATF agents under the command of the conspiratorial enterprise of Defendants Wilkins, Burke, Devito, further interfering in the plaintiff's interstate commerce.

265. If Plaintiffs' FFL is allowed to be revoked under the ATF's unlawful enforcement policy, it will not only infringe on Plaintiffs' rights, but also burden the Second Amendment rights of their marginalized customers.

266. The downstream effects of Defendants' Enforcement Policy is to severely limit the availability of lawful gun ownership to women, minorities and the LGBTQ.

267. Plaintiffs are in the best position to defend the Second Amendment rights of themselves and their customers because they are directly regulated by Defendants.

268. Plaintiffs are in the best position to defend the Second Amendment rights of themselves and their customers because they have been directly harmed by Defendants.

269. There is a hindrance to individual gun owners' ability to protect their own interests because they rely on licensees to purchase firearms.

270. Reducing the availability of lawful gun ownership burdens citizens' right to individual self-defense. See *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2133 (2022). Case 1:22-cv-01063 Document 1 Filed 10/19/22

271. The ATF Enforcement Policy will continue to make it harder for citizens, and directly the marginalized and already underserved customer base of the plaintiff, to obtain firearms, train with them, and maintain them for the purpose of self-defense.

272. Such a burden on the plaintiff and its community are not justified by a handful of paperwork errors, nor the disproven defamations of a conspiratorial enterprise acting under color of law, nor is it consistent with the Nation's historical tradition of firearm regulation.

273. Confiscating Plaintiff's RAK47-NYPTS (home defense rifle and a number of 10 round magazines), which is a semi-automatic NY compliant firearm and specifically not listed on the search warrant, which only allows for confiscation of "assault weapons, handguns (to include pistols and revolvers), shotguns, ammunition, large capacity magazines" was a violation of 18 U.S. Code § 242, deprivation of 2nd amendment rights under color of law. The forged search warrant, even if it were valid, granted no authority to confiscate New York compliant rifles or NY compliant 10 round magazines, regardless of the investigator's ineptitude to correctly identify such firearms and accessories due to inexperience or poor training.

274. Similarly, confiscating any New York compliant firearm or other unlisted item from the LLCs inventory was also not authorized on the forged search warrant. Warrantless robberies at both locations show that the Defendants had no intention of following any law or directive of justice, but were focused on the attempted total

disarmament of the Plaintiff as a matter of immediate extrajudicial punishment for

lawfully exercising their constitutional and economic rights, without due process of

law, in order to send a threatening message to the plaintiff's community, in violation of

18 U.S. Code § 1951 and 242.

275. In total, the defendant's conspiratorial enterprise is known to have stolen 40

firearms under color of law from the plaintiff and its clients.

276. *District of Columbia v. Heller,* 554 U.S. 570  holds the Second Amendment

protects these plaintiffs right to possess a firearm for traditionally lawful purposes,

expressly self-defense within the home.

277. *McDonald v. City of Chicago* holds that the plaintiff's right to keep and bear arms

for self defense in one's home is protected under the Second Amendment, incorporated

against the states through the Due Process Clause of the Fourteenth Amendment.

278. Illegally disarming the Plaintiff and depriving them of rights under color of law is

a gross misuse of both the Gun Control Act, the SAFE Act and taxpayer funded police

resources that should be directed towards stopping white supremacist domestic

terrorists like Buffalo shooter Payton Gendron, not community service oriented and

upstanding law-abiding citizens that come recommended by local religious leaders.

279. A prescribed course of action held by the Inter-American Court of Human Rights

(of the Organization of American States based in Washington DC), *restitutio in

integrum* can be achieved through restoration of employment. The Human Rights

Committee has held that authorities should ensure restoration of employment or a

similar employment so as to provide an effective remedy in the sense of Article 2(3)

ICCPR. In the case of *Chira Vargas Machuca v Peru* it held that the State should ensure

the applicant's "effective reinstatement to his duties and to his post, with all the consequences that that implies, at the rank that he would have held had he not been dismissed", and also "compensation comprising a sum equivalent to the payment of the arrears of salary and remuneration that he would have received from the time at which he was not reinstated to his post".[141] Similar findings have been reached by the Committee on the Elimination of Racial Discrimination,[142] the Working Group on Enforced or Involuntary Disappearances,[143] the African Commission on Human and Peoples' Rights.[144]  They also held that if the restoration of employment is not possible, the State should provide compensation. In the case of *Loayza Tamayo*[145], the InterAmerican Court found that the State had to ensure restoration of employment; if this was not possible because of the moral damage caused to the victim, then the authorities had to guarantee salary, social security and employment benefits.[146]

280. Declaratory relief is therefore appropriate to resolve this controversy.

## COUNT III

## RICO CONSPIRACY § 1962(d)

281. The allegations of paragraphs 1 through 279 are incorporated herein by reference.

282. This count is against the "Conspirators" or "Count III & Count XLVI Defendant(s)", whom from at least on or about August 6, 2021, through and including

---

[141]  Félix Enrique Chira Vargas-Machuca v Peru, Human Rights Committee Communication 906/2000, UN Doc CCPR/C/75/D/906/2000 (2002), para 9.

[142]  Yilmaz Dogan v the Netherlands, CERD Communication 1/1984, UN Doc CERD/C/36/D/1/1984 (1998), para 10.

[143]  Working Group on Enforced or Involuntary Disappearances, General Comments on Article 19 of the Declaration on the Protection of All Persons from Enforced Disappearance, UN Doc E/CN.4/1998/43 (1998), para 75.

[144]  Malawi African Association et al. v Mauritania, AfrComHPR Communications 54/91, 61/91, 98/93, 164/97, 196/97 and 210/98

[145]  Loayza Tamayo v Peru (Reparations), I/ACtHR, Judgment of 27 November 1998, Series C No. 42, paras 113-116.

[146]  María Elena Loayza-Tamayo was detained by the National Counter-Terrorism Bureau ("DINCOTE"). While detained, she was threatened with torture and was repeatedly raped in an effort to force her to confess to belonging to the Peruvian Communist Party ("Shining Path").  She was charged and found guilty of treason and was held in solitary confinement. She filed a complaint with the Inter-American Commission of Human Rights, alleging numerous human rights violations and requesting her release. The Court ordered that Loayza-Tamayo be released, and that she and her next of kin be compensated for any relevant expenses.

January 27 2022, and continuing til at least January 17th, 2023, in the Western District

of New York and elsewhere, including Conspirators

**KYLE WILKINS**
**CHRISTOPHER D BONHAM**
**SEAN P. BURKE**
**JOHN CURTIS**
**JOHN DEVITO**
**ANDREW O'CONNELL**
**ATF AGENT JOHN DOE #1, #2, #3, #4**
**8/18 NYSP JOHN DOES**
**RYAN BENTLY**
**BRUCE DRAKE**
**SA LANDER**
**M PIETRZYKOWSKI**
**RICHARD CANINO**
**BRYAN BLUM**
**JUSTIN PRUSAK**
**STEVEN MOWERS**
**DAVID CERRETTO**
**JORDAN BONAFEDE**
**MICHAEL MANLEY**
**JESSICA A KUZUDAL**
**MICHAEL S TURTON**
**COLEY S ELLISON**
**JASON D FIFIELD**
**BRIAN J RATAJCZAK**
**WILLIAM PEARSALL**
**MICHAEL DEYO §**
**THE FINGER LAKES RAILWAY CORPORATION §**
**COUNTY OF ONTARIO in *respondeat superior* to**
**ONTARIO COUNTY SHERIFF'S OFFICE**
**Frmr SHERIFF KEVIN HENDERSON,**
**DAVID CIRENCIONE,**
**BRYAN HOUSEL,**
**ONTARIO COUNTY DISTRICT ATTORNEY'S OFFICE**
**JEFFERY FRIESEN,**
**PETER VAN DELLON §**
**MONROE CRIME ANALYSIS CENTER INVESTIGATOR KUPKA**

and others known and unknown, willfully and knowingly combined, conspired,

confederated, and agreed with each other to violate Title 18 United States Code §1951(a),

Title 18 United States Code §1201(a), Title 18 United States Code §242, Title 18 United States Code §1623, Title 18, United States Code § 1512, among other crimes.

283. As set forth above, the Count III Defendants agreed and conspired to violate 18 U.S.C. § 1962(d) with intent to interfere with the plaintiff's duly licensed interstate commerce by means of kidnapping, armed robbery of an FFL08 and AECA registered business, witness intimidation, lying to a grand jury, and various other illegal means.

284. In order to effectuate the object of the conspiracy, the defendants used means, facilities, and instrumentalities of interstate commerce, including cellular telephones, email platforms, encrypted agency messaging services, global positioning satellite ("GPS") navigation and a Railway. In addition, defendants stalked and conducted surveillance of the plaintiffs at their home and business to determine when to strike.

## COUNT IV

### NY PENAL LAW § 135.25: KIDNAPPING IN THE FIRST DEGREE
### KIDNAPPING § 1201(a)(c)

285. Plaintiffs repeat, reiterate and reallege and incorporate by reference each and every allegation contained in paragraphs "1" through "284" of this complaint, with the same force and effect as if more fully set forth at length herein.

286. This count is against the "Kidnappers" or "Count IV & V Defendant(s)",

**KYLE WILKINS**
**CHRISTOPHER D BONHAM**
**RYAN BENTLY**
**BRUCE DRAKE**
**SA LANDER**
**M PIETRZYKOWSKI**
**RICHARD CANINO**
**BRYAN BLUM**
**DAVID CERRETTO**

**JORDAN BONAFEDE**
**MICHAEL MANLEY**
**MICHAEL S TURTON**
**BRIAN J RATAJCZAK**
**THE FINGER LAKES RAILWAY CORPORATION**

287. January 27th 2022, the Kidnappers with others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed with each other to violate Title 18, United States Code, Section 1201(a) by unlawfully seizing, confining, kidnapping, abducting or carrying away Krenzer; (1) the person is willfully transported in interstate or foreign commerce… or the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense; If two or more persons conspire to violate section 1201(a) and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life.

288. The Kidnappers, in order to affect the completion of the Enterprise's conspiracy to interfere in the plaintiff's interstate commerce, engaged in the AGGRAVATED FELONY - KIDNAPPING - FALSE IMPRISONMENT on 1/27/22:

*United States v. Iniguez-Barba*, ___ F.3d ___, 485 F.3d 790 (5th Cir. April 25, 2007) (per curiam) finding violation of a statute requiring as elements: (1) knowing removal or confinement; (2) substantial interference with the victim's liberty; and (3) force, threat, or fraud, or, if the victim is incompetent or under age thirteen, lack of consent from the person responsible for the general supervision of the victim's welfare, to be sufficient to qualify as "kidnapping" for purposes of meeting the "crime of violence" definition under U.S.S.G. 2L1.2; a "specific purpose" such as a desire for ransom, an

intent to facilitate another felony or flight, etc. is not required; the court noted that just because a state labels an offense "false imprisonment" does not mean it is not "kidnapping" if it otherwise meets the elements listed above). See also, *United States v. Gonzalez-Ramirez*, 477 F.3d 310 (5th Cir.2007).

289. In addition to its federal 1201 qualification by use of freight train, highway, and telephone lines to affect its success, this action is also in violation of NY Penal Law § 135.25: Kidnapping in the first degree. A person is guilty of kidnapping in the first degree when he abducts another person and when 1. His intent is to compel a third person to [] to refrain from engaging in particular conduct; or 2. He restrains the person abducted for a period of more than twelve hours with intent to: (b) Accomplish or advance the commission of a felony (Hobbs Act robbery); or (c) Terrorize him or a third person.

## COUNT V

### NY PENAL LAW § 135.25: KIDNAPPING IN THE FIRST DEGREE

### KIDNAPPING § 1201(a)(c)

290. Plaintiffs repeat, reiterate and reallege and incorporate by reference each and every allegation contained in paragraphs "1" through "289" of this complaint, with the same force and effect as if more fully set forth at length herein.

291. This count is against the "Kidnappers" or "Count IV & V Defendant(s)",

**KYLE WILKINS
CHRISTOPHER D BONHAM
RYAN BENTLY
BRUCE DRAKE
SA LANDER
M PIETRZYKOWSKI
RICHARD CANINO**

**BRYAN BLUM**
**DAVID CERRETTO**
**JORDAN BONAFEDE**
**MICHAEL MANLEY**
**MICHAEL S TURTON**
**BRIAN J RATAJCZAK**
**THE FINGER LAKES RAILWAY CORPORATION**

292. January 27th 2022, the Kidnappers with others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed with each other to violate Title 18, United States Code, Section 1201(a) by unlawfully seizing, confining, kidnapping, abducting or carrying away Fisher; (1) the person is willfully transported in interstate or foreign commerce… or the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense;

293. The Kidnappers, in order to affect the completion of the Enterprise's conspiracy to interfere in the plaintiff's interstate commerce, engaged in the AGGRAVATED FELONY - KIDNAPPING - FALSE IMPRISONMENT, and as in count IV, in addition to its federal 1201 qualification by use of freight train, highway, and telephone lines to affect its success, this action is also violation of NY Penal Law § 135.25: Kidnapping in the first degree. A person is guilty of kidnapping in the first degree when he abducts another person and when 1. His intent is to compel a third person to [] to refrain from engaging in particular conduct; or 2. He restrains the person abducted for a period of more than twelve hours with intent to: (b) Accomplish or advance the commission of a felony; or (c) Terrorize him or a third person.

**COUNTS VI-XL**

**THEFT OF FIREARMS 27 CFR § 478.33a**

**18 U.S.C. § 922(u), 18 U.S.C. § 922(j)**

294. Plaintiffs repeat, reiterate and reallege and incorporate by reference each and every allegation contained in paragraphs "1" through "293" of this complaint, with the same force and effect as if more fully set forth at length herein.

295. This count is against the "Armed Robbers" or "Count VI Defendants",

**KYLE WILKINS
CHRISTOPHER D BONHAM
RYAN BENTLY
BRUCE DRAKE
SA LANDER
M PIETRZYKOWSKI
RICHARD CANINO
BRYAN BLUM
DAVID CERRETTO
JORDAN BONAFEDE
MICHAEL MANLEY
JESSICA A KUZUDAL
MICHAEL S TURTON
COLEY S ELLISON
JASON D FIFIELD
BRIAN J RATAJCZAK**

whom conspired to further the goals of the enterprise's conspiracy against the plaintiff through obstructing interstate commerce by robbery in violation of the Hobbs Act, 18 U.S.C. § 1951 by carrying a firearm during and in furtherance of robbery. a crime of violence, in violation of 18 U.S.C. § 924(c)(1).

296. January 27th 2022, the Count VI defendants, with others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed with each other to violate Title 27 Code of Federal Regulations Section 478.33a Theft of firearms, stating "No person shall steal or unlawfully take or carry away from the person or the premises of a person who is licensed to engage in the business of importing,

manufacturing, or dealing in firearms, any firearm in the licensee's business inventory that has been shipped or transported in interstate or foreign commerce."

297. Concurrently, under 18 U.S.C. § 922(u), "It shall be unlawful for a person to steal or unlawfully take or carry away from the person or the premises of a person who is licensed to engage in the business of importing, manufacturing, or dealing in firearms, *any* firearm in the licensee's business inventory that has been shipped or transported in interstate or foreign commerce."

298. Thirty five firearms were stolen by the Armed Robbers from the plaintiff's business inventory on Jan 27th, comprising 35 separate counts of theft of a firearm:

299. **Count VI** is for the theft of Zastava ZPAPM70 7.62x39mm (s/n Z70099922)

300. **Count VII** is for the theft of JTS M12AK 12ga (s/n MK2101784)

301. **Count VIII** is for the theft of Palmetto State Armory Model Px9 9mm (s/n X9-032262)

302. **Count IX** is for the theft of Palmetto State Armory Model PA15 Custom "Nana" Cerakote (s/n SCD944795)

303. **Count X** is for the theft of Palmetto State Armory Model PA15 (s/n SCD402374)

304. **Count XI** is for the theft of Palmetto State Armory Model PA15 (s/n SCD402372)

305. **Count XII** is for the theft of Palmetto State Armory Model PSAK47 (s/n AKB051772)

306. **Count XIII** is for the theft of Palmetto State Armory Model PSAK47 (s/n AKB058135)

307. **Count XIV** is for the theft of Palmetto State Armory Model PSAK47 (s/n AKB058130)

308. **Count XV** is for the theft of Palmetto State Armory Model PSAK47 (s/n AKB058134)

309. **Count XVI** is for the theft of Riley Defense RAK47 7.62x39mm (s/n B35247)

310. **Count XVII** is for the theft of Riley Defense RAK47 7.62x39mm (s/n B34881)

311. **Count XVIII** is for the theft of Riley Defense RAK47 7.62x39mm (s/n B34927)

312. **Count XIX** is for the theft of Ruger AR556 (s/n 1852-14306)

313. **Count XX** is for the theft of RIA Imports VRPA40 12ga (s/n R380581)

314. **Count XXI** is for the theft of RIA Imports VRPA40 12ga (s/n R379595)

315. **Count XXII** is for the theft of RIA Imports VRPA40 12ga (s/n R293831)

316. **Count XXIII** is for the theft of RIA Imports VRPA40 12ga (s/n R293818)

317. **Count XXIV** is for the theft of RIA Imports VRPA40 12ga (s/n R379559)

318. **Count XXV** is for the theft of RIA Imports VRPA40 12ga (s/n R379595)

319. **Count XXVI** is for the theft of Springfield Model 67 12ga (s/n A881976)

320. **Count XXVII** is for the theft of Remington Model 870 (s/n 650012V)

321. **Count XXVIII** is for the theft of Appeal IT-21 (s/n APL00543)

322. **Count XXIX** is for the theft of Mossberg 12ga 2-in-1 (s/n 1454834)

323. **Count XXX** is for the theft of Mossberg 12ga 2-in-1 (s/n 1454818)

325. **Count XXXI** is for the theft of Diamondback DB15 (s/n DB2517690)

326. **Count XXXII** is for the theft of Omega E-3 lower (s/n A21936)

327. **Count XXXIII** is for the theft of Omega E-3 lower (s/n A21945)

328. **Count XXXIV** is for the theft of Omega E-3 lower (s/n A21946)

329. **Count XXXV** is for the theft of Anderson AM-15 lower (s/n 21290451)

330. **Count XXXVI** is for the theft of Anderson AM-15 lower (s/n 21328925)

331. **Count XXXVII** is for the theft of Anderson AM-15 lower (s/n 21310071)

332. **Count XXXIII** is for the theft of Hi-Point model 4095 40 S&W (s/n H86778)

333. **Count XXXIX** is for the theft of Hi-Point model 4095 40 S&W (s/n H86775)

334. **Count XL** is for the theft of Kriss Vector .45 ACP (s/n 45CO26430).

## COUNT XLI

### BURGLARY IN THE 1ST DEGREE NY PEN § 140.30

335. Plaintiffs repeat, reiterate and reallege and incorporate by reference each and every

allegation contained in paragraphs "1" through "334" of this complaint, with the same

force and effect as if more fully set forth at length herein.

336. This count is against the "Burglars" or "Count XLI + XLII Defendants",

**KYLE WILKINS
CHRISTOPHER D BONHAM
RICHARD CANINO
JUSTIN PRUSAK
MICHAEL S TURTON**

337. January 27th 2022, the Count VII defendants, with others known and unknown,

willfully and knowingly combined, conspired, confederated, and agreed with each other

to violate NY Penal Law § 140.30: Burglary in the first degree, stating "A person is

guilty of burglary in the first degree when he knowingly enters or remains unlawfully in

a dwelling with intent to commit a crime therein, and when, in effecting entry or while

in the dwelling or in immediate flight therefrom, he or another participant in the crime

(1)  Is armed with [] a deadly weapon.

### COUNT XLII

## THEFT OF FIREARMS NY PEN § 155.30(7)

338. Plaintiffs repeat, reiterate and reallege and incorporate by reference each and every allegation contained in paragraphs "1" through "337" of this complaint, with the same force and effect as if more fully set forth at length herein.

339. This count is against the "Burglars" or "Count XLI + XLII Defendants".

340. The following firearms were stolen by the Burglars from the plaintiff's home on Jan 27th: (a) RAK47-P-TSNY 7.62x39mm with Adidas Stripes (s/n B27035) and (b) Revelation Model 300F 20ga shotgun (no s/n, antique family heirloom of great significance to be passed down to plaintiffs' future child), and person is guilty of grand larceny in the fourth degree when he steals property and when: 1. The value of the property exceeds one thousand dollars; 6. The property, regardless of its nature and value, is obtained by extortion; or 7. The property consists of one or more firearms, rifles or shotguns, as such terms are defined in section 265.00 of this chapter.

## COUNT XLIII

### THEFT OF FIREARMS 27 CFR § 478.33a

### 18 U.S.C. § 922(u), 18 U.S.C. § 922(j)

341. Plaintiffs repeat, reiterate and reallege and incorporate by reference each and every allegation contained in paragraphs "1" through "340" of this complaint, with the same force and effect as if more fully set forth at length herein.

342. This count is against the "Pistol Thieves" or "Count XLIII Defendants",

**KYLE WILKINS**
**ATF AGENT JOHN DOE #1, #2**

341. The Count VII defendants, with others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed with each to violate Title 27 Code of Federal Regulations Section 478.33 a Theft of firearms, stating "No person shall steal or unlawfully take or carry away from the person or the premises of a person who is licensed to engage in the business of importing, manufacturing, or dealing in firearms, any firearm in the licensee's business inventory that has been shipped or transported in interstate or foreign commerce."

342. The following firearm was stolen by ATF John Doe #1 and #2 on the direction of Kyle Wilkins from the plaintiff's business associates shop in Vienna, Virginia: Springfield Armory Hellcat Micro-Compact OSP 9mm (serial #BA432519).

## COUNT XLIV

## THEFT OF FIREARMS NY PEN § 155.30(7), 18 U.S.C. § 924(l)

343. Plaintiffs repeat, reiterate and reallege and incorporate by reference each and every allegation contained in paragraphs "1" through "342" of this complaint, with the same force and effect as if more fully set forth at length herein.

344. This count is against the "Goon Squad" or "Count XLIV Defendants",

**JOHN DEVITO**
**ANDREW O'CONNELL**
**WILLIAM PEARSALL**

345. February 22nd, 2022, the Goon Squad, with others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed with each other to further the 1962(d) conspiracy by violating 18 U.S.C. § 924(l) Theft of a Firearm Moved in Interstate Commerce and New York Penal Law Section 155.30(7) Grand Larceny in the fourth degree by stealing property that consists of one shotgun, as such

terms are defined in section 265.00 of this chapter, from the home of plaintiff's clients

in violation of their 2nd, 4th and 14th Amendment rights in violation of 18 USC § 242.

346. The stolen firearm is a VRPA40 pump action shotgun (s/n R379561).

## COUNT XLV

## WITNESS INTIMIDATION § 1512

347. Plaintiffs repeat, reiterate and reallege and incorporate by reference each and every

allegation contained in paragraphs "1" through "348" of this complaint, with the same

force and effect as if more fully set forth at length herein.

348. This Count is against defendants Wilkins, DeVito, Van Dellon, and the

intimidation squad of ATF John Doe #3 and #4 and NYSP John Does seen on the 8/18

bodycam footage (the "Thugs" or "Count XLV Defendants")

### KYLE WILKINS
### JOHN DEVITO
### ATF AGENT JOHN DOE #3, #4
### 8/18/22 NYSP JOHN DOES
### PETER VAN DELLON

349. On and around 8/18/2022, Wilkins, Devito, ATF John Doe #3, ATF John Doe #4,

NYSP John Does, conspiring with others known and unknown, willfully and knowingly

combined, confederated, and agreed with each other to violate United States Code §

1512 (a)(2) Tampering with a witness, victim by use of physical force and the threat of

continued physical force and imprisonment for noncompliance against the plaintiffs

with intent to— (A) influence, delay, or prevent the testimony of any person in an

official proceeding and (C) hinder, delay, or prevent the communication to a judge of

the United States of information relating to the commission or possible commission of a Federal offense.

350. On two separate occasions in November 2022, Defendant Van Dellon, conspiring with others known and unknown, willfully and knowingly combined, confederated and continued the enterprise's attempts at witness intimidation against the plaintiffs with baseless requests for Orders of Protection for defendant Wilkins, violating 18 U.S. Code § 1001 and United States Code § 1512 (b) knowingly [and] corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to— (1) influence, delay, or prevent the testimony of any person in an official proceeding and (2) cause or induce any person to— (D) be absent from an official proceeding to which such person has been summoned by legal process.

## COUNT XLVI

## DEFENDANTS HAVE INTERFERED IN INTERSTATE COMMERCE THROUGH THREATS AND VIOLENCE § 1951 (HOBBS ACT)

351. Plaintiffs repeat, reiterate and reallege and incorporate by reference each and every allegation contained in paragraphs "1" through "350" of this complaint, with the same force and effect as if more fully set forth at length herein.

352. This count is against the "Conspirators" or "Count III & XLVI Defendant(s)", whom from at least on or about August 6, 2021, through and including January 27 2022, and continuing til at least January 17th, 2023, in the Western District of New York and elsewhere, including Conspirators

**KYLE WILKINS**
**CHRISTOPHER D BONHAM**
**SEAN P. BURKE**

**JOHN CURTIS**
**JOHN DEVITO**
**ANDREW O'CONNELL**
**ATF AGENT JOHN DOE #1, #2, #3, #4**
**8/18/22 NYSP JOHN DOES**
**RYAN BENTLY**
**BRUCE DRAKE**
**SA LANDER**
**M PIETRZYKOWSKI**
**RICHARD CANINO**
**BRYAN BLUM**
**JUSTIN PRUSAK**
**STEVEN MOWERS**
**DAVID CERRETTO**
**JORDAN BONAFEDE**
**MICHAEL MANLEY**
**JESSICA A KUZUDAL**
**MICHAEL S TURTON**
**COLEY S ELLISON**
**JASON D FIFIELD**
**BRIAN J RATAJCZAK**
**WILLIAM PEARSALL**
**MICHAEL DEYO §**
**THE FINGER LAKES RAILWAY CORPORATION §**
**COUNTY OF ONTARIO in respondeat superior to**
**ONTARIO COUNTY SHERIFF'S OFFICE**
**Frmr SHERIFF KEVIN HENDERSON,**
**DAVID CIRENCIONE,**
**BRYAN HOUSEL,**
**ONTARIO COUNTY DISTRICT ATTORNEY'S OFFICE**
**JEFFERY FRIESEN,**
**PETER VAN DELLON §**
**MONROE CRIME ANALYSIS CENTER INVESTIGATOR KUPKA**

and others known and unknown, willfully and knowingly combined, conspired,

confederated, and agreed with each other to violate the Hobbs Act, Title 18 United

States Code §1951(a) through violations of Title 18 United States Code §1201(a), Title

18 United States Code §242, Title 18 United States Code §1623, Title 18, United States

Code § 1512, 27 CFR § 478.33a, 18 U.S.C. § 922(u), 18 U.S.C. § 922(j), NY PEN §

155.30(7), and with carrying a firearm during and in furtherance of a crime of violence during the robbery and kidnapping in violation of 18 U.S.C. § 924(c)(1).

## COUNT XLVII

## DEFENDANTS COMMITTED VIOLENT CRIME IN AID OF

## RACKETEERING 18 U.S.C. § 1959(a)(1)

353. Plaintiffs repeat, reiterate and reallege and incorporate by reference each and every allegation contained in paragraphs "1" through "352" of this complaint, with the same force and effect as if more fully set forth at length herein.

354. 282. This count is against the "Mobsters" or Count XLVII Defendant(s)", including Conspirators

KYLE WILKINS
CHRISTOPHER D BONHAM
JOHN DEVITO
ANDREW O'CONNELL
ATF AGENT JOHN DOE #1, #2, #3, #4
8/18 NYSP JOHN DOES
RYAN BENTLY
BRUCE DRAKE
SA LANDER
M PIETRZYKOWSKI
RICHARD CANINO
BRYAN BLUM
JUSTIN PRUSAK
STEVEN MOWERS
DAVID CERRETTO
JORDAN BONAFEDE
MICHAEL MANLEY
JESSICA A KUZUDAL
MICHAEL S TURTON
COLEY S ELLISON
JASON D FIFIELD
BRIAN J RATAJCZAK
WILLIAM PEARSALL  §

**THE FINGER LAKES RAILWAY CORPORATION §**

and others known and unknown, willfully and knowingly combined, conspired,

confederated, and agreed with each other to violate Title 18 United States Code §1951(a),

Title 18 United States Code §1201(a), Title 18, United States Code § 924(c), Title 18,

United States Code § 1512, 27 CFR § 478.33a, 18 U.S.C. § 922(u), 18 U.S.C. § 922(j),

NY PEN § 155.30(7) and affect their enterprise's conspiracy under 1962(d) to interfere in

interstate commerce.

## COUNT XLVIII

### DEFENDANTS COMMITTED VIOLENT CRIME IN AID OF

### RACKETEERING 18 U.S.C. § 1959(a)(5)

355. Plaintiffs repeat, reiterate and reallege and incorporate by reference each and every

allegation contained in paragraphs "1" through "354" of this complaint, with the same

force and effect as if more fully set forth at length herein.

356. 282. This count is against the "Permitting Accomplices" or Count XLVIII

Defendant(s)", including Conspirators

**COUNTY OF ONTARIO in respondeat superior to**
**ONTARIO COUNTY SHERIFF'S OFFICE**
**DAVID CIRENCIONE,**
**BRYAN HOUSEL**

and others known and unknown, willfully and knowingly combined, conspired,

confederated, and agreed to assist the Count XCVII Defendants in violating Title 18

United States Code §1951(a), Title 18 United States Code §1201(a), Title 18, United

States Code § 924(c), Title 18, United States Code § 1512, 27 CFR § 478.33a, 18 U.S.C.

§ 922(u), 18 U.S.C. § 922(j), NY PEN § 155.30(7) and affect the enterprise's conspiracy under 1962(d) to interfere in interstate commerce.

## COUNT XLVIX

## DEFENDANTS' ACTION VIOLATES PLAINTIFFS' FIRST AMENDMENT RIGHTS § 242

357. Plaintiffs repeat, reiterate and reallege and incorporate by reference each and every allegation contained in paragraphs "1" through "356" of this complaint, with the same force and effect as if more fully set forth at length herein.

358. This count is against the "Conspirators" or "Count III & Count XLVI Defendant(s)", whom from at least on or about August 6, 2021, through and including January 27 2022, and continuing til at least January 17th, 2023, in the Western District of New York and elsewhere, including Conspirators

**KYLE WILKINS
CHRISTOPHER D BONHAM
SEAN P. BURKE
JOHN CURTIS
JOHN DEVITO
ANDREW O'CONNELL
ATF AGENT JOHN DOE #1, #2, #3, #4
8/18 NYSP JOHN DOES
RYAN BENTLY
BRUCE DRAKE
SA LANDER
M PIETRZYKOWSKI
RICHARD CANINO
BRYAN BLUM
JUSTIN PRUSAK
STEVEN MOWERS
DAVID CERRETTO
JORDAN BONAFEDE
MICHAEL MANLEY
JESSICA A KUZUDAL
MICHAEL S TURTON**

**COLEY S ELLISON**
**JASON D FIFIELD**
**BRIAN J RATAJCZAK**
**WILLIAM PEARSALL**
**MICHAEL DEYO §**
**COUNTY OF ONTARIO in respondeat superior to**
**ONTARIO COUNTY SHERIFF'S OFFICE**
**Frmr SHERIFF KEVIN HENDERSON,**
**DAVID CIRENCIONE,**
**BRYAN HOUSEL,**
**ONTARIO COUNTY DISTRICT ATTORNEY'S OFFICE**
**JEFFERY FRIESEN,**
**PETER VAN DELLON §**
**MONROE CRIME ANALYSIS CENTER INVESTIGATOR KUPKA**

and others known and unknown, willfully and knowingly combined, conspired,

confederated, and agreed with each other to violate Title 18 United States Code §1951(a),

Title 18 United States Code §1201(a), Title 18 United States Code §1623, Title 18,

United States Code § 1512, §1959, § 1001, § 922(u), 18 U.S.C. § 922(j), 27 CFR §

478.33a, NY PEN § 155.30(7) and 140.30(1), among other crimes, in retaliation for the

plaintiffs' legal exercise of their rights.

359. The Plaintiffs have the constitutional right to freedom of speech, religion, press,

assembly, and the right to petition the government through peaceful protest without

retaliation by the government or its agents.

360. "The right to criticize; The right to hold unpopular beliefs; The right to protest;

The right of independent thought. The exercise of these rights should not cost one

single American citizen his reputation or his right to a livelihood nor should he be in

danger of losing his reputation or livelihood merely because he happens to know

someone who holds unpopular beliefs." - Senator Margaret Chase Smith's "Declaration

of Conscience" (1950), the first woman to serve in both houses of the United States Congress and a Republican presidential nominee in the 1964 election.[147]

361. *Politica est rei publicae religio;* as with religion, every citizens' personal political views are protected by the first and fourteenth amendments, and cannot be subject to government scrutiny or retaliation without evidence of crime, despite what the FBI's unconstitutional civilian investigation policy prescribes post 9/11.

362. This Court has authority under Article III of the Constitution to issue an injunction against federal officials acting in their official capacities when that injunction will prevent an ongoing violation of federal law or of constitutional rights.

363. Politically charged mischaracterizations like "antifa," "rioter" or "militia" used to target the plaintiffs (who can be evidenced as nothing but law abiding citizens who care for their community) for malicious prosecution are similarly used against other such citizens who use their First Amendment rights to speak out against police brutality and killer cops hiding behind the corruptive cancer of Qualified Immunity.

364. Antifascism, as described by FBI director Chris Wray, "[is] not a group or an organization. It's a movement or an ideology." Antifascism cannot be in good faith seen as probable cause for suspicion against or investigation of citizens as its basic inherent principal is simply "community defense against murderous white supremacist ideology," nor should investigators be able to use such mischaracterizations to demonize and target everyday citizens opposed to police brutality and militarization.

365. Anti-Capitalist ideology, similarly, is not an actionable offense nor reasonable cause for suspicion against or investigation of any citizen of the United States.

---

[147] Smith later observed, "If I am to be remembered in history, it will not be because of legislative accomplishments, but for an act I took as a legislator in the U.S. Senate when on June 1, 1950, I spoke ... in condemnation of McCarthyism, when the junior Senator from Wisconsin had the Senate paralyzed with fear that he would purge any Senator who disagreed with him." The plaintiff prays that a mind like Senator Smith's considers this case; American citizens are not the enemies of America, and never have been.

366. Anti-Racist ideology, similarly, is not an actionable offense nor reasonable cause for suspicion against or investigation of any citizen of the United States. Agencies within the patchwork of the JTTF including the FBI, CIA, ATF and US Police forces have a long, indisputable and documented history of murdering working class citizens who dare exercise their civil rights or labor that dares organize their workplace, such agencies directly responsible for the murders of Andrew Goodman, James Chaney and Michael Schwerner on June 21, 1964; Viola Liuzzo on March 25, 1965; Dr. King Jr on April 4, 1968; Fred Hampton on December 4, 1969; the MOVE bombing on May 13, 1985; blatantly engaged in ongoing schemes to harm and murder the People who utilize and fight for their civil rights ad infinitum et ad verecundiam into the 2020's

367. To constitute probable cause, "it must appear to be at least more probable than not that a crime has taken place and that the one arrested is its perpetrator, for conduct equally compatible with guilt or innocence will not suffice." [*People v. Carrasquillo*, 54 N.Y.2d 248, 254 (1981)]. Conduct which is at most equivocal and suspicious, is not sufficient to establish probable cause. [see *People v. Gomcin*, 8 N.Y.3d 899, 900 (2007); *People v. Davis*, 36 N.Y.2d 280 (1975); *People v. Brown*, 32 N.Y.2d 172 (1973); *People v. Weekes*, 52 A.D.3d 1032 (3d Dep't 2008)]. A citizen utilizing their constitutional rights, be it the right to free discourse, religion, assembly, conducting legal business or organizing their workplace, do not qualify as threats nor appearing to have committed a crime. Targeting individuals for investigation for political motives is unconscionable and unamerican. Since the findings of the Church Committee, unaccountable agencies have abused millions of citizen's rights and things have only gotten worse since 9/11.

368. Upon information and belief, the Defendants and other agencies of the US will take this same unlawful position in the future to maliciously prosecute, harm, harass, disarm and murder law abiding citizens for exercising their first amendment rights to free political discourse, exercise of religion, lawful assembly and right to petition the government along with their second amendment right to own a firearm for self defense.

369. While targeted for utilizing their rights to free speech, assembly and petition of government,[148] Plaintiffs Fisher and Krenzers' religious rights were simultaneously deeply affected by the Defendant's violations of § 242 and the deprivation of rights under color of law.

370. Plaintiffs Fisher and Krenzer are Keepers of The Way of the Mandalore[149], a decentralized nontheistic church, which maintains a Creed, a form of Worship and religious tradition through its twelve tenets: 1) Remain Armed; 2) Remain Armored; 3) Never Initiate Violence; 4) Defend Those Who Cannot Defend Themselves; 5) Weapons and Armor are Holy Articles of the Faith; 6) Train Both Body and Mind; 7) Judge Others By Actions Only; 8) Be Self-Sufficient; 9) Keep Some Aside for the Foundlings (Orphaned and Abused Children); 10) Remain Loyal; 11) Spread the Way to those who will hear; 12) Do Not Isolate.

371. The First tenet of the Way states that *"A Mandalorian must remained armed at all times unless alone: 1)* A Mandalorian must be armed with a firearm whenever possible. Out of respect for the rights of private property owners, such weapons should remain discrete and concealed whenever possible, unless their use is needed to protect innocent life or property, 2) All weapons (including those not carried) have a spirit of their own. They walk with us and help to guard and protect us and the innocent, 3) A Mandalorian must, to the best of their individual ability, never be forcefully disarmed; 4) "Being alone" means either the Mandalorian is physically alone or is with members of his family (spouse, children, etc). The time to be alone means that it is their time at peace, not just their proximity to other people."

---

[148] Evidenced in baseless police descriptions like "rioter" or "militia"
[149] A full declaration of the church's tenets is available at https://wiki.mandalorianreligion.org/index.php/12_Tenets

372. The Second tenet of the Way states *"A Mandalorian must remain armored at all times unless alone: 1)* A Mandalorian must wear at least one piece of armor at all times. The item must be made of material that can function as armor (steel, leather, Kevlar, etc). Such an item can be as simple as a leather cuff bracelet/vambrace. The decision is left to the individual as to the extent of the armor; 2) This affirms that a Mandalorian is at all times defensive, but remains ready to defend innocent life and property; 3) Like weapons, a Mandalorian's armor has a spirit that walks with them and helps to protect their life; and like their weapons, must be treated with reverence as a holy article of their faith in The Way; 4) A Mandalorian is not ashamed of The Way. Therefore it is best that a symbol of The Way be displayed in some way on the armor; and the armor must be visible to others whenever possible; 5) "Being alone" holds the same meaning for the armor as it does for a Mandalorian's weapons."

373. The Fifth tenet of the Way states *"A Mandalorian's weapons and armor must be treated as holy articles of faith: 1)* The weapons, accessories, and armor of the Mandalorian have spirits that walk with them through life; 2) It is not enough to carry weapons and wear armor, the Mandalorian must maintain them and keep them in well working order. The act of cleaning and maintaining is an act of thanks and respect to the spirit of the article; 3) Likewise, donning and removing one's weapons and armor must be done with respect, giving thanks to the spirit for helping you to protect yourself and others.

374. Stripping the plaintiffs of holy articles of their faith during the kidnapping and robbing the LLC (which the plaintiffs consider to be a place of active worship) on 1/27/22, are acts of religious discrimination. Both Plaintiffs were stripped of their self defense articles in a similar unceremonious manner. These actions go against the plaintiff's religious rights on the deepest level, given no choice but to disarm and surrender to their many armed kidnappers to avoid violence and harm to bystanders and themselves.

375. When the plaintiffs offer that their LLC was a place of active religious worship, it is not a dismissable statement. Through the economic solvency and freedom provided by the LLC's successful interstate trade, the plaintiffs were able to adhere to **Tenet 8 - Be Self-Sufficient** with the Means to afford basics like housing and food so they could then provide for others, **Tenet 4 - Defend Those Who Cannot Defend Themselves** by providing the community with holy articles

of the faith in an inclusive atmosphere, **Tenet 6 - Train Both Body and Mind** by offering free weekly gun safety training and educational events, **Tenet 9 - Keep Some Aside for the Foundlings (Orphaned and Abused Children)** through donations, and **Tenet 11 - Spread the Way to Those Who Will Hear** by broadcasting every action with a message of unity, mutual aid and community defense cornerstone to the plaintiffs' commercial and private religious mission.

376. Declaratory relief is therefore appropriate to resolve this controversy.

## COUNT L

## AGENCY ACTION VIOLATES PLAINTIFFS KRENZER'S SECOND AMENDMENT RIGHTS § 242

377. Plaintiffs repeat, reiterate and reallege and incorporate by reference each and every allegation contained in paragraphs "1" through "376" of this complaint, with the same force and effect as if more fully set forth at length herein.

378. In Plaintiff Krenzer's interrogation on 1/27/22, Investigator Bonham accused the plaintiff of being under the conservatorship of her father after having been ruled mentally unfit before a judge after having been involuntarily committed to a mental health facility. This accusation has no basis in reality, and was invented by Wilkins. Research into the cause of this accusation led to the guidance provided by an FBI NICS agent:

> *NY SAFE required even voluntary hospital stays where the patient says "yes" to "do you own a firearm?" to be reported as 'statistical' red flags. NY law requires red flags to be deleted from its systems after 5 years under § 16. Section 837 of the NY executive law, though NY will only notify the affected citizen of the original unconstitutional loss of rights should that person already have a valid pistol permit. In addition, NY only informs NICS to strip a citizen's rights, with no update after 5*

*years restoring those rights. Any Red Flag in the state of NY, just or unjust, is a*

*permanent loss of constitutional rights without due process of law.*

The police are aware of this loophole and use it to attack citizens across the state,

stigmatizing those who have sought voluntary treatment for trauma.

379. The plaintiff had a voluntary §9.13 hospital stay in 2014 after a traumatic sexual

assault, and near a decade later the Defendants are weaponizing her mere presence in

a hospital to attack her by abusing medical records, while the plaintiffs only indication

of her rights status with NYS since 2014 was her valid NY hunting permit.

380. In the plainest terms, the Defendants are calling the Plaintiff "crazy" for seeking

help from mental health professionals after being raped in 2013. Defendants tried to

built their criminal case on attacking a rape victim for seeking aid a decade ago.

381. N.Y. Mental Hyg. Law § 33.01 states that *"no person shall be deprived of any*

*civil right, if in all other respects qualified and eligible, solely by reason of receipt of*

*services... nor shall the receipt of such services modify or vary any civil right of any*

*such person, including but not limited to civil service ranking and appointment, the*

*right to register for and to vote at elections, or rights relating to the granting,*

*forfeiture, or denial of a license, permit, privilege, or benefit pursuant to any law."*

382. On SAFE act's website it touts: *"This law should not dissuade any individual*

*from seeking mental health services they need."* but when investigators are allowed to

weaponize a decade old statistical red flag against a rape victim, it rings hollow.

383. In his testimony to the ATF hearing, Investigator Wilkins admits he can find no

evidence to support his claim that Krenzer ever had an involuntary stay.

384. Instead of evidence, a rushed 1/20/2022 note from the NY Department of Mental Health was acquired by Investigator Bonham that ignores the defendant's actual medical history in an attempt to justify Defendants conspiracy and criminal actions on 1/27/22, which it does not.

385. *District of Columbia v. Heller, 554 U.S. 570* holds the Second Amendment protects Krenzer's right to possess a firearm for traditionally lawful purposes, expressly self-defense within the home.

386. *McDonald v. City of Chicago* holds that the defendant's right to keep and bear arms for self defense in one's home is protected under the Second Amendment, and is incorporated against the states through the Due Process Clause of the Fourteenth Amendment.

387. Objective facts show that the plaintiff does not meet any of the 18 U.S.C. 2(a) & 922(g)/(n) credentials to disqualify her from firearms ownership:

    a. *NOT convicted in any court of a crime punishable by imprisonment for a term exceeding one year;*
    b. *NOT a fugitive from justice;*
    c. *NOT an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act, codified at 21 U.S.C. § 802);*
    d. *NOT been adjudicated as a mental defective or been committed to any mental institution;*
    e. *NOT an illegal alien;*
    f. *NOT been discharged from the Armed Forces under dishonorable conditions;*
    g. *NOT renounced his or her United States citizenship;*
    h. *NOT subject to a court order restraining the person from harassing, stalking, or threatening an intimate partner or*
    i. *child of the intimate partner; and*
    j. *NOT been convicted of a misdemeanor crime of domestic violence.*

388. For the reasons stated above, the plaintiff respectfully petitions for relief via restoration of rights, with a certified copy and judicial injunction to be provided to the FBI NICS Voluntary Appeal File to restore her inalienable rights unjustly stripped by

the state of NY to allow her to protect herself and her family, hunt, and engage in professional shooting sports and Civilian Marksmanship Program competitions. Krenzer is a gun-safe, community-service oriented, responsible adult who does no harm, follows the law and deserves her basic Constitutional rights.

389. On 12/20/2019, plaintiff Krenzer was robbed by machete-wielding James Williams, 37, of Rochester, while working alone managing a convenience store around 7:25 p.m. Ogden Police took reports of the robbery. The plaintiff has never committed violence on another person, but dangerous individuals have continued to commit violence against her, as illustrated by this event and many others. The plaintiff respectfully would petition for a reparative injunction directing defendants to expedite the issue of a much deserved concealed carry pistol permit to the plaintiff.

390. The use and abuse of broken Red Flag law and New York SAFE Act is an assault on the constitutional rights of the Plaintiff and every other law abiding citizen.

391. This court has the authority to provide relief through Injunction to state officers. There are exceptions to the sovereign immunity of a state, and the Eleventh Amendment does not stop a federal court from issuing an injunction against a state official who is violating federal law. Although the state official may be abiding by state law, he is not permitted to violate federal law, and a federal court can order him to stop the action with an injunction. [*Ex Parte Young*, 209 U.S. 123 (1908) ]

392. Misuse of expired red flags for malicious prosecution, red flags which the state of NY makes no attempt to repair with FBI NICS after their 5 year expiration nor inform citizens of at any point, creates only the opportunity for arrests that feed the

prison-industrial complex new slaves, and violates the 2nd Amendment with no

identifiable benefit to public safety and the 14th with no respect for due process.

393. Declaratory relief is therefore appropriate to resolve this controversy.

## COUNT LI

## CARJACKING § 160.10(3)

394. Plaintiffs repeat, reiterate and reallege and incorporate by reference each and every

allegation contained in paragraphs "1" through "393" of this complaint, with the same

force and effect as if more fully set forth at length herein.

395. Plaintiffs incorporate the allegations in the foregoing paragraphs as if set forth

fully herein.

396. This count is against defendants,

**CHRISTOPHER D BONHAM**
**RYAN BENTLY**
**BRUCE DRAKE**
**SA LANDER**
**M PIETRZYKOWSKI**
**RICHARD CANINO**
**BRYAN BLUM**
**DAVID CERRETTO**
**JORDAN BONAFEDE**
**MICHAEL MANLEY**

397. January 27th 2022, the Kidnappers with others known and unknown, willfully and

knowingly combined, conspired, confederated, and agreed with each other to violate

NY PENAL LAW § 135.25 and Title 18, United States Code, Section 1201(a) by

unlawfully seizing, confining, kidnapping, abducting or carrying away Krenzer and

Fisher. In the process, the defendants removed the plaintiffs from operation of their

vehicle and drove it to their gang headquarters where it was further tampered with by the defendants while the plaintiffs were illicitly held on false charges.

398. A person is guilty of robbery in the second degree, a C felony, when he forcibly steals property and when: 1. He is aided by another person actually present; or 2. In the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime: (b) Displays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; or 3. The property consists of a motor vehicle, as defined in section one hundred twenty-five of the vehicle and traffic law.

## COUNT LII

### EQUITABLE RELIEF FOR AN ONGOING VIOLATION OF FEDERAL LAW

399. Plaintiffs repeat, reiterate and reallege and incorporate by reference each and every allegation contained in paragraphs "1" through "393" of this complaint, with the same force and effect as if more fully set forth at length herein.

400. Plaintiffs incorporate the allegations in the foregoing paragraphs as if set forth fully herein.

401. This Court has authority under Article III of the Constitution to issue an injunction against federal officials acting in their official capacities when that injunction will prevent an ongoing violation of federal law or an ongoing violation of constitutional rights.

402. Defendants Dettelbach and Garland are federal officials with authority to interpret and enforce the Gun Control Act. They also oversee and direct other federal officials in the interpretation and application of the Act.

403. Acting in their official capacities, Defendants Dettelbach and Garland instituted a new Enforcement Policy that contradicts the Act.

404. Defendants Dettelbach and Garland, or their agents, have since enforced this policy against many licensees including the Plaintiff in violation of their rights.

405. Upon information and belief, Defendants Dettelbach and Garland will take this same unlawful position in the future to disarm other law abiding citizens.

406. Defendants Hochul, Nigrelli, Allan, Nohai, Chiumento and Ritts are state officials with authority to interpret and enforce the SAFE Act and Red Flag policies. They also oversee and direct other state officials in the interpretation and unconstitutional enforcement application of SAFE Act and Red Flag policies.

407. Acting in their official capacities, Defendants Hochul, Nigrelli, Allan, Nohai, Chiumento and Ritts instituted, proliferated and adhered to new Red Flag Policy that contradicts the Second, Fourth, Thirteenth and Fourteenth amendments of the Constitution and has put thousands of NY citizens at risk of malicious enforcement.

408. Defendants Hochul, Nigrelli, Allan, Nohai, Chiumento, Ritts and their agents, have since enforced this unconstitutional policy against many citizens including the Plaintiffs in violation of their rights.

409. Upon information and belief, Defendants Hochul, Nigrelli, Allan, Nohai, Chiumento, Ritts and their agents, have taken this same unlawful position in the past and will continue in the future to disarm other law abiding citizens to create profitable arrests of law abiding citizens.

410. This *de facto* strict liability policy of the ATF Enforcement Policy violates the gun control act and the Second Amendment.

411. By adopting the ATF Enforcement Policy, Defendants Dettelbach and Garland burden the Second Amendment rights of Plaintiffs and their customers.

412. By adopting and enforcing ever more strict SAFE-associated Enforcement Policies, Defendants Hochul, Nigrelli, Allan, Nohai and Chiumento and their agents burden the Second, Fourth and Fourteenth Amendment rights of Plaintiffs and their customers.

413. An actual and substantial controversy exists between Plaintiffs and Defendants as to their legal rights and duties with respect to whether the ATF Enforcement Policy violates Federal Statute and the United States Constitution.

414. An actual and substantial controversy exists between Plaintiffs and Defendants as to their legal rights and duties with respect to whether the SAFE Act and Red Flag Enforcement Policy violates Federal Statute and the United States Constitution.

415. Defendants clearly had no right or cause to conspire to cause an illegal raid, armed robbery and kidnapping in violation of the Plaintiffs' First, Second, Fourth, Fifth and Fourteenth amendment rights, nor slander and maliciously prosecute the Plaintiffs, nor lie about NYS law to a grand jury in violation of the Plaintiff's Sixth amendment rights and the defendants' duly sworn oaths, nor send an intimidation squad to ensure co-conspirators will not be sued for rights violations through threat of further violence in violation of 18 USC 1512 and their First and Sixth amendment rights, nor baselessly call the plaintiffs dangerous and cite lies about their perceived political beliefs in requests for Orders of Protection in violation of their First Amendment Rights, nor interfere in interstate commerce of a legal business because it refused to service police

in a ban state, nor attempt to fabricate realities in which the law abiding Plaintiffs were anything but upstanding Americans doing right by their community.

416. By arbitrarily enforcing the ATF Policy in collusion with Defendant Wilkins to destroy the LLC's economic viability, Defendant Curtis has violated the Plaintiff's 2nd, 4th, 5th and 8th Amendment Rights in addition to its right to unmolested interstate commerce under the Hobbs Act. In addition, the ATF's revocation hearing in and of itself could be seen as having constituted a violation of the Plaintiff's Seventh Amendment right to a jury trial in a civil proceeding. The plaintiff has committed no crime, and cannot be arbitrarily punished by a federal enforcement agency operating only under color of law to violate their civil rights.

417. While it is true that no action shall be maintained under section 18 U.S.C. § 2333 against— the United States, an agency of the United States, or an officer or employee of the United States or any agency thereof acting within his or her official capacity or under color of legal authority,

418. This court has the authority to provide relief through Injunction to state officers. The Eleventh Amendment does not stop a federal court from issuing an injunction against a state official who is violating federal law. Although the state official may be abiding by state law, he is not permitted to violate federal law, and a federal court can order him to stop the action with an injunction. [*Ex Parte Young*, 209 U.S. 123 (1908) ]

419. Money damages are possible against the state officer, as long as the damages are attributable to the officer himself, and are not paid from the state treasury. *Scheuer v. Rhodes*, 416 U.S. 232 (1974). The Eleventh Amendment does not automatically protect political subdivisions of the state from liability. *Moor v. County of Alameda*, 411 U.S.

693 (1973). The main factor is whether the damages would come out of the state treasury. *Hess v. Port Authority Trans-Hudson Corp.*, 115 S. Ct. 394 (1994), If the state would have to pay for damages from the state treasury, then the Eleventh Amendment will serve as a shield from liability. Other factors may include the amount of state control and how state law defines the subdivision, although the Supreme Court has never issued a comprehensive guideline. Eleventh Amendment immunity does not protect municipal corporations or other governmental entities that are not political subdivisions of the state, such as cities, counties, school boards, or *police departments*. Therefore, this court has the authority to demand damages be paid by the police departments themselves.

420. The 13th amendment provides that "*Neither slavery nor involuntary servitude, **except** as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.*" The 13th Amendment outlawed slavery except for as punishment for crime[150]. This exception created a financial incentive to criminalize people and steal their labor, and it was exploited almost immediately through Jim Crow laws and other racist implements of "law enforcement." The amendment codifies not the abolition of slavery, but the sole right as slave master to the US Federal Corporation as defined in 28 USC § 3002(15)(a) and its agencies. Without probable cause or warranted authorization, federal agents and state officers attempted to violate the Plaintiffs' 13th amendment rights, kidnap them, and make them slaves by abusing the legal system. The prison system is enormously lucrative, and the Defendants each profit from malicious policing through larger

---

[150] In 1982 a Senate subcommittee noted that ATF primarily devoted its firearms enforcement efforts to the apprehension, upon technical *malum prohibitum* charges of individuals who lack all criminal intent and knowledge. SAFE act is an echo of the same *malum prohibitum* enforcement policy, seeking to make federal slaves of law abiding citizens. The ATF's laughable 2022-2023 Pistol Brace Policy makes felons of all disabled military veterans, and has led to calls for the abolition of the ATF in congress.

budgets, all dedicated to maintaining the world's largest slave population. The plaintiffs

hold the belief such behavior in policing is immoral and deserves to be viewed under 18

U.S. Code § 1590 - Trafficking with respect to peonage, slavery, forced labor.

421. It would be unfair to say that the Defendants have not already profited off the

kidnapping and robbery of the plaintiffs, with thousands of logged taxpayer funded

hours of harassment and criminal action under color of law since October 2021 by

federal and state agents, and a waste of the court's time pursuing a faux criminal trial[151]

in an attempt to make legal slaves of the plaintiffs under the 13th.

422. The case is presently justiciable because the ATF Enforcement Policy directly

applies to Plaintiff as it was subject to revocation possible only under its Zero Tolerance

policy terms, which constitutes irreparable harm.

423. The case is presently justiciable because the NYS SAFE Enforcement Policy was

directly applied to the exempt Plaintiff in violation of its own statutes, which

constitutes irreparable harm.

424. The case is presently justiciable because the vague, predatory and unconstitutional

NYS Red Flag Policy is being abused to strip Plaintiff Krenzer and other NY citizens of

their constitutional rights without due process of law, which constitutes irreparable

harm to every citizen of the state.

425. Declaratory relief is therefore appropriate to resolve this controversy.

---

[151] The plaintiff provides that such a calculation is in fact entirely plausible via a FOIA demand for all interagency records of hours worked by investigators in its malicious prosecution. Violating the plaintiffs rights and those of its customers was enormously lucrative for involved agencies in hours paid alone, and that is without regard to the funds that will be generated through Civil Asset Forfeiture after unjust revocation of the plaintiff's license and seizure of all of its property and inventoy.

## PRAYER FOR RELIEF

Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, it is appropriate and proper that a declaratory judgment be issued by this Court, declaring that the defendant's Zero Tolerance Enforcement Policy is contrary to federal law. Furthermore, pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, it is appropriate and hereby requested that the Court issue a permanent injunction prohibiting Defendants from enforcing policy.

WHEREFORE, Plaintiffs petition for judgment against Defendants and that the Court:

(1) Declare that Defendants' Enforcement Policy violates the Gun Control Act, the Administrative Procedures Act, and the U.S. Constitution;

(2) Hold unlawful and set aside Defendants' Zero Tolerance Enforcement Policy; Case 1:22-cv-01063 Document 1 Filed 10/19/22

(3) Issue a permanent injunction against the Defendants, as well as all agents, administrators, employees, or other persons acting on behalf of the Defendants, from enforcing the ATF Zero Tolerance Enforcement Policy;

(3) Issue a permanent injunction against the Defendants, as well as all agents, administrators, employees, or other persons acting on behalf of the Defendants, from enforcing the ATF Pistol Brace Enforcement Policy in order to protect the civil liberties of America's disabled veterans, elderly and handicapped sports shooters;

(4) Overturn de novo the ATF's revocation of the Red Right Hand Rifle Syndicate's license and reinstate Plaintiff's FFL and inalienable right to conduct legal interstate commerce. The Plaintiffs were homeless, lost work to Covid, and built a business from nothing. Taking away the plaintiffs' hard earned economic means and stability- their right to Life, Liberty and Happiness- for month three clerical errors is a Cruel and

Unusual Punishment without due process, in violation of the Fourth, Eighth and

Fourteenth Amendment rights of the plaintiff and each and every FFL that will suffer

from such similar action and unfair economic damages in the future.

(5) Issue an appropriate order to the ATF to grant both the plaintiffs Fisher and the Red

Right Hand Rifle Syndicate separate and individual Special Tax Stamps to facilitate the

plaintiffs' international business under its AECA license, with a 20 year exemption on

paying the associated Special Occupational Tax (SOT) fees in restitution for defendant

agents' violations of the plaintiff's civil rights and economic freedom by means of

RICO conspiracy.

(6) Issue a permanent injunction against the Defendants, as well as all agents,

administrators, employees, or other persons acting on behalf of the Defendants, from

committing any crime or civil rights abuse against the plaintiff forthwith, providing for

the guaranteed longevity of the interstate business via freedom from unlawful state

interference from bad faith government actors.

(7) Issue an appropriate order against their respective agencies to remove Defendant

Wilkins, Defendant Bonham, Defendant Cirencione and Defendant Van Dellon from

their positions and bar them from holding state or federal law enforcement or bar

positions at any point in the future, as these lead Conspirators continued employment

by the government can only bring further rights abuses and damages to the credibility

of both the courts and law enforcement services. 18 U.S.C. § 1964 (a) explicitly

authorizes district courts to impose "reasonable restrictions on the future activities. . . of

any person, including, but not limited to, prohibiting any person from engaging in the

same type of endeavor as the enterprise engaged in." Courts have held that this

provision empowers courts to remove persons found liable for RICO violations or for

violating courts' judgment orders in Government civil RICO cases from positions in an

entity and to prohibit them from holding such positions in the future. [152]

(8) Issue an appropriate order under 18 U.S.C. § 1964 (a) against their respective

agencies to immediately remove all other Count XLVII law enforcement defendants

from their positions, each having conspired to interfere in interstate commerce through

violent crimes committed behind the presumed safety of a badge, and bar each from

holding state or federal law enforcement or government service positions henceforth.

(9) For participation in RICO conspiracy and violent crimes in aid of said conspiracy,

issue an appropriate order or recommendation for criminal prosecution and sentencing

to be made upon these defendants, with provisions for Forfeiture of Benefits under the

Public Integrity Reform Act

(10) Grant such other and further relief as the Court deems equitable, just, and proper.


FURTHERMORE, pursuant to 28 U.S.C. § 2202, Fed. R. Civ. P. 65, and N.Y. Mental

Hyg. Law § 33.01 it is appropriate and hereby requested that the Court issue a

permanent injunction prohibiting Defendants from conducting malicious prosecution

utilizing expired red flags or a simple history of voluntary mental health visits nor

enforcing unconstitutional state policy.

WHEREFORE, Plaintiffs petition for judgment against Defendants and that the Court:

---

[152] Section 1964 (a)'s legislative history confirms that Congress intended Section 1964 (a) to authorize district courts to impose such relief. For example, the Senate Report regarding civil RICO states: Where an organization is acquired or run by defined racketeering methods, then the persons involved can be legally separated from the organization, either by the criminal law approach of fine, imprisonment and forfeiture, or through a civil law approach of equitable relief broad enough to do all that is necessary to free the channels of commerce from all illicit activity. S. REP. NO. 91-617 at 79-80. The Senate Report also quoted with approval the Department of Justice's statement that:The relief offered by these equitable remedies would also seem to have a greater potential than that of the penal sanctions for actually removing the criminal figure from a particular organization and enjoining him from engaging in similar activity.

(1) Declare that the SAFE Act and Kathy Hochul's 2022 Extreme Risk Protection Order laws violate the 2nd, 4th, 8th and 14th amendments to the U.S. Constitution;

(2) Hold unlawful and set aside the entirety of the SAFE (Secure Ammunition and Firearm Enforcement) Act; or, barring such relief, hold unlawful the following provisions:

(a) The "one-feature" test which bans semi-automatic guns with detachable magazines that possess one feature commonly associated with "military weapons." To wit, the only common feature associated with "military weapons" is that they are not available to the general public[153], and therefore only "a grenade launcher" would qualify as a military feature, with the only commonality between the other banned features assigned to identify an "assault weapon" is that each was chosen arbitrarily by non-firearms experts because of its appearance, not its function, effectively banning "A folding or adjustable stock, a thumbhole stock, a pistol grip, a bayonet lug, a foregrip, a flash suppressor, a muzzle brake, a threaded barrel, a pistol with a manufactured weight over 50 ounces unloaded, a "second pistol grip", a magazine that attaches outside of the pistol grip," etc. None of these features are anything but common, civilian features long available to the majority of Americans in most states, and SAFE policy is an assault on lawful interstate commerce. None of these banned features increase a firearm's rate of fire, range or deadliness. As knives are not *per se* military articles, a bayonet lug also fails to meet the standard of a "military feature," and to wit not a single mass shooting in the United States has seen a death incurred by bayonet.

---

[153] Military articles, or as they are professionally known in the plaintiff's international trade as "Defense Articles", are defined under the Arms Exports Controls Act, not by legislators in NY senate. These include Machine guns, suppressors and other destructive devices articles already banned nationwide by the NFA.

(i)     Possessing a rifle with these common civilian features is not *malum in se*,

only *malum prohibitum*. Slavery sentences for *malum prohibitum* are what

is truly evil, and these laws must be struck down.

(b) Hold unlawful the following NYPL § 265.20 Exemptions: (b) Police officers as

defined in subdivision thirty-four of section 1.20 of the criminal procedure law or

(c) Peace officers as defined by section 2.10 of the criminal procedure law; and 2.

Possession of a machine-gun, large capacity ammunition feeding device,

rapid-fire modification device or firearm by a warden, superintendent… or deputy

of a state prison, penitentiary, workhouse, county jail or other institution" as

Police officers are not the military, nor is their function analogous to that of a

military; police are regular citizens with a regular job[154] and a corporate policy of

Us vs Them militarization only fosters violence against the People. They deserve

no special protections of their rights against the unconstitutional SAFE act

violations that are regularly visited on other citizens. If police are allowed

exemption to and separation from any law they are expected to enforce, it gives

them no need to know the law and invariably leads to rights abuses and a

corporate culture of ignorance and brutality.

(3) Hold unlawful and set aside the entirety of the Extreme Risk Protection Order law

of 2022;

(4) Issue a permanent injunction against NY state officers, as well as all agents,

administrators, employees, or other persons acting on behalf of the Defendants, from

enforcing the SAFE act or Hochul's ERPO law, nor abusing expired red flags, nor

---

[154] According to the U.S. Bureau of Labor Statistics (BLS), a pizza delivery driver is at a higher risk of injury and death than a police officer, despite common police union propaganda. Truck drivers, farm workers, construction workers, lumberjacks, roofers, power installers, social workers, pilots, fishermen, taxicab drivers, garbage men, structural metalworkers- the citizens who built the country and keep it running- are all at far more risk of injury at work than a police, a *fraternitas ignaviae*, ever will be.

abusing the civil rights of any such person who has received voluntary mental health treatment as pursuant to N.Y. Mental Hyg. Law § 33.01, or, barring such relief, provide injunction moving defendants must be ordered to create and enforce a policy to immediately contact FBI NICS to restore a citizen's civil rights status when the state of NY destroys a red flag by law at the end of the proscribed 5 year waiting period, protecting the second amendment and due process rights of every citizen.

(5) Issue a permanent injunction against Kathy Hochul, as well as all agents, administrators, employees, or other persons acting on behalf of the Defendants, to form an NYS investigative committee with the goal of reinstating the 2nd Amendment rights of all such citizens taken without due process of law under NY state red flag policies by working to uncover such rights abuses and immediately contacting FBI NICS on behalf of the victims to restore the civil rights status of all such NY citizens affected by the unconstitutional policy. Any NY citizen who acquired a *§ 9.13 Voluntary Admission* since the passing of the SAFE act is a potential victim of the red flag policy, and provisions must be made for the relief of all citizens so affected.

(6) Issue a permanent injunction to defendant Hochul and the NY legislature that, in order to preserve constitutional rights and provide for true, thoughtful public safety measures, gun control laws shall be drafted in committee with no less than 10 professional representatives of the industry (FFLs) to aid in guiding policy to preserve both freedom and public security; just as medical professionals are the licensed authority on COVID, FFLs are the licensed authority on firearms, and the plaintiff and other FFLs are dedicated to public safety in their positions as the fulcrum on interstate arms commerce. Professionals should be listened to in all fields.

(7) Grant such other and further relief as the Court deems equitable, just, and proper.

FURTHERMORE, pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, it is appropriate and hereby requested that the Court issue a permanent injunction prohibiting Defendants from continuing to damage the Plaintiff henceforth.

(1) Award Plaintiffs their costs and expenses incurred in the unreasonable and malicious prosecution in the Ontario County court case against them in which Defendants lied to the grand jury about NY law, including, but not limited to, reasonable attorney fees pursuant to 28 U.S.C. § 2412; including the $6,000.00 retainer paid by Krenzer and the $25,000.00 retainer paid by Fisher.

(2) Award Plaintiffs their costs and expenses incurred in this civil RICO case including, but not limited to, reasonable attorney fees pursuant to 28 U.S.C. § 2412;

(3) Award Plaintiff Red Right Hand Rifle Syndicate LLC, unconstitutionally stripped of its rights and a victim of armed robbery and irreparable economic damages in the amount of $9,011,213.10 by violations of 18 USC § 1962(d), 1951(a), 27 CFR § 478.33(a), 18 U.S.C. § 922(u), 18 U.S.C. § 922(j), §1959, § 924(c), §1623(a), §1001, NY PEN §135.25 and 18 U.S.C. § 1201(a), committed against it and its workforce by defendants of the Enterprise acting under color of law via:

(A) Award the Plaintiff Red Right Hand Rifle Syndicate LLC compensatory damages from Monroe and Ontario Counties for the Count III New York State Police Troop E and SIU defendants and their associates for violations of § 1951(a) in the amount of $6,000,000.00 out of these damages. To avoid burden on the taxpayer or state, these damages should first be secured via (1) salable[155] inventory unnecessary to

---

[155] Salable inventory under the plaintiff's FFL and AECA included as **Exhibit**

the duties as Officers of the Law, including but not limited to equipment defendants acquired under the DoD's 1033 program, such as any 5.56 assault rifles, 7.62 caliber precision rifles, .50 Caliber Rifles, or Lenco BearCat G2's (used price $180,000)[156] or G3 models, and (2) any seized firearm[157] held by the Defendants, provided:

(i) the firearm has not been used in commission of a murder or violent crime, unless that "violent crime" was only civilian possession of *per se* illegal firearms in NY,

(ii) the firearm is subject to civil asset forfeiture and would otherwise profit any agency associated with the conspiratorial Enterprise, or be destroyed,

(iii) it is an undamaged, fully functional firearm or "assault weapon" that the plaintiff may legally transfer for profit in interstate commerce as an Importer, with

(iv) a commercial value greater than $300 and a legible serial number, and

(v) the firearm is not an NFA weapon requiring an SOT, unless an Special Tax Stamp has been granted to the Plaintiff by the ATF through above relief and restitution;

(B) Award the Plaintiff Red Right Hand Rifle Syndicate LLC compensatory damages from the County of Ontario and the municipal incorporation Ontario County Sheriff's Office, frmr Sherriff Kevin Henderson, Sheriff David Cirencione and Communications Officer Bryan Housel for violations of § 1951 in the amount of $1,500,000.00 out of these damages.  To avoid burden on the taxpayer or state, these damages should first be secured via (1) salable inventory unnecessary to the duties of Officers of the Peace, including but not limited to equipment acquired under the 1033 program, such as 5.56 assault rifles, 7.62 caliber precision rifles, .50 Caliber Rifles, or

---

[156] Lenco BearCat G2 pricing found at https://www.lencoarmor.com/bearcats-are-affordable/
[157] Defendant Hochul announced over 6,000 firearms seizures and a 140 Percent Increase in New York State Police Gun Seizures Between August 2021 to July 2022 Compared to August 2020 to July 2021. The resale value of these NYSP seized firearms, perfectly legal for regular purchase in 80% of the Union where most of the plaintiff's customers reside, will rebuild the plaintiff's business per *Loayza Tamayo* in the most equitable way for the plaintiff and crimeless taxpayer.

the department's Lenco BearCat G2 (used price $180,000) or G3 models, and (2) any seized firearm held by the Defendants, provided:

(i) the firearm has not been used in commission of a murder or violent crime, unless that "violent crime" was only civilian possession of *per se* illegal firearms in NY,

(ii) the firearm is subject to civil asset forfeiture and would otherwise profit the Sheriffs or an associated agency or municipality employing defendants of the conspiratorial Enterprise, or be destroyed,

(iii) it is an undamaged, fully functional firearm or "assault weapon" that the plaintiff may legally transfer for profit in interstate commerce as an Importer, with

(iv) a commercial value greater than $300 and a legible serial number, and

(v) the firearm is not an NFA weapon requiring an SOT, unless a Special Tax Stamp has been granted to the Plaintiff by the ATF through above relief and restitution;

(C) Award the Plaintiff Red Right Hand Rifle Syndicate LLC compensatory damages from the Finger Lakes Railway Corporation in the amount of $1,500,000.00 for its accomplice to kidnapping and armed robbery in violation of 18 USC 1951(a) Interference in Interstate Commerce.

(4) Award Plaintiff Krenzer damages for pain and suffering via kidnapping (NY PEN §135.25 / 18 USC § 1201(a)), NY PEN § 140.30 and violations of her 1st, 2nd, 4th, 6th, 8th and 14th amendments rights in the amount of $250,000.00 from the 35 Count III Conspirators acting under color of law and sued in their individual capacities, under 18 U.S.C. §242 and 42 U.S. Code § 1983. These damages should be taken direct from the personal estate of each defendant.

(5) Award Plaintiff Fisher damages for pain and suffering via kidnapping (NY PEN §135.25 / 18 USC § 1201(a)), NY PEN § 140.30 and violations of their 1st, 2nd, 4th, 6th, 8th and 14th amendments rights in the amount of $250,000.00 from each of the 35 Count III Conspirators acting under color of law and sued in their individual capacities, under 18 U.S.C. §242  and 42 U.S. Code § 1983.

(7) Grant such other and further relief as the Court deems equitable, just, and proper.

**WHEREFORE**, for the reasons stated above, your Affirmant respectfully requests that the Court grant the relief set forth herein, together with such other and further relief which as to the Court may seem just and proper. *Fīat jūstitia ruat cælum.*

DATED: Jan 1st, 2023

PREPARED BY
KEENAN FISHER

Respectfully Submitted,

_____

_____
*Attorney for the Defendant*
—

_
telephone:
facsimile:

TO: Honorable Charles J Siragusa
      US District Court
      Western District of New York