UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KEENAN FISHER,

              Plaintiff,

    -v-

BUREAU OF ALCOHOL, TOBACCO and
FIREARMS (ATF), KYLE WILKINS (IOI),
JOHN CURTIS (DOI), JOHN DeVITO,
and agents/officers who entered our home
without warrant 8/18 to intimidate (18
U.S.C. 1512) into no appeal,

              Defendants.
_____

          22-CV-6440-CJS
          DECISION and ORDER

## INTRODUCTION

*Pro se* Plaintiff, Keenan Fisher, filed this "*Bivens*" action seeking relief under 42 U.S.C. §1983, alleging that Defendants, who were federal agents acting under color of federal law, violated his federal constitutional rights under the First, Second, and Fourth Amendments to the U.S. Constitution.  The Complaint further alleged, *inter alia*, that Defendants violated federal statutes, namely 18 U.S.C. § § 242, 1001, 1951, 1035 and 1512.  Now before the Court is a proposed amended complaint ("PAC") (ECF No. 7) and a motion for appointment of counsel (ECF No. 6).  For the reasons discussed below, the motion for appointment of counsel is denied, all but one of the claims are dismissed, and Fisher is required to submit a supplemental affidavit in support of his request to proceed *in forma pauperis*.

## BACKGROUND

    The reader is presumed to be familiar with the factual and legal history of this action.  Briefly, on October 14, 2022, Keenan Fisher ("Plaintiff" or "Fisher"), proceeding

*pro se*, purported to bring a federal civil rights *Bivens* action on behalf of himself and a limited-liability-company gun shop, Stea Rosie LLC ("Stea Rosie").  The Complaint also contained references to alleged civil rights violations against Fisher's live-in business associate/"secretary," Theresa Krenzer ("Krenzer"), but did not list her as a party.  Fisher also filed a motion for leave to proceed *in forma pauperis*.

The 9-page Complaint was directed at the following governmental activity, which was allegedly politically motivated and/or in retaliation for Fisher's expression of anti-police[1] views: The revocation of a federal firearms importer's license (FFL 08) issued to Stea Rosie by the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"); harassment and the dissemination of defamatory statements about Fisher and Krenzer;[2] and an alleged incident on August 18, 2022, in which officers went to Fisher's and Krenzer's residence and attempted to intimidate them, and in which one ATF officer entered the apartment and physically assaulted Krenzer.[3]  The Complaint referred to "civil rights and RICO violations" by "the defendant and its agents," referring to the ATF.  The Complaint alluded to the ATF working in coordination with members of the New York State Police ("NYSP").  However, the Complaint indicated that the action was brought solely against "federal officials," and not "state or local officials."  In that regard, the Complaint specifically named as defendants the ATF and three ATF employees sued in

---

[1] Fisher explains, for example, that Stea Rosie's gun shop offered discounts to various groups, such as "sex workers" and the "working class," but refused to offer them to law enforcement officers because "2/5" of them are "domestic abusers, and many are white power affiliates." PAC at p. 33.  Fisher further maintains that weapons-possession provisions of the New York Penal Law should be stripped of any exemptions for police officers, purportedly since "a pizza delivery driver is at a higher risk of injury and death than a police officer." PAC at p. 141, fn. 154.

[2] *See*, Compl. at p. 4 ("ATF and NYS police attacked my character as 'Antifa' and the entire farcical investigation was politically motivated.").

[3] *See*, Compl. at p. 4 ("ATF agent entered our home without a warrant and dragged Theresa onto the porch.").

their official capacities only: Kyle Wilkins ("Wilkins"), John Curtis ("Curtis"), and John DeVito ("DeVito").

On December 20, 2022, the Court issued a Decision and Order (ECF No. 4) granting the application to proceed *in forma pauperis*, screening the Complaint pursuant to 28 U.S.C. § 1915(e), dismissing certain claims, and ordering that the remainder of the action would be dismissed with prejudice unless, within thirty days, Fisher filed an amended complaint that complied with the Court's Decision and Order (ECF No. 4). The Court dismissed all claims purportedly brought by anyone except Fisher himself, after explaining that since Fisher was proceeding *pro se* he could not pursue claims on behalf of anyone else. That is, the Court dismissed any claims purportedly brought by Fisher on behalf of Stea Rosie or Krenzer, including any claim relating to the revocation of Stea Rosie's firearms license and any claim "of financial injury related to injury to, or the cessation of, Stea Rosie's [gun shop] business operations." Decision and Order (ECF No. 4) at p. 4.

The Court explained, however, that Fisher could pursue claims on his own behalf, provided that he filed an amended pleading that complied with the Decision and Order. Specifically, the Court was referring to the only remaining claims, *i.e.*, claims alleging constitutional violations related to the alleged retaliatory harassment and defamation of Fisher and the incident at his home on August 18, 2022. In that regard, however, the Court explained that Fisher could not sue the ATF, or the individual defendants in their official capacities, for money damages, though he could attempt to sue Wilkins, Curtis, and Devito for such damages in their individual capacities, provided that he pleaded a basis to find personal involvement. The Court pointed out that the Complaint did not

3

allege any personal involvement by Curtis or DeVito, and did not clearly state a claim against Wilkins. *See*, Decision and Order (ECF No. 4) at p. 8 ("[I]t is not clear from the Complaint whether Fisher is alleging that Wilkins was personally involved in the alleged warrantless raid on his home, or whether he is only alleging that Wilkins made defamatory statements about him.").  Finally, the Court noted that to the extent Fisher was attempting to sue additional unnamed ATF agents who may have participated in the incident on August 18, 2022, he would need to list them as "John Does" in the amended pleading and describe each of them with as much specificity as possible.[4]

On January 20, 2023, still proceeding *pro se*, Fisher responded to the Court's Decision and Order by filing three documents: 1) a "response" to the Court's Decision and Order, ECF No. 5, captioned as a "RICO Case Statement"; 2) a motion to appoint counsel, ECF No. 6; and 3) the PAC, ECF No. 7.

The 146-page PAC bears little resemblance to the original 9-page Complaint, except that it still attempts to bring claims on behalf of others in addition to Fisher.[5] Specifically, in addition to Fisher, the proposed pleading now lists The Red Right Hand Rifle Syndicate LLC, the members thereof, and Krenzer, as plaintiffs.  The PAC indicates that the Red Right Hand Rifle Syndicate ("Red Right Hand") is the "d/b/a" assumed business name of the gun shop operated by Stea Rosie.  Additionally, the PAC now lists, in addition to Wilkins, Curtis and DeVito, approximately 53 new defendants not mentioned

---

[4] The Court referred to the incident as a "warrantless raid" or "warrantless search" because at the time it understood Fisher to be alleging that the incident on August 18, 2022, involved the execution of a search warrant.  It is now apparent that such incident primarily involved agents going to Fisher and Krenzer's apartment and talking to them them (Fisher characterizes it as threatening them), and that when Krenzer attempted to go back inside (where there were undoubtedly weapons, since Fisher maintains that he and Krenzer are always armed) an agent followed her, grabbed her, and brought her back onto the porch.

[5] Presumably, Fisher intended to get around this hurdle by requesting appointment of counsel, but the Court is denying that application.

in the original Complaint.  The proposed new defendants include the United States, the U.S. Attorney General, various ATF employees, various New York State Officials including Governor Kathy Hochul, members of the NYSP, the New York Joint Terrorism Task Force, various officials of the Counties of Monroe and Ontario, and the Finger Lakes Railway Corporation.

Regarding claims by Red Right Hand/Stea Rosie, the PAC alleges that the federal defendants "violated" the Gun Control Act of 1968 by revoking Stea Rosie's federal firearms license ("FFL") on inadequate grounds.  In that regard, the PAC alleges that any failure by Stea Rosie to comply with rules for FFL license holders was non-willful, and therefore should not have resulted in the revocation of the license.  The PAC describes an overall policy change by the Biden administration, to more aggressively monitor FFL license holders and revoke their licenses for non-willful technical violations of rules and regulations governing such licenses, which the PAC maintains is unlawful and inconsistent with past practices.

Concerning the alleged non-willful nature of any gun-law violations that may have resulted in the revocation of Stea Rosie's license, the PAC indicates, for example, that a 9mm pistol Fisher received in the mail in New York was sent to him due to an error by a distributor outside of New York.[6]  Fisher then mailed the pistol, which was purchased for his personal use, to an out-of-state gunsmith to have modifications performed.[7]  The PAC alleges that ATF Agent Wilkins improperly cited these incidents as evidence that Stea

---

[6] PAC at p. 33, ¶ 97.
[7] PAC at pp. 33–34, ¶ 97.

Rosie and/or Fisher had violated New York State gun laws.[8]  The PAC further alleges that insofar as Stea Rosie was  alleged to have engaged in firearms transactions without the proper New York State licenses, the licenses either were not required or their issuance was improperly delayed by New York State officials.[9]

Regarding Fisher and Krenzer, the PAC also sets forth an entirely new theory of recovery.  More specifically, the original 9-page Complaint alleged *Bivens* claims, relating to retaliatory defamation and the alleged a warrantless entry into Fisher and Krenzer's home on one occasion in August 2022, while the 146-page proposed amended complaint purports to state a vast year-long RICO conspiracy to falsely investigate and prosecute Fisher and Krenzer, seize their firearms, kidnap them, rob them, and interfere with the interstate commerce of their gun shop.

The PAC essentially describes various firearms-related investigations and prosecutions that were initiated and/or maintained against Stea Rosie, Fisher, and/or Krenzer, by state and federal law enforcement officials, and labels those actions as crimes which, together, form the basis for the alleged RICO conspiracy.  For example, the pleading, refers to an arrest of Plaintiff and Krenzer as a "kidnapping" and "carjacking;" to a law-enforcement seizure of alleged illegally-possessed weapons as a "robbery;" and to all of the law-enforcement personnel who participated in the investigations and arrests

---

[8] The PAC alleges that another factor in the ATF's decision to revoke the license was that Krenzer was falsely accused of being ineligible to possess firearms under the New York SAFE Act due to having been involuntarily committed to a mental hospital.

[9] *See*, e.g., PAC at p. 39.  Alternatively, the PAC suggests that Fisher had a self-defense justification for possessing whatever weapons he possessed, since he had been threatened by a neonazi group. PAC at p. 43, ¶ 116.

as "armed robbers," "burglars," "thugs," "mobsters," "goons," "blue line gang members" and "conspirators."[10]

More specifically, the PAC alleges that on January 27, 2022, ATF agents and NYSP officers committed a "kidnapping," "armed robbery," and "carjacking," when they stopped Fisher and Krenzer's car and detained them for several hours.  The PAC alleges that on the same date the officers committed a "theft of firearms" and "burglary" when they executed a search warrant and seized guns from the gunshop and from Fisher and Krenzer's home and car. [11]   The PAC alleges that as a result of these actions, the Red Right Hand gun shop ceased doing business on January 27, 2022. PAC at p. 95, ¶ 236.

Regarding the searches and seizures that occurred on January 27, 2022, the PAC alleges that officers had a "forged" search warrant.[12]  On that point, the PAC baldly asserts that "investigators" signed the search warrant instead of a judge.[13] The PAC refers to an exhibit purporting to show that the warrant was signed "for" the judge, but no such exhibit is filed in this action.

The PAC also alleges that the officers executing the search warrants seized certain firearms from Fisher that were not covered by the warrant, and that such seizure amounts to a Second Amendment violation since it deprived Fisher of the means to defend himself.[14]

---

[10] Amusingly, Fisher simultaneously scolds the defendants for using "baseless police descriptions like 'rioter' or 'militia." PAC, fn. 148.

[11] The PAC also alleges that on February 22, 2022, agents committed a "theft of firearms" by seizing a gun from one of Fisher's clients.  These events are also discussed in ECF No. 5.  Fisher has no standing to sue over the seizure of weapons from his customer.

[12] *See*, PAC at p. 15, ¶ 17 (Alleging that Wilkins and a NYSP officer "forged" a search warrant used on January 27, 2022).

[13] PAC at p. 52, fn. 94.

[14] PAC, Count II.

The PAC further refers to Fisher subsequently being charged under the New York Penal Law with Criminal Possession of a Weapon in the Third Degree, for "acquiring non compliant assault rifles and high-capacity magazines without the proper NY State License."[15]  Indeed, the PAC states that Fisher "was told directly by the charging officer that he was being charged with criminal possession of a weapon 'primarily because you do not have your state licensing.'"[16]  The PAC baldly asserts,[17] however, that Fisher did not need any license from New York since Stea Rosie had a federal firearms license:

> The Plaintiff undisputedly possessed all necessary licenses (FFL08 & AECA) to operate in the LLC's capacity in all internal messages between Defendants, who based their entire theory of prosecution around the 'lack' of an unnecessary $35 state dealer permit, which the LLC would only need to sell assault weapons within the state of ny[.]

PAC at p. 52, fn. 95.

The PAC further refers to Fisher and Krenzer subsequently being indicted, in or about June 2022, by an Ontario County grand jury for one count of Criminal Possession of a Weapon in the First Degree, PL § 265.04(2), thirteen counts of Criminal Possession of a Weapon in the Third Degree, PL § 265.02(7), and forty-four counts of Criminal Possession of a Weapon in the Third Degree, PL § 265.02(8). PAC at pp. 76-77, ¶ ¶ 193-194. The PAC alleges that Wilkins and other officers made false statements in the grand jury to obtain the indictment.  Specifically, the testimony was allegedly false in asserting that Fisher needed a New York license to engage in the complained-of firearms transactions. PAC at p. 74; *see also, id*. at p. 143 ("Defendants lied to the grand jury about NY law[.]").  The PAC alleges, meanwhile, that the defendants "concealed" from the grand

[15] PAC at pp. 47–48.
[16] PAC at p. 58.
[17] PAC at p. 48.

jury that Stea Rosie had a federal firearms license. PAC at p. 78, ¶ 197.  The PAC admits

that Fisher was selling firearms without any license from New York State. PAC at p. 45.

The PAC next indicates that on August 16, 2022, Wilkins went to the residence of

Fisher and Krenzer, to deliver notification that the ATF had revoked Stea Rosie's FFL 08

license, and "gloated."  Then, on August 18, 2022, Wilkins and eight officers of the ATF

and NYSP returned to the residence and delivered a "Warning Notice Against Unlawful

Activity" referencing 18 U.S.C. § 1521.[18]  The PAC implies that Wilkins served such notice

on Fisher and Krenzer because the ATF had allegedly obtained information suggesting

that Fisher and Krenzer were planning some type of retaliation against law enforcement

for their prosecution and/or the revocation of Stea Rosie's license.[19]  While the agents

were on the porch of the residence with Fisher and Krenzer, Krenzer apparently went

inside the apartment, whereupon an agent followed her inside, grabbed her, and brought

her back onto the porch.  The PAC characterizes the officers' visit to the residence as

unlawful intimidation, and the officer's restraint of Krenzer as an assault.

To summarize, the PAC asserts that the revocation of Stea Rosie's FFL license

was improper, since the ATF should have overlooked any non-willful failures by the

gunshop to comply with federal rules and regulations, and that the revocation was

politically motivated.  Further, the PAC maintains that Fisher and Krenzer are innocent of

any criminal wrongdoing since the FFL entitled them to engage in the complained-of

firearms transactions in New York without the need for a separate license from the State

of New York.  In that regard, the PAC alleges that Fisher and Krenzer cannot be guilty of

Criminal Possession of Weapon, since PL § 265.20(a)(10) provides an "exemption" for

---

[18] PAC at p. 85.
[19] *Id*.

9

"licensed manufacturers and importers" of firearms and they possessed a federal firearms license. PAC p. 67, ¶ 173.  The PAC therefore contends that the investigative and prosecutorial actions of the defendants amount to politically- or ideologically motivated and improper search and seizure, false arrest and malicious prosecution.  The PAC also purports to state a First Amendment retaliation claim, insofar as it maintains that all the improper actions by the defendants were motivated by the intent to retaliate against Fisher and Krenzer for their political beliefs.  Further, the PAC purports to state a Second Amendment claim insofar as the search and seizure conducted on January 27, 2022, resulted in the taking of a firearm that was not authorized by the search warrant.  Finally, the PAC alleges that the actions by the defendants amount to crimes committed in furtherance of a RICO conspiracy.

The Court previously granted Fisher's application for leave to proceed *in forma pauperis*, and will now consider the PAC in light of 28 U.S.C. § 1915(e)(2) and the Court's prior Decision and Order.

DISCUSSION

The Motion for Appointment of Counsel is Denied

Fisher has requested appointment of counsel and maintains that he has consulted several attorneys but is financially unable to retain anyone.[20]  Although there is no constitutional right to appointed counsel in civil cases, under 28 U.S.C. § 1915(e), the Court, in its discretion, may appoint counsel to assist indigent litigants. *See, e.g., Sears, Roebuck & Co. v. Charles W. Sears Real Estate, Inc.*, 865 F.2d 22, 23 (2d Cir. 1988).

---

[20] Fisher also claims, however, to have retained criminal defense counsel, which causes the Court to question whether he is actually indigent.  In that regard, when considering an IFP application the Court can consider not only the Plaintiff's resources but the resources he receives from others, such as family members.  Nevertheless, the Court will at this time adhere to its earlier finding on that question.

The factors to be considered include whether: (1) the claims are likely to be of substance; (2) the indigent is able to investigate the crucial facts concerning his claim; (3) conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder; (4) the legal issues involved are complex; and (5) there are any special reasons why appointment of counsel would be more likely to lead to a just determination. *See Hendricks v. Coughlin*, 114 F.3d 390, 392 (2d Cir. 1997) (citing Hodge v. Police Officers, 802 F.2d 58, 61-62 (2d Cir. 1986)).   In this action, for reasons discussed below the Court does not believe that most of the claims in the PAC are "likely to be of substance," and the one potentially meritorious claim is not complex.   The request is denied.

The PAC Does Not Comply with Fed. R. Civ. P. 8

As a preliminary matter, the Court points out that the PAC does not comply with Fed. R. Civ. P. 8(a) which states that a complaint must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief."

> The statement should be plain because the principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial. *See, e.g., Geisler v. Petrocelli*, 616 F.2d 636, 640 (2d Cir.1980); 2A Moore's Federal Practice ¶ 8.13, at 8–61 (2d ed. 1987). <u>The statement should be short because "[u]nnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage."</u> 5 C. Wright & A. Miller, Federal Practice and Procedure § 1281, at 365 (1969).

> When a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative or in response to a motion by the defendant, to strike any portions that are redundant or immaterial, see Fed.R.Civ.P. 12(f), or to dismiss the complaint.

*Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (emphasis added).

The 146-page PAC is neither short nor plain, but, rather, is bloated, rambling, grandiose, and replete with irrelevant factual digressions, tiresome commentary, *ad hominem* attacks on the defendants, and improper legal argument.  The Court could dismiss the PAC for those reasons alone. *See, e.g., Prezzi v. Schelter*, 469 F.2d 691, 692 (2d Cir. 1972) (Affirming dismissal of 88-page *pro se* complaint containing "a labyrinthian prolixity of unrelated and vituperative charges that defied comprehension [and therefore] failed to comply with the [short-and-plain-statement] requirement of Rule 8."); *see also, O'Neil v. Ponzi*, 394 F. App'x 795, 796–97 (2d Cir. 2010) ("O'Neil's amended complaint, even when read liberally, fails to contain a "a short and plain statement of the claim" entitling her to relief. Fed. R. Civ. Pro. 8(a)(2).  Instead, O'Neil indulges in a prolix and unintelligible "conspiracy theory novel," *Gollomp v. Spitzer*, 568 F.3d 355, 371-72 (2d Cir.2009) (internal quotation marks omitted), which fails to allege that defendants' conduct was the legal, much less the logical, cause of her injury. Thus, while we have "repeatedly cautioned against *sua sponte* dismissals of *pro se* . . . complaints prior to requiring the defendants to answer," *Salahuddin v. Cuomo*, 861 F.2d 40, 43 (2d Cir.1988), it is well settled that "where leave to amend has previously been given and the successive pleadings remain prolix and unintelligible ... or where the substance of the claim pleaded is frivolous on its face," *id*. at 42, § 1915(e) permits a district court to dismiss the complaint *sua sponte*.").

The Court could also give Fisher another opportunity to replead in compliance with Rule 8.  However, the Court already gave him an opportunity to replead, and he did not comply with Court's instructions to clarify his claims, but, rather, submitted an essentially

different lawsuit.[21]   Consequently, it does not appear likely that if given another such opportunity he would produce a more concise pleading.  Accordingly, the Court will wade through the "mass of verbiage" and address the PAC in its current form.

<u>Claims on Behalf of Red Right Hand Rifle Syndicate LLC and Krenzer are Dismissed</u>

Fisher purports in the PAC to bring this action on behalf of himself, Red Right Hand and its members, and Krenzer.  In this regard, Fisher now refers to Red Right Hand in place of, or interchangeably with, Stea Rosie, which was dismissed from the action in the original Decision and Order.[22]   However, as explained in the prior Decision and Order, Fisher is a non-attorney who cannot represent anyone but himself.  Consequently, the claims brought on behalf of Red Right Hand and its members, and Krenzer, are dismissed without prejudice.  This includes PAC Count II (violation of Second Amendment due to revocation of firearms license); Counts VI-XL (theft of firearms from firearms licensee); Count XLIII (theft of firearms from firearms licensee); Count L (violation of Krenzer's Second Amendment rights); any claims on behalf of persons who bought firearms from Stea Rosie; and any claim challenging the constitutionality of the New York SAFE Act.

---

[21] The PAC clearly exceeds the scope of the leave-to-amend granted by the Court in its prior Decision and Order, and could also be dismissed without prejudice for that reason alone. *See, e.g., McCray v. Patrolman N.A. Caparco*, 761 F. App'x 27, 30 (2d Cir. 2019) ("When the district court permitted McCray to amend his complaint in July 2011 so that McCray could plead his claims in compliance with Fed. R. Civ. P. 8, his existing allegations concerned only the March 2008 stop and arrests. Additional allegations can only be added "with the opposing party's written consent, or the court's leave," Fed. R. Civ. P. 15(a)(2), and neither was present here. Even construing McCray's amendment to be a motion for leave to amend, we review a denial of such leave "only for abuse of discretion," *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 389 (2d Cir. 2015), which is not evident in the refusal to allow an amended complaint with fifty additional pages of allegations encompassing unrelated events occurring months and years later than those originally pleaded."); *see also, Palm Beach Strategic Income, LP v. Salzman*, 457 F. App'x 40, 43 (2d Cir. 2012) ("District courts in this Circuit have routinely dismissed claims in amended complaints where the court granted leave to amend for a limited purpose and the plaintiff filed an amended complaint exceeding the scope of the permission granted.") (collecting cases).

[22] Fisher now refers to the FFL license as belonging to the Red Right Hand Rifle Syndicate, whereas the original Complaint indicated that the license belonged to Stea Rosie. *See*, PAC, Prayer for Relief ¶ (4). There is no plausible allegation that the FFL license belonged to Fisher personally.

See, e.g., PAC at p. 71, ¶ 185 (referring to "Couple C" and purporting to allege constitutional violations on behalf of "plaintiff's customers.").  This also includes any claim that the FFL license issued to Stea Rosie was improperly revoked; any claim involving alleged false statements about Krenzer's eligibility under the New York SAFE Act to possess firearms; any claim involving the alleged improper search and seizure, arrest and prosecution of Krenzer; and any claim by Krenzer involving the incident on August 18, 2022.[23]

Fisher's Remaining Claims

Under 28 U.S.C. § 1915(e)(2), the Court must conduct a screening of the Complaint to determine whether it is frivolous or malicious or fails to state a claim on which relief may be granted. In so doing, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted).

More specifically, as the Court explained in its prior Decision and Order, the determination of whether an *in forma pauperis* plaintiff should be permitted to proceed under 28 U.S.C. § 1915 involves two separate considerations. *Pace v. Waterbury Police Dep't*, No. 3:17CV00426(DJS), 2017 WL 1362683, at *1 (D. Conn. Apr. 12, 2017).  First, the Court must determine whether the plaintiff may proceed with the action without prepaying the filing fee in full. *See* 28 U.S.C. § 1915(a).  The Court already found that Fisher may so proceed.[24]  Second, the Court must review the complaint to determine

---

[23] Even assuming that the claims on behalf of Stea Rosie and Krenzer could otherwise be properly brought, they would be subject to dimisssal for the same reasons discussed below relating to Fisher's claims.
[24] Although, as discussed below the PAC provides reason to doubt whether Fisher is indigent.

whether the plaintiff has stated a cognizable, non-frivolous claim. *Pace*, 2017 WL 1362683 at *1. The Court must dismiss the case if it determines that the case "is frivolous or malicious," "fails to state a claim on which relief may be granted," or "seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B)(i)–(iii).

As for whether the complaint states a claim on which relief may be granted as required by § 1915(e)(2)(B)(ii),

> [w]hen reviewing a complaint under section 1915(e), the court is guided by applicable requirements of the Federal Rules of Civil Procedure. More specifically, Rule 8 of the Federal Rules of Civil Procedure provides that a pleading must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 [2007]). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).
> "In reviewing a complaint . . . the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

*Rogers v. U.S. Dep't of the Treasury*, No. 521CV1351DNHML, 2022 WL 899771, at *3 (N.D.N.Y. Mar. 28, 2022); *see also*, *Komatsu v. Cubesmart, Daniels Norelli Cecere & Tavel PC*, No. 20-3676-CV, 2021 WL 6060603, at *1 (2d Cir. Dec. 20, 2021) ("To avoid

dismissal, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).").

　　　　　*Claims that Defendants Violated Criminal Statutes*

　　　　　Applying these principles to the instant action, the Court notes preliminarily that insofar as the PAC purports to assert stand-alone claims based on defendants' alleged violations of federal and state criminal statutes, those claims are dismissed since Fisher has no standing to sue for violations of such statutes.   In that regard, the PAC purports to assert numerous causes of action or "counts" alleging that defendants violated state and federal criminal statutes by committing "kidnappings," "robberies," "burglaries," "carjackings," and such.  However, Fisher cannot sue to enforce federal criminal statutes or other statutes that don't provide a private right to sue, and he therefore lacks standing, meaning that such claims are frivolous. *See, e.g., Foskey v. Corp. State of New York*, No. 22-CV-2546(GRB)(ARL), 2022 WL 3228271, at *3 (E.D.N.Y. Aug. 10, 2022) ("Insofar as Plaintiff seeks to invoke this Court's federal question subject matter jurisdiction by relying upon Sections 241, 242, 1341, and 1918 of Title 18 of the United States Code, such reliance is misplaced. 'As a general matter ... crimes are prosecuted by the government, not by private parties.' *Hill v. Didio*, 191 F. App'x 13, 15 (2d Cir. 2006) (citing *Connecticut Action Now, Inc. v. Roberts Plating Co*., 457 F.2d 81, 86-87 (2d Cir. 1972)). Thus, private citizens, such as Plaintiff, lack standing to bring criminal charges or to otherwise initiate federal criminal proceedings.  . . .   Indeed, none of these criminal statutes provide a private cause of action.  Accordingly, Plaintiff's claims brought pursuant to 18 U.S.C. §§ 241, 242, 1918, and 1341, as well as New York Penal Law § 195.00 are not plausible, are frivolous, and are thus dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)–(ii).")

(numerous citations omitted); *see also, McRae v. Norton*, No. 12-CV-1537 KAM, 2012 WL 1268295, at *4 (E.D.N.Y. Apr. 13, 2012) ("[P]laintiff's claims for conspiracy and mail fraud pursuant to 18 U.S.C. §§ 371 and 1341, respectively, must be dismissed for failure to state a claim upon which relief may be granted because those criminal statutes do not create private rights of action upon which plaintiff may recover.").

*Claims that Defendants Engaged in a RICO Conspiracy*

Fisher next alleges that the dozens of defendants sued in this action, by their involvement in the revocation of Stea Rosie's FFL license and/or their participation in the investigation and prosecution of Fisher and Krenzer, engaged in a "RICO conspiracy." The predicate acts of the conspiracy, according to Fisher, were the crimes --"carjacking," "kidnappings," "robberies," "witness tampering," etc.-- that the defendants supposedly committed when they, for example, arrested Fisher and Krenzer and seized weapons from the gun shop.

> To state a claim under RICO's civil provision, 18 U.S.C. § 1962[(d)], a plaintiff must allege "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains [an] interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 123–24 (2d Cir. 2018) (*quoting Moss v. Morgan Stanley, Inc*. 719 F.2d 5, 17 (2d Cir. 1983)). Section 1961(1), in turn, identifies predicate "acts" that can form a pattern of racketeering activity[.]

*Liang v. Home Reno Concepts, LLC*, 803 F. App'x 444, 447 (2d Cir. 2020).  Such predicate acts can include kidnapping, robbery, fraud, and witness tampering. 18 U.S.C. § 1961(1) (West).

However, Fisher fails to allege facts sufficient to plausibly state a RICO conspiracy claim.  Rather, the PAC makes only conclusory and allegations of a wide-ranging

conspiracy, relying on the various aspects of the criminal prosecution and investigation against Fisher and Krenzer as alleged predicate criminal acts.  In that regard, it strongly appears to the Court that after Fisher was provided discovery by the prosecution in his criminal action in Ontario County,[25] he simply sued, in this action, every individual named in that discovery as being a member of the alleged conspiracy.  The PAC baldly asserts that all these public officials were agreeable, and actually did agree, to committing myriad criminal offenses simply to punish Fisher for his refusal to sell firearms to police officers based on his belief that police are largely "domestic abusers," "white power affiliates," etc. PAC at p. 33.  The PAC, though, does not plausibly allege any actual nexus between Fisher's beliefs and the so-called criminal acts about which he complains.[26]

The purported RICO claim in this action thus resembles one dismissed in another case in which the court stated:

> Glick contends that all Defendants are liable for violating the Racketeer Influenced and Corrupt Organizations Act (RICO).  . . .   [T]o state a claim for a RICO violation ... a plaintiff must show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. Because Glick fails to plead factual allegations establishing that it is plausible that all the defendants were engaged in an "enterprise," the Court need not analyze the other RICO elements.
>
> Title 18 U.S.C. § 1961(4) defines "enterprise" as any entity, legal or illegal, that is "associated in fact." The Supreme Court has clarified that the "associated in fact" language requires that the defendants were "associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). To establish the existence of such an enterprise, a plaintiff must provide 'evidence of an ongoing organization, formal or informal,' and 'evidence that the various associates function as a continuing unit.' *Odom v. Microsoft Corp.*, 486 F.3d 541 (9th

---

[25] The PAC cites to various pieces of discovery provided to Fisher in the criminal prosecution in Ontario County.
[26] For example, the PAC does not claim that Fisher ever actually denied service to a police officer, and the Court finds it unlikely that officers would be flocking to Fisher's communist-themed shop to buy firearms.

Cir.2007) (quoting *Turkette*, 452 U.S. at 583). Put simply, a party alleging a RICO enterprise must plead facts that make it plausible that the defendants were acting together towards a common goal.

Glick's complaint in this regard falls short of the plausibility standard set forth in *Iqbal* and *Bell Atlantic*. First, as this Court previously noted: "Glick's claim that multiple judges, governmental agencies, his probation officer, and the clerk of court are involved in a massive conspiracy against him simply exceeds the limits of plausibility." *Glick I*, 2010 WL 4392549, at *2. In his present complaint, Glick has compounded that implausibility by adding three federal judges and the United States District Court—Montana District to the list of conspirators.

Second, Glick pleads no facts establishing that Defendants were working as a "continuing unit" or in conjunction with another. Instead, Glick simply makes conclusory statements to the effect that Defendants are involved in a coordinated "crusade" against him. The Court agrees with [Magistrate] Judge Lynch that Glick's complaint makes "conclusory and bare allegations" that assert conduct that is merely consistent with a RICO enterprise, instead of pleading sufficient facts that would show that a RICO enterprise indeed existed. The complaint's deficiency makes it incompatible with the plausibility standard set forth *Iqbal* and *Bell Atlantic*.

*Glick v. Molloy*, No. CV 11-168-M-DWM-JCL, 2012 WL 1155207, at *5 (D. Mont. Apr. 5, 2012) (adopting report and recommendation; citation, footnote, and some internal quotation marks omitted), *aff'd sub nom. Glick v. Edwards*, 803 F.3d 505 (9th Cir. 2015). Fisher's RICO claim is similarly implausible and is therefore dismissed.

*Bivens and Section 1983 Claims*

Fisher's remaining claims are asserted as constitutional violations under *Bivens* and Section 1983.

To state a claim under § 1983, a plaintiff must allege that defendants violated plaintiff's federal rights while acting under color of state law.  And to state a *Bivens* claim, a plaintiff must allege that he has been deprived of

a constitutional right by a federal agent acting under color of federal authority.[27]

*O'Donoghue v. United States Soc. Sec. Admin.*, 828 F. App'x 784, 787 (2d Cir. 2020) (citations and footnote omitted).  Fisher's claims, asserted against a variety of state and federal officials, purport to state the following causes of action: First Amendment retaliation claim; Second Amendment seizure of firearm claim; Fourth Amendment warrantless search and seizure claim; Fourth Amendment False Arrest claim; and Fourth Amendment Malicious Prosecution claim.

*Bivens* Claims

The PAC purports to assert the aforementioned constitutional claims against the individual federal defendants pursuant to *Bivens*.  However, the ability to maintain *Bivens* claims is quite circumscribed, limited to just a tiny set of contexts:

> Over the past half-century, the [U.S. Supreme] Court has endorsed such a claim in only three instances: (1) unlawful search of a home and warrantless arrest in violation of the Fourth Amendment, *Bivens*, 403 U.S. at 395-97; (2) employment discrimination based on gender in violation of the Due Process Clause of the Fifth Amendment, *Davis v. Passman*, 442 U.S. 228 (1979); and (3) inadequate medical treatment of a prisoner, resulting in the prisoner's death, in violation of the Eighth Amendment, *Carlson v. Green*, 446 U.S. 14 (1980). "After those decisions, however, the Court changed course." *Hernandez v. Mesa*, 140 S. Ct. 735, 741 (2020). Today, the Supreme Court has warned, expanding *Bivens* is a "disfavored" judicial activity. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017).

---

[27] "*Bivens* is the short-hand name given to causes of action against federal officials for alleged constitutional violations.  Bivens is essentially a federal analog to suits brought against state officials under Section 1983." *Rosado v. Dickson*, No. CV 22-1274, 2022 WL 1443674, at *2 (D.N.J. May 5, 2022) (citations and internal quotation marks omitted); *see also, Quinlan v. Conaty*, No. 221CV00991TSZJRC, 2022 WL 17822501, at *3 (W.D. Wash. Nov. 21, 2022) ("Unlike 42 U.S.C. § 1983 claims against state officers, there is no statute providing for damages against federal officers. Claims against federal officers must fall within the *Bivens* framework.") (citation omitted), report and recommendation adopted as modified, No. C21-0991 TSZ JRC, 2022 WL 17820319 (W.D. Wash. Dec. 20, 2022).

*Komatsu v. United States*, No. 21-CV-1838, 2023 WL 317326, at *5 (S.D.N.Y. Jan. 19, 2023); *see also*, *O'Donoghue v. United States Soc. Sec. Admin.*, 828 F. App'x 784, 787 (2d Cir. 2020) ("The Supreme Court has recognized a *Bivens* remedy in [only] limited circumstances . . . and has deemed the expansion of the *Bivens* remedy to new contexts a disfavored judicial activity.") (citing *Ziglar v. Abbasi*, ––– U.S. –––, 137 S. Ct. 1843, 1857, 198 L.Ed.2d 290 (2017) (internal quotation marks omitted).

> Cautioning courts to pause before permitting a *Bivens* claim to proceed, the Supreme Court has developed a rigorous two-step inquiry, which, first, instructs a court to assess "whether the case presents a 'new *Bivens* context' " and, second, if the claim does arise in a new context, instructs that "a *Bivens* remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Egbert v. Boule*, 142 S. Ct. 1793, 1803 (2022) (quoting *Ziglar*, 137 S. Ct. at 1859, 1858). This test has had the effect of foreclosing *Bivens* actions in cases with facts that differ from those presented in *Bivens*, *Davis*, and *Carlson*.

*Komatsu v. United States*, 2023 WL 317326, at *5.

> First, the question is "whether the case presents 'a new *Bivens* context,' which asks if it is "'meaningful[ly]' different from the three cases in which the Court has implied a damages action." *Id*. at 1803 (alteration in original) (quoting *Abbasi*, 137 U.S. at 1859-60). Meaningful differences may include "the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the function of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider." *Abbasi*, 137 U.S. at 1860. "A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Hernández*, 140 S. Ct. at 743 (citations omitted).

> "Second, if a claim arises in a new context, a *Bivens* remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Egbert*, 142 S. Ct. at 1803 (quoting *Abbasi*, 137 U.S. at 1858). The Supreme Court has not defined which "special factors counsel[ ] hesitation[;]" however, "the necessary inference ... is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 137 S. Ct. at 1857-58. In deciding whether to impose a *Bivens* remedy, the "watchword is caution." *Hernández*, 140 S. Ct. at 742. "[E]ven a single sound reason to defer to Congress" is sufficient to require judicial restraint. *Egbert*, 142 S. Ct. at 1803 (quoting *Nestlé U.S.A., Inc. v. Doe*, —— U.S. ——, 141 S. Ct. 1931, 1937, 210 L.Ed.2d 207 (2021) (plurality opinion)).

*Cuney v. Choi*, No. 122CV00154BKSCFH, 2022 WL 16743984, at *4 (N.D.N.Y. Nov. 7, 2022).

Applying these principles, the Court notes, first, that Fisher's attempted *Bivens* First Amendment retaliation claim is clearly not actionable. *See, e.g., Selvam v. United States*, No. 21-2513-CV, 2022 WL 6589550, at *2 (2d Cir. Oct. 11, 2022) ("First Amendment retaliation claims cannot proceed under *Bivens*. *See Egbert v. Boule*, 142 S. Ct. 1793, 1807 (2022)."

Fisher's purported Second Amendment seizure-of-firearm claim is similarly not actionable under *Bivens*, since it "arises in a new context" and there are special factors cautioning against recognition of such a claim, meaning that the Court cannot say that the federal judiciary is "undoubtedly better positioned than Congress to authorize a damages action" in this context. *Egbert v. Boule*, 213 L. Ed. 2d 54, 142 S. Ct. 1793, 1805 (2022). *See, Robinson v. Pilgram*, No. 20-CV-2965 (GMH), 2021 WL 5987016, at *11 (D.D.C. Dec. 17, 2021) ("Plaintiff alleges that Defendants also violated his Second Amendment right to bear arms when they arrested him for possession of the high-capacity

magazine, 10mm bullet, and brass knuckles.  This claim, too, arises in a new context, as the Supreme Court has never sanctioned a *Bivens* remedy for Second Amendment violations. *See Yorzinski v. Imbert*, 39 F. Supp. 3d 218, 223 (D. Conn. 2014) ("*Bivens* liability has not been extended to violations of the Second Amendment."); *see also Meeks v. Larsen*, 611 F. App'x 277, 286 (area6th Cir. 2015) (affirming the district court's refusal to extend *Bivens* to the plaintiffs' claims under the Second Amendment)."), *aff'd*, No. 22-5001, 2022 WL 3009621 (D.C. Cir. July 28, 2022).

Fisher's remaining *Bivens* claims, for unreasonable search and seizure, false arrest, and malicious prosecution, all arise under the Fourth Amendment. *Cruz v. City of New York*, No. 18CV5584NGGRLM, 2021 WL 1617103, at *4 (E.D.N.Y. Apr. 26, 2021) ("False arrests, false imprisonments, and malicious prosecutions all violate an individual's Fourth Amendment right to be free from unreasonable searches and seizures. *See Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 116–18 (2d Cir. 1995).").  However, as alluded to earlier, the fact that such claims arise under the Fourth Amendment does not mean they arise in the same context as the original *Bivens* case, which involved a warrantless search and arrest of an individual in his home by agents of the Federal Bureau of Narcotics.[28] For example, Fisher's malicious prosecution claim involves a "new context" that also involves special factors cautioning against the recognition of such a claim under *Bivens*.

---

[28] *See, Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389, 91 S. Ct. 1999, 2001, 29 L. Ed. 2d 619 (1971) ("This case has its origin in an arrest and search carried out on the morning of November 26, 1965. Petitioner's complaint alleged that on that day respondents, agents of the Federal Bureau of Narcotics acting under claim of federal authority, entered his apartment and arrested him for alleged narcotics violations. The agents manacled petitioner in front of his wife and children, and threatened to arrest the entire family. They searched the apartment from stem to stern. Thereafter, petitioner was taken to the federal courthouse in Brooklyn, where he was interrogated, booked, and subjected to a visual strip search.").

*See, Butler v. Hesch*, 1:16-cv-1540 (MAD/CFH), 2020 WL 1332476 (N.D.N.Y. Mar. 23, 2020) (dismissing purported *Bivens* claim for malicious prosecution).

Similarly, Fisher's alleged unreasonable-search-and-seizure and false-arrest claims, against ATF employees during a firearms investigation, present a "new context." *See, e.g., Mejia v. Miller*, 53 F.4th 501, 506 (9th Cir. 2022) ("The dissent in *Egbert* does not appear to be wrong in inferring the Court now sees a new *Bivens* context even if only the officer's employing agency is different.") (citation omitted).   Additionally, special factors are present since this Court cannot say that it is better qualified than Congress to decide whether a remedy against the federal defendants should exist in this new context. *See, Mejia v. Miller*, 53 F.4th at 506 ("Under *Egbert*, rarely if ever is the Judiciary equally suited as Congress to extend *Bivens* even modestly. The creation of a new cause of action is inherently legislative, not adjudicative.") (citation omitted); *see also, Greene v. United States*, No. 21-5398, 2022 WL 13638916, at *3 (6th Cir. Sept. 13, 2022) (Observing that, in light of *Egbert*, "*Bivens* claims are currently limited to three situations: 1) a Fourth Amendment claim against federal narcotics agents for an illegal seizure, 2) a Fifth Amendment claim against a member of Congress for sex discrimination, and 3) an Eighth Amendment claim against prison officials for inadequate medical care.  There is a firm presumption against implying any other new cause of action under *Bivens*.") (citations and internal quotation marks omitted).

Accordingly, Fisher's purported *Bivens* claims against the various federal defendants are dismissed for failure to state a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

<u>Section 1983 Claims</u>

Fisher asserts the same constitutional violations against state actors pursuant to Section 1983.  Unlike the *Bivens* claims, constitutional claims under Section 1983 are not narrowly circumscribed, and Fisher could, theoretically, properly assert all such claims under Section 1983.  By this, the Court means the claims alleging First Amendment retaliation, Second Amendment seizure of firearm, Fourth Amendment search and seizure, Fourth Amendment false arrest, and Fourth Amendment malicious prosecution. Nevertheless, with one exception, the PAC stills fails to state actionable claims.

*First Amendment Retaliation*

To the extent Fisher alleges that Defendants violated his First Amendment rights by investigating/arresting/prosecuting him in retaliation for his political beliefs, the claim is conclusory and not plausible, since, for example, he has not plausibly alleged facts indicating a causal nexus between his prosecution and any particular protected First Amendment activity. *See, e.g., Kelsey v. Rutledge*, No. 21-CV-04298 (PMH), 2022 WL 2110436, at *6 (S.D.N.Y. June 10, 2022) ("To state a retaliatory arrest claim under the First Amendment, Plaintiff must show '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)."); *see also, Boykin v. City of New York*, No. 21CV1362 (DLC), 2022 WL 4585299, at *4 (S.D.N.Y. Sept. 29, 2022) ("[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected speech. *Hartman v. Moore*, 547 U.S. 250, 256, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006). To prevail on a First Amendment

claim based on a purported retaliatory arrest, the plaintiff 'must [additionally] plead and prove the absence of probable cause for the arrest.' *Nieves v. Bartlett*, —— U.S. ——, 139 S. Ct. 1715, 1724, 204 L.Ed.2d 1 (2019).").

Rather than plausibly alleging a causal nexus, the PAC merely posits that Fisher's anti-police sentiments were well known, and that his arrest and prosecution must therefore have been retaliatory.  At the same time, Fisher admits that the defendants consistently told him that he was being prosecuted for selling firearms without a New York license, which he admittedly did.  Although Fisher baldly asserts he did not need such a license, that assertion of law, even if true, which the Court does not believe it to be, without more, does not raise any reasonable inference of a causal nexus between his arrest/prosecution and his political views or any other activity protected under the First Amendment.[29]  Consequently, Fisher's First Amendment retaliation claim under Section 1983 is dismissed for failure to state a claim.

*Fourth Amendment Malicious Prosecution*

The PAC indicates that Fisher is presently being maliciously prosecuted for weapons-possession offenses in Ontario County.  The PAC indicates, in that regard, that the prosecution is based on the false assertion by police and prosecutors, etc., that Fisher needed a New York State license to sell firearms, when he actually did not.  Putting aside the question of whether the allegations in support of the claim are otherwise plausible, the malicious prosecution claim has not yet accrued.  A claim for malicious prosecution does not accrue unless and until the plaintiff obtains a favorable termination of the criminal

---

[29] For example, the PAC does not even allege any temporal proximity between any particular protected activity and any particular alleged retaliatory action.  To the extent the PAC alleges that defendants actions were motivated in part by Fisher's affiliation with groups facilitating violent activities, such activities are not protected activities.

action. *See, Olaizola v. Foley*, 797 F. App'x 623, 624 (2d Cir. 2020)  ("To state a claim for malicious prosecution under § 1983, a plaintiff must allege '(1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, ... (4) that the prosecution was terminated in the plaintiff's favor . . ., [and] that there was (5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights.' *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000) (internal quotation marks omitted)."); s*ee also, Smalls v. Collins*, No. 20-1099-CV, 2021 WL 3700194 (2d Cir. Aug. 20, 2021) ("In the context of malicious-prosecution claims, a plaintiff must demonstrate that the underlying criminal proceeding ended in a manner that affirmatively indicates her innocence.").

Since the PAC cannot plausibly allege that the criminal prosecution against Fisher terminated favorably to him, it fails to state an actionable claim for malicious prosecution. Indeed, the claim has not even accrued. *See, e.g., McMurray v. Stolz*, No. 1:21-CV-7730 (LTS), 2021 WL 4555774, at *5 (S.D.N.Y. Oct. 1, 2021) ("Because Plaintiff fails to allege facts showing that his conviction was overturned or otherwise invalidated, his claim of malicious prosecution under Section 1983 against Polesovsky has not yet accrued.") (citation omitted), appeal dismissed, No. 21-2788, 2022 WL 16835535 (2d Cir. Apr. 13, 2022).  The Section 1983 malicious prosecution claim is therefore dismissed without prejudice.

*Fourth Amendment Search and Seizure-Defective Warrant*

The PAC alleges that the search and seizure conducted on January 27, 2022, violated Fisher's Fourth Amendment rights because the search warrant was "forged."

27

Specifically, the PAC alleges that the warrant was not signed by the authorizing judge, but was signed "for" the judge by one of the officers involved. *See*, PAC ¶ 210.  The PAC alleges that the search and seizure was therefore warrantless and unreasonable.

However, even accepting as true the PAC's somewhat conclusory allegation that the warrant was not actually signed by a judge, but was signed "for" him, such fact would not render the warrant "forged" or otherwise improper under the Fourth Amendment:

> Turner's first constitutional argument is that [insofar as the search warrant was not personally signed by the authorizing judge,] the warrant was not issued by a neutral and detached magistrate as required by the Fourth Amendment. This argument misconceives the nature of the constitutional requirement in question. The Fourth Amendment requires that the determination of probable cause the judgmental function of drawing inferences from evidence and deciding whether probable cause exists be made by a neutral and detached magistrate. *Gerstein v. Pugh*, 420 U.S. 103, 118, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Shadwick v. City of Tampa*, 407 U.S. 345, 351-52, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972); *Coolidge v. New Hampshire*, 403 U.S. 443, 449, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), *quoting Johnson v. United States*, 333 U.S. 10, 13-14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). That requirement was clearly satisfied here. Judge Johns was a neutral and detached magistrate who was informed of the facts. On the basis of what he was told he determined that probable cause existed to search Turner's residence. The cases cited above have nothing to do with the question of who is authorized to sign the magistrate's name to the warrant after his determination has been made. We hold that nothing in the Fourth Amendment prevented the magistrate from delegating that purely ministerial task to Customs Agent Nadel. As long as the magistrate in fact performs the substantive tasks of determining probable cause and authorizing the issuance of the warrant, the amendment is satisfied.

*United States v. Turner*, 558 F.2d 46, 49–50 (2d Cir. 1977); *see also, United States v. Pierce*, 493 F. Supp. 2d 611, 640 (W.D.N.Y. 2006) ("Other circuits have also found that a magistrate judge's failure to sign a search warrant does not, by itself, invalidate the search warrant.") (collecting cases); *Hernandez v. Hemphill*, No. 1:13-CV-01177-SEB, 2015 WL

3793784, at *2 (S.D. Ind. June 16, 2015) ("Mr. Hernandez alleges that the search warrants were unlawful because they appeared to be signed by different judicial officers and on one of them the original date typed on the affidavit showed '12/14/2010' and was hand corrected to state '12/14/2011.' Neither of these circumstances rendered any of the search warrants unlawful. Rather, it is undisputed that a neutral magistrate made the probable-cause determination and issued the warrant. Whether a different judge signed each warrant is immaterial. The date error was merely a clerical error that was corrected.").

Here, the PAC offers no facts to plausibly suggest that the warrant was not actually approved by a judge, or that the authorizing judge did not perform the functions required of him by the Fourth Amendment.  Accordingly, this claim is dismissed.

*Fourth Amendment False Arrest*

The PAC alleges that Fisher was falsely arrested without probable cause since he was not actually guilty of possessing firearms in New York without an appropriate license. As mentioned earlier, the PAC indicates that Fisher was arrested for Criminal Possession of a Weapon in the Third Degree, for "acquiring non compliant assault rifles and high-capacity magazines without the proper NY State License."  The PAC contends that Fisher did not need a license from the State of New York since Stea Rosie already had an FFL08 federal firearms importer's license, and since New York Penal Law § 265.20(a)(10) provides an "exemption" for "licensed manufacturers and importers" of firearms.[30]

---

[30] The PAC also makes passing reference to Penal Law §  265.20 including an exemption for a "transferee recipient of firearms from a manufacturer," but does not plausibly allege  that such exemption applies to Fisher. *See*, PAC ¶ 83.

The legal principles applicable to a claim for false arrest under Section 1983 are well settled:

> "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures ... is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citations omitted); *accord Jaegly v. Couch*, 439 F.3d 149, 151–52 (2d Cir. 2006). "Under New York law, to prevail on a claim for false arrest, a plaintiff must show that (1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021) (alteration in original, internal quotation marks omitted). Probable cause to arrest is a complete defense to a false arrest claim. *See, e.g., id*. "An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Jaegly*, 439 F.3d at 152 (internal quotation marks omitted). To assess probable cause, a court considers only the facts "available to the officer at the time of the arrest and immediately before it." *Ashley*, 992 F.3d at 136 (internal quotation marks omitted).

*Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021).

Probable cause is not difficult to establish. *See, Keyes v. City of New York*, No. 21-2406-CV, 2023 WL 176956, at *2 (2d Cir. Jan. 13, 2023) ("[P]robable cause 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.' *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983) (internal citation omitted). Moreover, 'the fact that an innocent explanation may be consistent with the facts alleged ... does not negate probable cause, and an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause.' *Panetta v. Crowley*, 460 F.3d 388, 395–96 (2d Cir. 2006) (alteration adopted) (internal quotation marks and

citation omitted). Thus, probable cause "is not a high bar." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (internal quotation marks and citation omitted).").

Additionally, the arresting officer's subjective intent is irrelevant if probable cause for the arrest exists. *See, e.g., Smith v. Town of Lewiston*, No. 17-CV-959-LJV-LGF, 2022 WL 3273241, at \*7 (W.D.N.Y. Aug. 11, 2022) ("[T]he Supreme Court has made clear that if an arrest is objectively—or even arguably—supported by probable cause, the officers' subjective intent in making the arrest is of no moment. *See Bond v. United States*, 529 U.S. 334, 338 n.2 (2000) ("[S]ubjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment.").").

In considering whether Fisher has stated a valid claim for false arrest, the Court reiterates that while it must accept the PAC's factual allegations as true, that rule does not apply to legal conclusions, particularly where, as here, Fisher offers no legal authority to support his assertions of law.  Consequently, the Court is not required to accept the PAC's bald assertion that Fisher did not need any type of firearms license from the State of New York since he already had the federal FFL08 license.

Moreover, the Court's research into New York law and federal law finds nothing to support that contention.  Rather, New York caselaw, while sparse on this point, appears to refute the contention that a New York firearms license is unnecessary for someone who possesses a federal firearms license:

> Although subdivisions (C) and (E) of section 47–5 of the City's Municipal Code exempt firearms dealers licensed *either by New York or the United States* from prohibitions against the possession and disposal of firearms, *those subdivisions conflict with Penal Law § 400.00(1), which prohibits a person from engaging in the business of firearms dealer unless he has been licensed to do so pursuant to section 400.00.* Because section 47–5 is not intended to conflict with State law (see, Municipal Code of City of Rochester

§ 47–5[A] ), that section must be read to exempt only persons licensed by the State from the prohibition against the possession and sale of firearms. *Although plaintiff Albert M. Ranieri possessed a Federal license to operate as a dealer in firearms, his application for a New York State gunsmith-dealer in firearms license had been denied. Thus, the record establishes that neither plaintiff was lawfully authorized to operate a firearms sales store* at the subject premises prior to the enactment of Ordinance 96–297.

*Ranieri v. Argust*, 254 A.D.2d 771, 772, 679 N.Y.S.2d 765, 766–67 (4th Dept. 1998) (emphasis added).

Additionally, New York Penal Law § 265.20(a)(10), which the PAC contends provides an "exemption" for "licensed manufacturers and importers," refers only to persons who have been licensed by the State of New York under Penal Law § 400.00, which Fisher was not. *See*, PL § 265.20(10) ("10. Engaging in the business of gunsmith or dealer in firearms by a person to whom a valid license therefor has been issued *pursuant to section 400.00*.") (McKinney) (emphasis added); *see also*, PL § 400.00(1) ("No person shall engage in the business of gunsmith or dealer in firearms unless licensed pursuant to this section.") (later redesignated as § 400.00(1-a)); PL § 400.00(2) ("A license for gunsmith or dealer in firearms shall be issued to engage in such business."). Indeed, the PAC indicates that Fisher had applied for such a license, but that it was never granted.

Nor does the issuance of an FFL preempt state licensing requirements. *See, e.g.*, ATF Publication for FFLs, "Do I need a license to buy or sell firearms?" (ATF P 5310.2) ("Note that some states have more stringent laws with respect to when a state-issued license is required for selling a firearm. Please consult the laws of the state to ensure compliance.  . . .  All persons who transfer firearms, regardless of whether they are

engaged in the business of dealing in firearms, must ensure that any transfers are in compliance with federal, state and local laws.").[31]

Accordingly, the PAC does not plausibly allege that defendants lacked probable cause to arrest Fisher for Criminal Possession of a Weapon in the Third Degree simply because he had a federal firearms license. The false arrest claim is therefore dismissed for failure to plausibly state a claim on which relief may be granted.[32]

*Seizure of Firearm that was Outside the Scope of the Search Warrant*

Fisher's final § 1983 claim is that officers violated the Fourth Amendment when, during a search at his home pursuant to a search warrant, they seized various items that were outside the search warrant's description of items to be seized. Specifically, the PAC refers to the seizure of two firearms that were outside the scope of the search warrant. *See*, PAC ¶ 163 ("RAK47-P-TSNY 7.62x39mm with Adidas Stripes" and "Revelation Model 300F 20ga shotgun").[33] The gist of the claim is that even assuming the search

---

[31] https://www.atf.gov/firearms/docs/guide/atf-p-53102-do-i-need-license-buy-or-sell-firearms

[32] Assuming that the PAC otherwise stated a plausible claim for false arrest, the claim would be potentially actionable even though the criminal charges related to the arrest are still pending against Fisher in Ontario County and could result in a conviction. *See, Stegemann v. Rensselaer Cty. Sheriff's Office*, 648 F. App'x 73, 76 (2d Cir. 2016) ("*Heck* [*v. Humphrey*, 512 U.S. 477 (1994)] bars a § 1983 claim based on an extant conviction, but it has no application to an anticipated future conviction."); *see also Wallace v. Kato*, 549 U.S. 384, 393 (2007) (refuting the argument that "an action which would impugn an anticipated future conviction cannot be brought until that conviction occurs and is set aside" and stating "[w]e are not disposed to embrace this ... extension of *Heck*") (emphasis in original); *McDonough v. Smith*, 139 S. Ct. 2149, 2157 (2019) (noting that "some claims do fall outside *Heck*'s ambit when a conviction is merely 'anticipated' ")."). The Court, though, would stay the claim until Fisher's criminal matter was resolved, and then consider whether it was barred by *Heck*. *See, e.g., Roberites v. Huff*, No. 11-CV-521SC, 2012 WL 1113479, at *5 (W.D.N.Y. Mar. 30, 2012) ("To the extent that (I) plaintiff sets forth potentially viable claims which accrue prior to a favorable termination ruling and (ii) plaintiff's underlying conviction is not final, to preserve such claims from expiring, the Court may exercise its discretion to grant a stay until a favorable termination has either been obtained or is no longer available. *See Wallace v. Kato*, 549 U.S. at 393–94(citations omitted) ("If a plaintiff files a false-arrest claim before he has been convicted.... it is within the power of the district court ... to stay the civil action until the criminal case ... is ended.... If the plaintiff is ultimately convicted, and if the stayed civil suit would impugn that conviction, *Heck* will require dismissal; otherwise, the civil action will proceed, absent some other bar to suit.").").

[33] Fisher characterizes the alleged improper seizure of the firearms as a Second Amendment violation, positing that the seizure of the firearm deprived him of the right to arm himself. Courts, meanwhile, have variously recognized similar allegations of wrongful seizure of a firearm, without a warrant or due process,

warrant was valid, the seizure of these items was unreasonable since they were outside the scope of the warrant.

The contention that items were seized which were outside the scope of the search warrant states an actionable Fourth Amendment claim under Section 1983:

> [I]t is well established that "seizures of property during a search conducted pursuant to a warrant are limited to (1) the items named in the warrant, (2) any fruits, instrumentalities, or evidence of a crime that are discovered in the course of a search of legitimate scope, and (3) certain kinds of property for which a special reason for seizure, such as officers' safety or safekeeping of cash, can be shown." *Dale v. Bartels*, 732 F.2d 278, 284 (2d Cir. 1984). Where an officer seizes items that plainly fall outside the warrant's permissible scope and there is no other circumstance otherwise justifying the items' seizure, a § 1983 claim may still lie.

*Dominique v. Zylowski*, No. 03-5406 (JS) (ARL), 2006 WL 8441027, at *5 (E.D.N.Y. June 30, 2006) (citation omitted); *see also, Patel v. Hall*, 849 F.3d 970, 984 (10th Cir. 2017) ("When a warrant clearly and precisely specifies items to be seized, and the officers executing the warrant seize additional items, those officers act unreasonably for Fourth Amendment purposes unless their conduct may be justified under an exception to the

---

as stating a claim under the Second (violation of right to bear arms), Fourth (warrantless seizure), or Fifth/Fourteenth (taking without due process) Amendments to the U.S. Constitution. *See, e.g., Frein v. Pennsylvania State Police*, 47 F.4th 247, 258 (3d Cir. 2022) (retention of seized firearm beyond limit of warrant supported Second Amendment claim and Due Process claim); *see also, Alvarez v. Abreau*, 54 F. Supp. 2d 335, 337 (S.D.N.Y. 1999) (Claim that during execution of search warrant police officers seized firearms not covered by the warrant treated as a Fourth Amendment violation). However, under the facts presented, in which the rifle was seized during the execution of a search warrant, the Court finds that this claim is most-properly construed as a Fourth Amendment unreasonable seizure claim. *See, Soukaneh v. Andrzejewski*, No. 3:19-CV-1147 (JBA), 2021 WL 3475700, at *6 (D. Conn. Aug. 6, 2021) ("Although the right to keep and bear arms serves as important conceptual backing to numerous legal issues surrounding firearms and the enforcement of criminal law, our analysis will not focus upon the contours of that right" because this case is about unreasonable search and seizure and therefore its analysis falls under the Fourth Amendment.") (citation omitted).  "In the ordinary case, seizures of personal property are unreasonable within the meaning of the Fourth Amendment, without more, unless accomplished pursuant to a judicial warrant, issued by a neutral magistrate after a finding of probable cause." *Ong v. Park Manor (Middletown Park) Rehab. & Healthcare Ctr.*, No. 12-CV-974 (KMK), 2017 WL 4326540, at *10 (S.D.N.Y. Sept. 28, 2017) (citation omitted). To the extent the claim could be viewed as one for seizure of property without due process, it fails to state a claim since it does not allege that state post-deprivation remedies were inadequate. *See, e.g., Rubenstein v. Rubenstein*, 2007 WL 987534 at *3 (D.Conn. Mar. 31, 2007).

warrant requirement.") (citation and internal quotation marks omitted); *Carniglia v. Dearmon*, No. 01–1852,16 Fed.Appx. 548, 548-49 (8ᵗʰ Cir. Jul. 31, 2001) (remanding for consideration of Fourth Amendment claim where Plaintiff alleged that police officers "exceeded the scope of a search warrant by removing from his residence property not described in the warrant.").

However, it is also true that a warrantless seizure of firearms under the circumstances presented here might comport with the Fourth Amendment pursuant to the plain view doctrine:

> The "plain view" exception to the Fourth Amendment's warrant requirement is well-established. *United States v. Andino*, 768 F.3d 94, 99 (2d Cir. 2014). Under the plain view doctrine, a law enforcement officer may seize evidence without a warrant if (1) the officer is "lawfully in a position from which [the officer] view[s] an object," (2) the object's "incriminating character is immediately apparent," and (3) the officer has "a lawful right of access to the object." *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). When an officer, during a justified intrusion, encounters incriminating evidence, "[t]he doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure." *Horton v. California*, 496 U.S. 128, 135-36, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

*United States v. Babilonia*, 854 F.3d 163, 179–80 (2d Cir. 2017); *see also, id*. at 180 ("Seizure of everyday objects in plain view is justified where the officers have probable cause to believe that the objects contain or constitute evidence.") (collecting cases).

Here, the PAC appears to allege that the improper seizure affecting Fisher occurred on January 27, 2022, at Fisher's residence,³⁴ and involved the taking of two

---

³⁴ The PAC indicates that other items outside the scope of the warrant were seized from the LLC's gunshop, such as particular firearms and "the LLC's brand new Macbook." PAC ¶ 172.  However, the Court has indicated that Fisher cannot pursue the LLC's claims.

firearms not covered by the warrant. PAC ¶ 163 ("RAK47-P-TSNY 7.62x39mm with Adidas Stripes" and "Revelation Model 300F 20ga shotgun"); *see also, id.* at ¶ 340. Additionally, it is not apparent from the PAC that the seizure of these weapons was permissible under the plain view doctrine.  Accordingly, the PAC states an actionable claim.

To be liable under Section 1983, a defendant must have been personally involved in the alleged constitutional violation.   The PAC alleges that the following state-actor defendants personally participated in the seizure of items outside the scope of the warrant (The PAC refers to it as a "burglary") at Fisher's apartment:   Christopher D. Bonham ("Bonham"), Richard Canino ("Canino"), Justin Prusak ("Prusak") and Michael S. Turton ("Turton"). (PAC ¶ 336).  Bonham, Canino, Prusak and Turton were all allegedly employed by the NYSP. (PAC at p. 3 & ¶¶ 17, 20).

Accordingly, the Court will, at the screening stage and without prejudice to any motion practice by the defendants, allow the Section 1983 Fourth Amendment seizure-beyond-the-scope-of-warrant claim to proceed as to Bonham, Canino, Prusak, and Turton.

*Fisher's Entitlement to Proceed In Forma Pauperis*

The Court granted Fisher permission to proceed *in forma pauperis* based on the allegations of poverty contained in his supporting affidavit.  However, the PAC refers to Fisher having personally paid a $25,000 retainer to an attorney in his pending criminal action. *See*, PAC at p. 143 (Demanding recovery of "reasonable fees," including "the $25,000.00 retainer paid by Fisher.").  This suggests that Fisher's financial affidavit is either incorrect or that he receives support from someone else.  The *in forma pauperis*

statute states that "the court shall dismiss the case at any time if the court determines

that – the allegation of poverty is untrue." 28 U.S.C. § 1915(e)(2)(A).  Moreover, when

considering whether a litigant qualifies to proceed *in forma pauperis,* courts consider the

financial resources available to the litigant:

> To qualify for *in forma pauperis status*, plaintiff does not have to
> demonstrate absolute destitution, *see Potnick v. E. State Hosp.*, 701 F.2d
> 243, 244 (2d Cir. 1983) (per curiam), but he does need to show that "paying
> such fees would constitute a serious hardship." *Fiebelkorn v. U.S.*, 77 Fed.
> Cl. 59, 62 (2007). Put differently, a "sufficient" *in forma pauperis* application
> is one that demonstrates that plaintiff "cannot because of [her] poverty pay
> or give security for the costs and still be able to provide [her]self and [her]
> dependents with the necessities of life." *Adkins v. E.I. DuPont de Nemours
> & Co.*, 335 U.S. 331, 339 (1948).
>
> In determining whether a plaintiff's financial circumstances meet these
> standards, courts consider not only his or her personal resources, but also
> the resources of persons who support him. *See, e.g., Fridman v. City of
> N.Y.*, 195 F. Supp. 2d 534, 537 (S.D.N.Y. 2002) ("In assessing an
> application to proceed in forma pauperis, a court may consider the
> resources that the applicant has or can get from those who ordinarily
> provide the applicant with the necessities of life, such as from a spouse,
> parent, adult sibling or other next friend.") (internal quotation marks and
> citations omitted); *Monti v. McKeon*, 600 F. Supp. 112, 114 (D. Conn. 1984),
> *aff'd*, 788 F.2d 1 (2d Cir. 1985) (table decision). In other words, "[w]here a
> litigant is supported or assisted by another person, the Court may consider
> that person's ability to pay the filing fee." *Pierre v. City of Rochester*, No. 16-
> cv-6428 CJS, 2018 WL 10072449, at *1 (W.D.N.Y. Dec. 13, 2018).

*Scott P. v. Kijakazi*, No. 3:22-CV-01228-SRU, 2022 WL 16640788, at *1 (D. Conn. Oct.

6, 2022).

Accordingly, before allowing Fisher's Fourth Amendment claim to proceed without

the payment of the required filing fee, the Court will require Fisher to submit a

supplemental financial affidavit (using the "Motion to Proceed *In Forma Pauperis* and

Supporting Affirmation" available on the Court's website), including an explanation of the

source of the retainer paid in his criminal action, and listing any support that he receives from any person or entity. (See, Supporting Affirmation, question no. 2, subparagraphs d and g, including funds from "*any* other source") (emphasis added).

## CONCLUSION

For the reasons discussed above, the Motion for Appointment of Counsel (ECF No. 6) is denied, and  Fisher's Fourth Amendment seizure-beyond-the-scope-of-warrant claim may proceed as to Bonham, Canino, Prusak, and Turton, subject to Fisher first either submitting a completed supplemental financial affidavit (using the "Motion to Proceed *In Forma Pauperis* and Supporting Affirmation" available on the Court's website) or paying the filing fee within **thirty (30) days** of the date of this Decision and Order.  All other claims are dismissed, and the Clerk of the Court is directed to terminate all defendants except Bonham, Canino, Prusak, and Turton.   Upon receipt of the supplemental financial affidavit the Court will determine whether Fisher may continue to proceed *in forma pauperis* or whether he must first pay the filing fee.  **The action will be dismissed without further notice unless, within thirty (30) days of the date of this Decision and Order, Fisher either pays the filing fee or files the supplemental financial affidavit.**

SO ORDERED.

CHARLES J. SIRAGUSA
United States District Judge

DATED:      February 17, 2023
            Rochester, NY